# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. | ) | |
| CHERRY GRAZIOSI, Relator, | ) | |
| | ) | Case No. 13 C 1194 |
| Plaintiffs, | ) | |
| | ) | Judge Robert M. Dow |
| v. | ) | |
| | ) | |
| ACCRETIVE HEALTH, Inc. et al., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF FILING

**TO:**   See service list.

   **PLEASE TAKE NOTICE** that on Friday, July 8, 2016 I filed with the United States District Court for the Northern District of Illinois, Eastern Division, Relator's **SECOND AMENDED COMPLAINT** (redacted), a true and correct copy of which is attached hereto and is hereby served upon you.

                                        s/ Robin Potter
                                        One of Relator's Attorneys

Robin B. Potter, Esq.                    J. Brad Pigott, Esq.
ROBIN POTTER & ASSOCIATES, P.C.          PIGOTT and JOHNSON, P.A.
111 East Wacker Drive, Suite 2600        775 N. Congress Street
Chicago, Illinois  60601                 Post Office Box 22725
(312) 861-1800                           Jackson, Mississippi 39225-2725
robin@potterlaw.org                      (601) 354-2121
                                        bpigott@pjlawyers.com



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | **Case No. 13cv1194** |
| **ex rel. CHERRY GRAZIOSI, Relator** ) | |
| ) | |
| **Plaintiff** ) | **Chief Judge Castillo** |
| ) | **Magistrate Judge Sidney I.** |
| | **Schenkier** |
| **v.** ) | |
| ) | **FILED IN CAMERA** |
| ) | **UNDER SEAL** |
| ) | **PURSUANT TO THE** |
| **ACCRETIVE HEALTH, INC.,** ) | **FALSE CLAIMS ACT** |
| **MEDSTAR HEALTH, INC.,** ) | |
| **THE METHODIST HEALTH CARE** ) | |
| **SYSTEM, INC., BAPTIST HEALTH** ) | |
| **HOSPITALS, INC, SOUTHEAST HEALTH** ) | |
| **SYSTEM, INC., VB HARLIGEN** ) | |
| **HOLDINGS, INC., and "JOHN DOE** ) | |
| **HOSPITALS"** ) | |

**Defendants**

## SECOND AMENDED COMPLAINT
(JURY TRIAL REQUESTED)

*Qui tam* relator, Cherry Graziosi, by her undersigned attorneys and pursuant to

Rule 15 of the Federal Rules of Civil Procedure and the Court's Order herein dated

February 23, 2016, hereby alleges as follows:

1.      This is a civil action brought on behalf of the United States of America

against the Defendants named herein to recover damages and civil penalties under the

False Claims Act, 31 U.S.C. §§ 3729-3732, as amended ("FCA"). Relator Cherry Graiozi

("Graziosi"), acting on behalf of the United States, brings this civil action under the *qui*

*tam* provisions of the False Claims Act.

### Venue and Jurisdiction

2.       This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345
and 31 U.S.C. §§ 3730(b) and 3732(a).

3.       Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and
31 U.S.C. § 3732(a). Defendant Accretive Health originated, managed and conducted the
activity alleged and attributed to it herein from and through its corporate headquarters
located in Chicago, Illinois, and thus in this District and Division.

### The Parties

4.       *Qui tam* relator Graziosi is an adult citizen of the United States and a
resident of the State of Maryland. She has been employed continually since January of
2010, with a title of "Service Associate," in the Emergency Department of the MedStar
Washington Hospital Center, a 926-bed hospital owned by the Defendant MedStar
Health, Inc. and located in Washington, D.C. That Hospital is the largest privately-owned
hospital in the Nation's Capital, and is among the fifty largest hospitals in the United
States. Between mid-2012 and October of 2013, Relator Graziosi was required as a
substantial part of her job to make and receive daily communications from that Hospital's
Emergency Department staff to the staff of Defendant Accretive Health, Inc. in  the
implementation of what is defined below as the "Accretive admissions certification
scheme," as a result of which she has gained through her work personal knowledge of the

2

facts set forth herein. In the course of that same work, she also became aware through non-public information that the remaining named Hospital Defendants (as defined herein) have entered, in the year specified below for each, agreements with Defendant Accretive Health, Inc., to engage in the same "Accretive admissions certification scheme."

5.      Defendant Accretive Health, Inc. (hereafter, "Accretive") is a corporation organized under the corporate laws of the State of Delaware, the stock of which is publicly traded. Accretive maintains its principal place of business at 401 North Michigan Avenue, Suite 2700, Chicago, Illinois 60611, from which it has originated and managed the activity described and attributed to it herein.

6.      Defendant MedStar Health, Inc. (hereafter, "MedStar"), is a Maryland corporation which maintains its principal place of business at 5565 Sterrett Place, Columbia, Maryland 21044. MedStar operates nine different hospitals, including MedStar Washington Hospital Center, and 20 other health-related facilities and businesses located in Maryland and Washington, D.C.

7.      Defendant The Methodist Health Care System (hereafter, "Houston Methodist Hospital"), is a domestic nonprofit corporation which maintains its principal place of business at 6565 Fannin Street, Houston, Texas 77030. Houston Methodist Hospital operates and controls the administration of five (5) different hospitals in the Houston, Texas area: Houston Methodist Hospital located at 6565 Fannin Street, Houston, Texas 77030; Houston Methodist Sugar Land Hospital located at 16655

3

Southwest Freeway, Sugar Land, Texas 77479; Houston Methodist Willowbrook Hospital located at 18220 State Highway 249, Houston, Texas 77070; Houston Methodist San Jacinto Hospital located at 4401 Garth Road, Baytown, Texas 77521; and Houston Methodist West Hospital located at 18500 Katy Freeway, Houston, Texas 77094. It may be served with process through service on its registered agent for that purpose, R.G. Girotto, 6565 Fannin Street, M.S. D200, Houston, Texas 77030.

      8.    Defendant Baptist Health Hospitals (hereafter, "Baptist Health Little Rock") , is a nonprofit corporation which maintains its principal place of business at 9500 Kandis Road, Little Rock, Arkansas 72205. Baptist Health Little Rock operates and controls the administration of six different hospitals in the Little Rock, Arkansas area: Baptist Health Extended Care Hospital, located at 9601 Baptist Health Drive, 10th Floor, Little Rock, Arkansas; Baptist Health Medical Center Arkadelphia, located at 3050 Twin Rivers Drive, Arkadelphia, Arkansas; Baptist Health Medical Center Herber Springs, located at 1800 Bypass Road, Herber Springs, Arkansas; Baptist Health Medical Center Little Rock, located at 9601 Interstate 630, Little Rock, Arkansas; Baptist Health Medical Center North Little Rock, located at 3333 Springhill Drive, North Little Rock, Arkansas; and Baptist Health Medical Center Stuttgart, located at 1703 North Buerkle Street, Stuttgart, Arkansas. It may be served with process through service on its registered agent for that purpose, Russell D. Harrington, Jr. at 9500 Kandis Road, Little Rock, Arkansas 72205.

9.     Defendant SoutheastHEALTH System, Inc. (hereafter, "Southeast Missouri Hospital"), is a nonprofit corporation which maintains its principal place of business at 1701 Lacey Street, Cape Girardeau, Missouri 63701.  Southeast Missouri Hospital operates and controls the administration of one hospital in the Cape Girardeau, Missouri area. It may be served with process through service on its registered agent for that purpose, Southeast Missouri Hospital Association, 1701 Lacey Street, Cape Girardeau, Missouri 63701.

10.     Defendant VB Harligen Holdings, Inc. (hereafter, "Valley Baptist Medical Center"), is a domestic nonprofit corporation which maintains its principal place of business at 2101 Pease Street, Harlingen, Texas.  Valley Baptist Medical Center operates and controls the administration of two different hospitals in the Brownsville, Texas area: Valley Baptist Medical Center located at 2101 Pease Street, Harlingen, Texas, and Valley Baptist Medical Center located at 1040 West Jefferson, Brownsville, Texas. It may be served with process through service on its registered agent for that purpose, Alan Johnson 2121 Pease Street, 5th Floor, Harlingen, Texas 78550

11.     On information and belief, Accretive has entered agreements with each of the Defendants named herein (other than Accretive itself), or with hospital operations owned and controlled by each such Defendant, to engage in what is described hereafter as the "Accretive Admissions Certification Scheme." Apart from those Defendants, the Relator has not yet identified the names of other such hospitals or

hospital owners in the United States, and therefore includes other such hospitals as

Defendants herein by denominating them as "the John Doe Hospitals." Any reference

hereafter to "the Hospital Defendants" in this Second Amended Complaint shall mean

each of the Defendants named herein (apart from Accretive itself) and all such John Doe

Hospitals.

## The False Claims Act

12. The False Claims Act (FCA) provides in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be
> presented, to an officer or employee of the United States
> Government or a member of the Armed Forces of the United
> States a false or fraudulent claim for payment or approval;[1]
> (2) knowingly makes, uses, or causes to be made or used, a
> false record or statement to get a false or fraudulent claim
> paid or approved by the Government;[2] (3) conspires to
> defraud the Government by getting a false or fraudulent claim
> paid or approved by the Government; ... or (7) knowingly
> makes, uses, or causes to be made or used , a false record or
> statement to conceal, avoid, or decrease an obligation to pay
> or transmit money or property to the Government,
>
>             * * *
>
> is liable to the United States Government for a civil penalty of
> not less than $5,500 and not more than $11,000, plus 3 times
> the amount of damages which the Government sustains
> because of the act of that person....

---

[1] In 2009 that language was amended by Congress, and re-codified as 31 U.S.C. § 3729(a)(1)(A), to apply to any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

[2] The same 2009 amendments revised that language to apply to any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," and re-codified that language as 31 U.S.C. § 3729(a)(1)(B).

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent is required.

31 U.S.C. § 3729.

### The Medicare, Medicaid and Tricare Federal Health Care Programs

13.     The United States, through the Department of Health and Human Services

("HHS") and its component agency, the Centers for Medicare and Medicaid Services

("CMS"), administers the Medicare Part A and Medicare Part B programs.  Generally,

hospitals are reimbursed through the Medicare Part A program.

14.     Hospitals and other health care providers who participate in the Medicare

program, as well as other federal health care programs, are required to enter into contracts

or "Medicare Enrollment Applications" with CMS, in a contract form known as a "CMS-

855A" form.  Each of the Hospital Defendants as to the time periods relevant herein

executed (and, in order to get paid by CMS each of the claims alleged herein as false,

inherently used) an Enrollment Application and Agreement with CMS in which each such

hospital represented that through its authorized responsible official it "understand(s) that

payment of a claim by Medicare is conditioned upon the claim and the underlying

transaction complying with (Medicare) laws, regulations, and program instructions . . .

and on the provider's compliance with all applicable conditions of participation in

Medicare."

7

15.     The United States also maintains a federally-approved Medicaid program to reimburse health care charges made by hospitals for the treatment of many Americans, including low-income Americans, not covered by Medicare, most of the payments for which are made by funds of the United States (with the remainder funded by the States and the District of Columbia).  Claims made to the Medicaid system or payors are claims made to the United States, within the meaning of the FCA.

16.     The United States, through the Department of Defense Military Health System, also administers a health care insurance program known as Tricare (formerly known as the Civilian Health and Medical Program of the Uniformed Services, or "CHAMPUS"), which pays for medical care rendered to U. S. military personnel, military retirees, and their dependents, including some members of the Reserve Component. The Defendants also made (or, in the case of Defendant Accretive, caused to be made) claims to Tricare pursuant to the billing scheme described below, intending for Tricare to pay such claims with funds of the United States Treasury.

17.     As a further part of enrolling and re-enrolling in the Medicare system, for instance, each Hospital Defendant herein expressly certified, above a signature by its authorized management and on a CMS Form 855-A, that the Hospital's administration then had an actual understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with (Medicare) laws, regulations, and program instructions," expressly "including" the "Federal anti-kickback

8

statute" among other federal health care laws. Each such Hospital Defendant therefore

had actual knowledge, prior to any claim of the kind alleged to be legally false in this

case, that its entitlement to be paid under any such program any amount for any claim was

conditioned on that claim not being the result of and not arising from any activity

undertaken in exchange for any inducement paid or offered in violation of the Anti-

Kickback Act ("AKA"), codified at 42 U.S.C. § 1320a-7b(b), which in part provides as

follows:

> (B)(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind - - (B) in return for . . . arranging for or recommending . . . or ordering any . . . services . . . for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

> (B)(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person - - (B) to . . . arrange for or recommend . . . ordering any . . . service . . . for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

### Licensed Physician's Certification of Medical Necessity as Condition of any Hospital's Right to Payment

18. Like all hospitals which seek payment for hospital admissions from federal

health insurance programs, the Hospital Defendants present claims for payment to such

programs through submission of a CMS Form UB-04 (and/or a CMS Form 1450), and

9

certify on each such payment submission form, as "pertinent to this Bill," that a

"physician's certifications" of the medical necessity of the hospital admission medical

"are on file," and that "(r)ecords adequately disclosing services will be maintained" by the

hospital sufficient to document the medical necessity of the admission. A sample of such

a hospital payment form is attached hereto as Exhibit A.

19.     By operation of statutory law, in order for any hospital to be legally entitled

to be paid on any claim for inpatient medical services rendered to a Medicare, Medicaid

or Tricare beneficiary, it is "the obligation" of the hospital "to assure, to the extent of (its)

authority that services or items ordered or provided" to such beneficiaries "will be

provided economically and only when, and to the extent, medically necessary," which

determination must "be supported by evidence of medical necessity" as determined by a

licensed physician with personal knowledge of that medical necessity.  42 U.S.C. §

1320c-5(a).

20.     As a matter of regulatory law, it is "a condition for Medicare

payment that a physician certify the necessity of the services" including a hospital

inpatient admission, since a licensed "physician has a major role in determining utilization

of health services furnished by providers," including hospitals. 42 C.F.R. § 424.10(a).

Inherent in any claim form submitted by any hospital for compensation for any inpatient

admission is a certification by the hospital "on the appropriate billing form" that it has

obtained (and retains a record of) a certification by a physician of the medical necessity of

the admission. 42 C.F.R. § 424.11. Physician certifications of the medical necessity of a hospital admission "must be signed by the physician responsible for the case, or by another physician who has knowledge of the case and who is authorized to do so by the responsible physician or by the hospital's medical staff." 42 C.F.R. § 424.13. "Medicare Part A pays for inpatient hospital services of hospitals . . . only if a physician certifies . . . (to) (1) (t)he reasons for . . . (c)ontinued hospitalization of the patient for medical treatment or medically required inpatient diagnostic study . . . (and) (2) (t)he estimated time the patient will need to remain in the hospital. *Ibid.* Truthful certification by a properly-licensed physician is a condition of payment by each of the federal health insurance programs described above.

21.     The claims challenged in this case would not have been paid but for the explicit and implicit making of those certifications, all of which were presumed by government-authorized payors to be true at the time each such claim form and certifications were presented by each such Hospital Defendant. Each such claim used a statement that the underlying transaction complied with Medicare laws and regulations, and that such compliance was a condition that had been satisfied by and with respect to each such claim for payment. Each such claim, for that additional reason, therefore used a false statement in order to get each such false claim paid.

## Accretive's False Admissions Certification Scheme

22.     Accretive has entered with the owners and operators of each of the Hospital

Defendants, contracts under its "Physician Advisory Services" ("PAS") program, under which Accretive has generated written "recommendations" purporting to justify the inpatient admission of federally-insured patients as to whom the hospitals' own Emergency Departments and Hospital Staff physicians had previously determined, based on their own medical judgments after consulting with the patients and reviewing their relevant medical records, did not then meet the medical necessity requirements for an inpatient hospital stay, but instead only met medical necessity requirements for an "observation" of their medical condition for a period of up to twenty-four (or forty-eight) hours. Defendant Southeast Missouri Hospital began implementing such an agreement with Accretive in January 2008, Defendant Baptist Health Little Rock began implementing such an agreement with Accretive in April 2008, both Houston Methodist Hospital and Valley Baptist Medical Center began implementing such an agreement with Accretive in August of 2008, and Defendant MedStar began implementing such an agreement with Accretive in mid-2012. All such agreements provided for implementation of what is defined herein as the "Accretive admissions certification scheme."

23. Underlying the financial motive for all Defendants' participation in Accretive's admissions certification scheme is that Medicare and other federal hospital insurance programs pay substantially lower amounts for patients for whom an in-hospital "observation" (or "OBS") is prescribed or ordered, than those programs pay for patients for whom an inpatient admission is prescribed or ordered. Patients prescribed an

12

"observation" treatment are observed and treated in a hospital setting for fewer than twenty-four hours (or, during some relevant periods, fewer than forty-eight hours). As a result of further clinical information learned through such observation and treatment during that "observation" period, hospital physicians may, or may not, decide as a result of such information to order an inpatient admission. A physician's order that a patient is to be admitted as an "inpatient" constitutes a representation that a hospital stay involving treatment longer than forty-eight hours is medically necessary. An "inpatient admission" order is thus far more financially lucrative for a hospital.

24.     All of the Accretive "recommendations" for admission challenged in this case are made by persons (a) other than physicians licensed to diagnose medical conditions in (and actually practicing medicine in) the jurisdictions in which the relevant hospitals are located, (b) other than physicians who have met the prerequisites to practice medicine on the medical staff of the relevant hospitals, (c) who have never met or examined the patients, (d) who have never examined any medical documents not previously examined by or available to the hospitals' own on-site physicians, and (e) who did not know (or who recklessly disregarded) what treatments and diagnostic resources would be utilized within the relevant hospitals during any "observation" (or "OBS") period. All such Accretive "recommendations" challenged in this case were also contrary to the prior medical decisions made by those on-site, on-staff licensed physicians to the effect that no hospital admission was then medically necessary.

13

25.     Despite knowing all of these characteristics of each such "recommendation"
by Accretive that a hospital admission was purportedly "medically necessary," each of the
Hospital Defendants, contradicting the medical judgments of their own on-site physicians
who had actually met with and examined the patients, authorized and presented to
Medicare, Medicare and/or Tricare  claims for resulting inpatient hospital stays as to the
patients who were the subjects of the Accretive "recommendations."  All such written
"recommendations" by Accretive were legally and factually false. All such inpatient
admission payment claims by all such Hospital Defendants pursuant to all such contracts
with Accretive were legally false when made, which all such hospitals knew, or had reason
to know, at the time each such claim was made. The scheme and pattern of conduct by
Accretive and the Hospital Defendants with whom it entered such contracts, as described
in Paragraphs 22 through 45 hereof, shall be referred to herein as the "Accretive
admissions certification scheme."

26.     The central, knowing, and willful purpose of both Accretive and the Hospital
Defendants in engaging in Accretive's admissions certification scheme has been (and is)
for the hospitals to pay, and for Accretive to receive, remuneration (in the form of per-
review fees paid by the Hospital Defendants to Accretive) in return for substantial
numbers of recommendations from Accretive to change the level of health care services
for substantial numbers of patients from observation-only (or other outpatient services), as
previously ordered by the hospitals' own medical staff, to a status and level of inpatient

14

admission services, in order for each such hospital to get substantially higher claims and payments for inpatient admissions to be paid by Medicare, Medicaid, Tricare and other federal insurers.

27.     Accretive and the Hospital Defendants explicitly confirmed and crystallized their joint motive in engaging in the Accretive admissions certification scheme when Accretive periodically authored (and the Defendant Hospitals received and reviewed) reports revealing the high fraction of originally "observation only" orders which Accretive (during the period being reported on) had recommended for a change to inpatient admission.  Accretive also used such reports to calculate for its Hospital Defendant clients the amounts of the "reimbursement lift" (or the "revenue impact") to each such hospital which Accretive estimated or claimed had been or would be caused, in increased payments from claims to Medicare, Medicaid and Tricare, as a direct result of Accretive's recommendations, made pursuant to the Accretive admissions certification scheme, to change a high fraction of "observation only" patients to "admit inpatient" patients. As Accretive and the Hospital Defendants knew, obtaining that "reimbursement lift" or "revenue impact" for the Hospitals as a result of those changes was the central purpose of the Accretive admissions certification scheme itself.

28.     Accretive focused in its monthly reports to the Hospital Defendants on the additional Medicare and Medicaid payments Accretive expected those Hospitals to receive as a result of the high fraction of "observation only" patients being changed to inpatient

15

admission, because all such parties to the Accretive admissions certification scheme knew that such additional monetary "value" was the core purpose of the Hospital Defendants paying Accretive for that activity in the first place. Accordingly, Accretive termed such reports to the Hospital Defendants its "Monthly Statements of Value" resulting from the operation of the Accretive admissions certification scheme.

29.     The purpose of the Accretive admissions certification scheme was (and is) to increase the Hospital Defendants' revenue from federal health insurance programs, and was not (and is not) to increase (or even to affect) the quality of health care delivered to federally-insured patients. Rather than submit to Accretive for medical necessity "reviews" documents concerning all patients seeking treatment or a diagnosis in the Hospital Defendants' emergency rooms, the scheme provided only for "recommendations" by Accretive as to "all Medicare patients that do **not** meet Inpatient criteria." (Emphasis added). The contents of Accretive's resulting "recommendations" for inpatient admissions of the same patients are typically not even communicated to or used by the physicians or nurses following such inpatient admissions, as the Hospital Defendants manifestly value Accretive's "recommendations" only as a means of increasing revenue as a result of causing claims for inpatient admissions to be made, and do not value or treat Accretive's "recommendations" as a credible or useful source of clinical medical judgments for the actual treatment of actual federally-insured patients.  Indeed, the contents of Accretive's "recommendations" provided to the Hospital Defendants no information, of clinical value

16

to the Hospital Defendants or their federally-insured patients, which was not otherwise and already available to them from the Hospital's own medical staff.

30.     As a part of the Accretive admissions certification scheme, the Hospital Defendants pressured and expected their own medical staff members to adopt and enforce Accretive's recommendations to change "observation only" patients to "inpatient admission" in order for the Hospital Defendants to make substantially higher-paying claims to Medicare, Medicaid and Tricare. As a result, an extremely high fraction of such "recommendations" from Accretive for such changes were implemented within the Hospital Defendants' facilities by the inpatient admissions of hundreds of patients previously determined by those Hospitals' own licensed medical staff members not to be in medical need of any such services.

31.     As an example of those pressures from the administrators of those Hospital Defendants to their own medical staff members, Defendant MedStar instructed its on-site physicians who had earlier ordered "observation only" treatment (for patients later "recommended" by Accretive for inpatient admission) the following: "Please write 'Admit to Inpatient' w/diagnosis," adopting Accretive's change. That directive from MedStar's non-physician administrators to MedStar's own medical staff physicians was undertaken on a form ending with the following "all capped" words: "THIS IS NOT A PERMANENT PART OF THE PATIENT CHART."

32.     Each resulting "Order" attributed to physician members of the Hospital

17

Defendants' medical staffs, in order to comply with and adopt Accretive's "recommendations" of an inpatient admission, contradicted the same medical staff members' own prior professional judgments that such an admission was not then medically necessary, and was accordingly a factually and legally false record when made, as the Defendants knew. Because such "orders" were material to the legality of (and were used in the course of submitting and in order to get paid on) resulting claims of payment for inpatient admissions, such "orders" were also false records and false statements made in violation of the False Claims Act.

33.    Every such inpatient admission resulting from and caused by Accretive recommendations for such changes, and every claim to Medicare, Medicaid and Tricare for DRG or other payments for inpatient admissions, resulted directly and proximately from the Defendants' violations of the Anti-Kickback Act as described in Paragraph 17 above, compliance with which was known by the Defendants to be a prerequisite to any hospital's legal right and entitlement to be paid on any such claim. If federal payment officials had known that such inpatient admission claims for payment had resulted from such violations, the claims would not have been paid or payable, as a matter of law and policy.

34.    All patients as to whom false claims are alleged in this case to have been presented had been diagnosed, by the Hospital Defendants' on-site physicians and prior to the Hospital Defendants' referrals of records to Accretive pursuant to the Accretive

18

admissions certification scheme, as requiring only an initial observation ("IO" or "OBS"), or short stay ("SS") of less than 24 hours, or other treatment short of (and substantially less expensive to the federal insurer than) an actual hospital admission (which, if medically necessary, entitles each such Hospital Defendant to be paid based on the typical cost of the entire hospital stay, the amount of which varies according to the "Diagnostic Related Group" or "DRG" linked to the purported reason for the hospital admission).

35.     As a part of the Accretive admissions certification scheme, Accretive prepares, and the relevant personnel at the Hospital Defendants use, a form "Cover Sheet" to instruct Relator Graziosi and other relevant hospital staff what to communicate to Accretive in order to carry out the scheme. Exhibit B hereto is an example of such a Cover Sheet. As Exhibit B indicates, the Hospital Defendants' personnel are instructed by the Hospital Defendants not to send to Accretive any information concerning patients who were not insured, or whose medical condition has already been determined by the hospitals' own medical staff to justify a hospital inpatient admission. Medical charts already reviewed or generated by the hospitals' medical staff are only to be faxed to Accretive for the purposes of the scheme if a hospital admission had expressly and specifically *not* been authorized or found necessary.

36.     In an effort by both Accretive and the Hospital Defendants to conceal such criteria for sending information to Accretive, the relevant form itself provides, as Exhibit B illustrates, that it is to be withheld from the patients' medical records, and is to be

19

shredded after it is used for a particular patient.

37.    Consistent with requiring such secrecy in the Hospital Defendants'
submissions to Accretive, the Defendants also undertook numerous other practices as a
part of their Accretive admissions certification scheme to conceal the purpose and terms of
that scheme, including non-disclosure and secrecy agreements entered between Accretive
and each of the Hospital Defendants.

38.    Because Accretive "recommendations" to admit patients are made by
Accretive personnel located in entirely different states or other jurisdictions from the
locations of the Defendant Hospitals (and thus their patients), all medical records
"reviewed" by Accretive personnel are faxed by the Hospitals' personnel, including the
Relator, to the Accretive headquarters in Chicago, Illinois.

39.    No documents are faxed or otherwise communicated to Accretive personnel
for purposes of the Accretive admissions certification scheme which have not previously
been used by the Hospitals' on-site physician staff in the course of making their decisions
that a hospital admission was not medically necessary or justified.

40.    After medical documents are faxed by the hospitals' personnel to
Accretive pursuant to the Accretive admissions certification scheme, Accretive personnel
generate a computer record purporting to be a "recommendation" by Accretive as to
whether or not the relevant patient's condition justifies an inpatient hospital admission.
A representative example of the forms used by Accretive to communicate its

"recommendations" is attached hereto as Exhibit C. Such forms shall hereafter be referred to as "Accretive Patient Classification Recommendations." Accretive is paid by the hospitals for these "reviews" of medical documents based on a fee for each patient for whom records are reviewed.

41.    Accretive in the course of its admissions certification scheme has typically made "recommendations" for inpatient admissions, contradicting the hospitals' own on-site medical staffs' decisions not to admit such patients, approximately half of the times Accretive has been sent documentation from Defendant MedStar's Washington Hospital Center ("WHC"). Those recommendations, all of which contradicted the medical judgments of that Hospitals' own on-site physicians, have been used by MedStar to present claims to Medicare, Medicaid, Tricare and other insurers in thousands of cases.

42.    It has likewise been a condition and expectation of all Defendants' agreements to participate in the Accretive admissions certification scheme that Accretive was expected to, and did, change a substantial fraction, often in the range of 40% to 60%, of the Hospital Defendants' medical staffs' original "observation only" orders to "recommendations" for inpatient admissions. Accretive's monthly reports to the administrators of each of the Hospital Defendants reflected and confirmed to those administrators that Accretive was meeting that contractual expectation and purpose.

43.    Each of the written Accretive Patient Classification Recommendations expressly represented that the "sole purpose" of each such document was "to help (the

21

Hospital Defendants) comply with applicable payor policies regarding the use of observation and inpatient admission classification status." For the reasons explained above, each such statement on each such document was factually and legally false, as the Defendants knew. The truth, as the Defendants also knew, was that the central purpose of the Accretive admissions certification scheme and the resulting "recommendations" was to increase revenue to the Hospital Defendants through what the Defendants expressly termed "reimbursement lifts" by and "revenue impacts" for the Hospital Defendants causing substantial increases in inpatient admissions and resulting claims for payment therefor.

44.     Each such "recommendation" document was knowingly used by the Defendants to cause, and did cause, the submission of a legally false claim to Medicare, Medicaid or Tricare, for payment of a purportedly medically necessary inpatient admission, and to get each such claim to be paid. Each such "recommendation" also resulted directly from an agreement and inducement made in violation of the Anti-Kickback Act, and was legally false for that separate reason.

45.     Accretive on the face of its Accretive Patient Classification Recommendations likewise represents falsely not only that it is only making a "recommendation," but also that it is making a "recommendation regarding whether documentation supports inpatient or outpatient classification *for billing purposes*." (Emphasis added.)  As Accretive and the Hospital Defendants know, that is false, since

22

with respect to all of the hospital inpatient admissions (and resulting claims) challenged in this case, Accretive creates the only medical diagnostic records used to cause the resulting hospital admissions, none of which would have occurred but for the activity by Accretive pursuant to the Accretive admissions certification scheme. Accretive through its admissions certification scheme is engaged in causing patients to be admitted to the hospital, and for claims to be made for those inpatient admissions which but for Accretive's "recommendations" would not have been made, and is not merely engaged in offering expertise in how such treatments should be coded or classified "for billing purposes."

## Examples of Accretive-Generated Inpatient Admissions at MedStar's WHC Hospital

46. A random and representative sample of the hospital admissions (and resulting claims to Medicare and Medicaid) resulting from the Accretive admissions certification scheme is represented by the following Accretive "recommendations" of hospital admissions consecutively received at the WHC from Accretive during a randomly-selected week in January of 2013 (as to each of which Accretive admitted that no concurrence in any such admission by any WHC physician had been "specified"):

(A) On January 21, WHC physicians Dr. Maloy and Dr. Huq personally examined Medicare Patient ▮▮▮▮, who complained of swelling in her right arm associated with a catheter earlier inserted in order to enable her to receive antibiotics. Finding that her condition could not medically justify a full hospital

23

admission, the WHC physicians prescribed instead an initial observation of her condition. Accretive (through a form a duplicate of which is attached as Exhibit C hereto) then changed the patient's diagnosis, and also changed the prescribed treatment to a hospital admission, causing the patient's admission and a related claim to Medicare based on the changed diagnosis by Accretive.

(B)     On January 22, WHC Emergency Room physician Dr. Pitts examined Medicare Patient ████, who complained of abdominal pain. Finding that her condition could not medically justify a full hospital admission, the WHC physician prescribed instead an initial observation of her condition. Accretive then changed the patient's diagnosis to represent that she was "at risk for narcotic overdose, respiratory depression due to narcotics, hypovolemia, and inability to care for self, inability to ambulate, poor oral intake, falls which may result in head and body trauma, and increased intrahospital mortality." Based on that changed diagnosis, Accretive then also changed the prescribed treatment to a hospital admission, causing the patient's admission and a related claim to Medicare based on the changed diagnosis by Accretive.

(C)     On January 23, WHC Emergency Room physicians Dr. Gatewood and Dr. Marchand personally examined Medicare Patient ████, who complained of fatigue, weakness and near syncope. Finding that his condition could not medically justify a full hospital admission, the physicians prescribed instead an initial observation of

24

his condition. Accretive then changed the patient's diagnosis, representing that he was "at risk for recurrent syncope, arrhythmia and myocardial ischemia as well as infarction." Based on that changed diagnosis, Accretive then also changed the prescribed treatment to a hospital admission, causing the patient's admission and a related claim to Medicare based on the changed diagnosis by Accretive.

(D)     On January 23, WHC Emergency Room physicians Dr. OMara and Dr. Marchand personally examined Medicaid Patient ▬▬▬, who complained of inability to move his legs sufficiently to walk. Finding that his condition could not medically justify a full hospital admission, the physicians prescribed instead an initial observation of his condition. Accretive then changed the patient's diagnosis, representing that he was "at risk for TIA, CVA, dehydration, hypertensive emergency, underlying occult infection and falls due to weakness." Based on that changed diagnosis, Accretive changed the prescribed treatment to a hospital admission, causing the patient's admission and a related claim to Medicaid based on the changed diagnosis by Accretive.

(E)     On January 26, WHC Emergency Room physician Dr. Pontius personally examined Medicare Patient ▬▬▬, who complained of fever and was diagnosed as having the flu. Finding that her condition could not medically justify a full hospital admission, the WHC physician prescribed instead an initial observation of her condition. Accretive then changed the patient's diagnosis, representing that he

25

was "at immediate short term risk of dehydration, hypertensive emergency, myocardial injury, renal failure, worsening pneumonitis, worsening hyperglycemia, acute hypoxic respiratory failure, bacteremia, sepsis, and intrahospital mortality." Based on that changed diagnosis, Accretive then changed the prescribed treatment to a hospital admission, causing the patient's admission and a related claim to Medicare based on the changed diagnosis by Accretive.

(F)     On January 26, WHC Emergency Room physician Dr. Chang personally examined Medicare Patient              , who complained of lower back pain and resulting inability to walk. Finding that her condition could not medically justify a full hospital admission, the physician prescribed instead an initial observation of her condition. Accretive then changed the patient's diagnosis, representing that "(d)ue to inability to ambulate patient is at immediate risk for traumatic fall injuries, increased morbidity and mortality." Based on that changed diagnosis, Accretive also changed the prescribed treatment to a hospital admission, causing the patient's admission and a related claim to Medicare based on the changed diagnosis by Accretive.

(G)     On January 27, WHC Emergency Room physician Dr. Gatewood personally examined Medicaid Patient              , who complained of shortness of breath. Finding that her condition could not medically justify a full hospital admission, the physician prescribed instead an initial observation of her condition.

26

Accretive then changed the patient's diagnosis, representing that she was at "risk of atypical infection, worsening respiratory status, and hypoxia." Based on that changed diagnosis, Accretive then changed the prescribed treatment to a hospital admission, causing the patient's admission and a related claim to Medicaid based on the changed diagnosis by Accretive.

(H)     On January 28, WHC Emergency Room physician Dr. Chang personally examined Medicare Patient ███, who complained of nausea and dizziness. Finding that his condition could not medically justify a full hospital admission, the physician prescribed instead an initial observation of his condition. Accretive then changed the patient's diagnosis, representing that he was "at significant short term risk for recurrent transient ischemic attacks, cerebrovascular accident, permanent neurological deficits, decrease in activities of daily living, acute coronary syndrome, myocardial infarction, life-threatening dysrhythmias, dislodgment of atherosclerotic plaques, and intrahospital mortality." Based on that changed diagnosis, Accretive also changed the prescribed treatment to a hospital admission, causing the patient's admission and a related claim to Medicare based on the changed diagnosis by Accretive.

(I)     On January 28, WHC Emergency Room physicians Dr. Phillips and Dr. Schwartz examined Medicare Patient ███, who complained of numbness in her left hand (which had recently been the subject of a surgical graft). Finding that

27

her condition could not medially justify a full hospital admission, they prescribed instead an initial observation of her condition. Accretive then changed the patient's diagnosis to represent instead that she "is at immediate short term risk of limb ischemia and limb loss," and changed the prescribed treatment to a hospital admission, causing the patient's admission and a related claim to Medicare based on the changed diagnosis by Accretive.

### **Defendants' Other Related Illegal Conduct and Resulting False Claims**:

47.     As to all payment claims to the Medicare, Medicaid or Tricare systems resulting from Accretive's "recommendations" of inpatient admissions, the only diagnostic records which ever purport to represent any "evidence of medical necessity" of any hospital inpatient admission are the Accretive Patient Recommendation Classifications, generated entirely by Defendant Accretive. No written diagnostic records, purporting to justify evidence of any such hospital admission of any such federally-insured patient, are authored by any physician employed by, or practicing medicine at, any of the Hospital Defendants' hospitals. As to all such admissions and claims, therefore, no diagnostic records exist within the meaning of, and as required by, the certification requirements of written "evidence of medical necessity" set forth in Paragraphs 18 through 20 above, as a legal prerequisite to the legal validity of each such claim. As the Defendants knew, each such claim was legally false for that additional reason.

48.     The generation of such Accretive Assessment forms and the

"recommendations" contained thereon involve and require the application of medical science to the diagnoses of individual patients located in specific hospitals, and the prescription of a specific course of treatment for each such patient, and accordingly constitute the practice of medicine in those localities within the meaning of medical licensing statutes and regulations issued by the District of Columbia and the fifty states of the United States.

49.     That District and those states require licensing of the physician in and by the District and State in which such activity is conducted, including licensing in the District of Columbia for the prescription or ordering of hospital admissions to and for the MedStar Washington Hospital Center. On information and belief, the Accretive personnel who authored the "recommendations" contained in the Accretive Patient Classification Recommendation forms used by the MedStar WHC to charge for inpatient hospital admissions were typically not licensed to practice medicine in the District of Columbia and therefore had no legal authority to make any such "recommendation." The same is believed to be true as to other Accretive personnel who authored such Recommendation forms pursuant to the Accretive admissions certification scheme at all other hospitals owned or operated by the remaining Hospital Defendants.

50.     The activities by non-licensed Accretive personnel resulting in the Accretive Patient Classification Recommendations were therefore illegal activities, and the resulting forms were not lawful or valid certifications of the medical necessity of any hospital

29

admission of any patient in any jurisdiction in which the author of the "recommendation" was not then licensed.

51. For this additional reason, the hospital admissions "recommended" by and resulting from use of the Accretive Patient Classification Recommendation forms were not justified by any lawful or valid physician diagnosis or certification, and the claims to federal insurance programs resulting from those admissions were accordingly legally and factually false claims, as Accretive knew when it (and they) caused such admissions and resulting claims to occur, and as MedStar (and the remaining Hospital Defendants) knew when it (and they) authorized or ordered such admissions and resulting claims to federal health insurance programs.

52. Through its implementation of the Accretive admissions certification scheme as described above, Accretive caused the presentation and submission by each of the Hospital Defendants, to agencies and contractors of the United States (and to State and District agencies using funds of the United States), of claims for compensation for entire hospital inpatient admissions and resulting treatments, paid by those agencies or contractors in reliance on the presumed truth of the Hospital Defendants' materially false certifications that each such inpatient admission was medically necessary, and also that each such hospital retained legally and professionally valid records of decisions by licensed physicians that the relevant hospital admissions were indeed medically necessary.

53. No such records were in fact retained by any of the Hospital Defendants,

30

since no such records had been prepared lawfully or otherwise by the Hospital Defendants'
medical staffs in whose names certifications were made that such records had been
prepared and were on file as part of the patients' hospital medical records.

54.     The Hospital Defendants regularly "copied" the purported clinical contents
of inpatient admission "recommendations" (authored entirely by off-site Accretive
personnel), and "pasted" such contents onto records which falsely appeared to have been
authored and generated by licensed personnel working for and at the Hospital Defendants'
facilities, fraudulently concealing the fact that the "recommendations" had been authored
by off-site personnel not licensed in the relevant jurisdiction and not admitted to the
Hospitals' Medical Staffs, and resulting in false "patient records" all of which were
material to the Hospital Defendants' entitlement to be paid on claims for inpatient
admissions, and all of which were knowingly made and used by the Hospital Defendants
as false statements material to and in the course of making such claims, in further violation
of 31 U.S.C. § 3729(a)(1)(B).

55.     Such payments would not have been made but for reliance by federal and
state health programs' personnel (including personnel of insurance carriers and
intermediaries contracted to pay lawful claims under those programs) on the presumed
truth of those hospital certifications, and on the presumed lawfulness of the inpatient
admissions and resulting claims.

56.     MedStar alone presented (and federal health insurers paid for) approximately

31

670 such false claims for admissions to MedStar's WMC during the first five months of the scheme's operation at that one hospital (between June and October of 2012).

57.     The presumed truth of those certifications was a condition of, and was legally and factually material to, the Hospital Defendants' legal entitlement to be paid on each of those claims. As the Defendants knew, those certifications were in fact false when made.

58.     The total amounts of such payments not legally due to each of the Hospital Defendants, in payment for the entire amount due for an entire inpatient hospital treatment (according to the "Diagnostic-Related Group" or "DRG" of the diagnosis attributed to each patient), were damages to the United States resulting from the Defendants' presentation of, and those payments of, those legally false claims.  No payments would have been made in any amount, for any inpatient admission service under any of the relevant federal health insurance programs, if payment personnel had known the truth about the facts set forth above.

59.     Because the actual medical necessity of an inpatient admission, and accurate and lawful certifications of the maintenance in patient files of clinical records evidencing that medical necessity, were material to and were necessary conditions of any Hospital Defendant's entitlement to be paid any amount for any such inpatient admission, and because those conditions were not satisfied as a result of the Accretive admissions certification scheme, the Defendants knew that no payment was legally due to the Hospital

32

Defendants as a result of any such claims.

60.  Because the Defendants also knew that compliance with the Anti-Kickback

Act was material to and a prerequisite to the Hospital Defendants' entitlement to any

payment in any amount for inpatient admissions, and because the Defendants further knew

that no monetary payment was due from any federal health care insurance program to any

Hospital Defendant as a result of inpatient admissions (and inpatient admission claims)

submitted because of recommendations paid for by the Hospital Defendants and provided

by Accretive pursuant to the Accretive admissions certification scheme in violation of the

Anti-Kickback Act, all payment claims submitted for all such inpatient admissions and as

to all such patients were known by the Defendants to be legally and factually false claims

made in violation of the FCA.

## COUNT I

## Claim By and on Behalf of the United States under the FCA Against Accretive
## (Causing False Claims to be Presented)

61.  Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as
though fully set forth herein.

62.  This is a claim under the False Claims Act,  31 U.S.C. §§ 3729-33, as
amended, against Defendant Accretive.

63.  The Plaintiff/Relator, Cherry Graziosi, has standing to maintain this claim by
virtue of 31 U.S.C. §3730(b).

64.  By virtue of the acts described herein, Defendant Accretive knowingly caused

to be presented false or fraudulent claims for payment, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1), and as amended in 2009 and codified as 31 U.S.C. § 3729(a)(1)(A).

65. By virtue of the false claims caused to be presented by Accretive, the United States has suffered actual damages and is entitled to recover three times the amount which it paid in response to such false claims (and therefore the amount by which it is damaged), plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims caused to be presented, and other monetary relief as appropriate.

## COUNT II

**Claim By and on Behalf of the United States under the FCA Against Accretive
(Causing False Record or Statements to be Used to Get,
and/or Which were Material to, False Claims Paid)**

66. Plaintiff realleges and incorporates by reference paragraphs 1 through 60 as though fully set forth herein.

67. This is a claim on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended, against Accretive.

68. The Plaintiff/Relator, Cherry Graziosi, has standing to maintain this claim by virtue of 31 U.S.C. §3730(b).

69. By virtue of the acts described above and Defendant Accretives' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the Government, and otherwise Accretives' acts causing false

records and statements to be used which were material to false or fraudulent claims,

Defendant Accretive caused to be made or used false records or statements to get false or

fraudulent claims paid or approved by an agency of the United States Government, in

violation of 31 U.S.C. § 3729(a)(2)(as codified before 2009 amendments), and also caused

to be made or used false records or statements which were material to false or fraudulent

claims in violation of 31 U.S.C. § 3729(a)(1)(B) as codified pursuant to amendments to

the FCA in 2009.

70.  By virtue of, and as a result of, the false records and statements used to get

false claims paid by the Government, the United States has suffered actual damages and is

entitled to recover three times the amount by which it is damaged, plus civil money

penalties of not less than $5,500 and not more than $11,000 for each of the false claims

presented or caused to be presented, and other monetary relief as appropriate.

### COUNT III

### Claim By and on Behalf of the United States under the FCA Against Accretive (Conspiracy to Submit False Claims)

71.  This is a claim under the False Claims Act,  31 U.S.C. §§ 3729-33, as

amended, against Defendant Accretive.

72.  Plaintiff realleges and incorporates by reference paragraphs 1 through 60 as

though fully set forth herein.

73.  By reason of the foregoing with respect to Defendant Accretives' fraudulent

admissions certification scheme, Accretive agreed and conspired with each and every one

of the Hospital Defendants to defraud the government in order to get false or fraudulent

claims paid by Medicare, in violation of 31 U.S.C. § 3729(a)(3), and in violation of 31

U.S.C. § 3729(a)(1)(C) as amended in 2009. In furtherance of the conspiracy, and through

each of the particular activities described above, Accretive and the Hospital Defendants

acted overtly to affect the objects of the conspiracy alleged herein.

74. By virtue of the false claims presented or caused to be presented by the

Defendants pursuant to this conspiracy, the United States has suffered actual damages and

is entitled to recover from Accretive three times the amount by which it is damaged, plus

civil money penalties of not less than $5,500 and not more than $11,000 for each of the

false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT IV

### Claim By and on Behalf of the United States under the FCA
### Against the Hospital Defendants (Presenting False Claims)

75. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as

though fully set forth herein.

76. This is a claim against each of the Hospital Defendants under the False Claims

Act, 31 U.S.C. §§ 3729-33, as amended.

77. The Plaintiff/Relator, Cherry Graziosi, has standing to maintain this claim by

virtue of 31 U.S.C. §3730(b).

78. By virtue of the acts described herein, each of the Hospital Defendants

knowingly presented false or fraudulent claims for payment, or knowingly caused false or

fraudulent claims for payment to be presented, to officials of the United States

Government in violation of 31 U.S.C. § 3729(a)(1), and as amended in 2009 and codified

as 31 U.S.C. § 3729(a)(1)(A).

79. By virtue of the false claims presented or caused to be presented by Hospital

Defendants, the United States has suffered actual damages and is entitled to recover three

times the amount by which it is damaged, plus civil money penalties of not less than

$5,500 and not more than $11,000 for each of the false claims presented or caused to be

presented, and other monetary relief as appropriate.

### COUNT V

### Claim By and on Behalf of the United States under the FCA
### Against the Hospital Defendants (Using False Records or Statements)

80. Plaintiff realleges and incorporates by reference paragraphs 1 through 60 as

though fully set forth herein.

81. This is a claim on behalf of the United States under the False Claims Act,

31 U.S.C. §§ 3729-33, as amended, against each of the Hospital Defendants as defined

herein.

82. The Plaintiff/Relator, Cherry Graziosi, has standing to maintain this action by

virtue of 31 U.S.C. §3730(b).

83. By virtue of the acts described above and each of the Hospital Defendants' use

of, or activities causing to be used, false records and statements to get false and fraudulent

claims paid and approved by the Government, and in otherwise using false records and

37

statements which were material to false claims, each of the Hospital Defendants caused to be made or used false records or statements to get false or fraudulent claims paid or approved by an agency of the United States Government, in violation of 31 U.S.C. § 3729(a)(2)(as codified before 2009 amendments), and also caused to be made or used false records or statements which were material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B)(as codified pursuant to amendments to the FCA in 2009).

84. By virtue of, and as a result of, the false records and statements used to get false claims paid by the Government, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

### COUNT VI

### Claim By and on Behalf of the United States under the FCA
### Against the Hospital Defendants (Conspiracy to Submit False Claims)

85. This is a claim under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

86. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as though fully set forth herein.

87. By reason of the foregoing with respect to Defendants' fraudulent scheme, each of the Hospital Defendants conspired with Defendant Accretive to defraud the government in order to get false or fraudulent claims paid by Medicare, in violation of 31

38

U.S.C. § 3729(a)(3)(as codified before 2009 FCA amendments), and also in violation of 31 U.S.C. § 3729(a)(1)(C)(as codified as a result of such 2009 FCA amendments). In furtherance of the conspiracy, each of the Hospital Defendants acted to affect the objects of the conspiracy alleged herein, through the overt acts described above.

88.  By virtue of the false claims presented or caused to be presented by the Hospital Defendants pursuant to this conspiracy, the United States has suffered actual damages and is entitled to recover from each of the Hospital Defendants, with respect to the claims submitted by each of them, three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States:

1.      On Counts I - III, under the False Claims Act, against Defendant Accretive for treble (i.e., three times) the amount of the United States' actual damages (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

2.      On Counts IV - VI, under the False Claims Act, against each of the respective Hospital Defendants for treble (i.e., three times) the amount of the United States' actual damages (including investigative costs), plus civil penalties as are allowable

by law for each false claim made by or on behalf of the respective Hospital Defendant, and for all costs of this civil action;

3.  For all costs of this civil action, including all investigative and expert expenses incurred herein; and

4.  For such other and further relief as the Court deems just and equitable.

WHEREFORE, Relator Cherry Graziosi demands and prays that judgment be entered in her favor:

1.  On Counts I - VI, under the False Claims Act, for a percentage of all civil penalties and damages obtained from any of the Defendants pursuant to 31 U.S.C. § 3730, reasonable attorney's fees, investigative costs, expert witness fess incurred, and all costs incurred in pursuing these claims against the Defendants; and

2. Such other relief as the Court deems just and proper.

This the 26th day of February, 2016.

Respectfully submitted,
CHERRY GRAZIOSI, Relator
By her Attorneys,
PIGOTT & JOHNSON, P.A.

By: _____
        J. Brad Pigott

J. Brad Pigott, Mississippi Bar No. 4350
PIGOTT and JOHNSON, P.A.
775 N. Congress Street
Post Office Box 22725
Jackson, Mississippi 39225-2725

Telephone: (601) 354-2121
Facsimile: (601) 354-7854
Admitted *Pro Hac Vice*

Robin Potter
ROBIN POTTER & ASSOCIATES
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
Phone: (312) 861-1800

## Certificate of Service

I hereby certify that I served the foregoing Second Amended Complaint, through the United States Mails (and also through the electronic mailing addresses set forth below), consistent with the Order requiring the sealing of all pleadings herein, on the following:

Honorable Thomas G. Bruton
Clerk of U. S. District Court
Northern District of Illinois
Everett McKinley Dirksen U. S. Courthouse
219 South Dearborn Street
Chicago, Illinois 60604

Honorable David Lidow
Assistant United States Attorney
Northern District of Illinois
United States Attorney's Office
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
David.Lidow@usdoj.gov

This the 26th day of February, 2016.

J. Brad Pigott, Esquire

41



**EXHIBIT A**

R-001

**UB-04 NOTICE:** THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARTY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts. The following certifications or verifications apply where pertinent to this Bill:

1. If third party benefits are indicated, the appropriate assignments by the insured /beneficiary and signature of the patient or parent or a legal guardian covering authorization to release information are on file. Determinations as to the release of medical and financial information should be guided by the patient or the patient's legal representative.

2. If patient occupied a private room or required private nursing for medical necessity, any required certifications are on file.

3. Physician's certifications and re-certifications, if required by contract or Federal regulations, are on file.

4. For Religious Non-Medical facilities, verifications and if necessary re-certifications of the patient's need for services are on file.

5. Signature of patient or his representative on certifications, authorization to release information, and payment request, as required by Federal Law and Regulations (42 USC 1935f, 42 CFR 424.36, 10 USC 1071 through 1086, 32 CFR 199) and any other applicable contract regulations, is on file.

6. The provider of care submitter acknowledges that the bill is in conformance with the Civil Rights Act of 1964 as amended. Records adequately describing services will be maintained and necessary information will be furnished to such governmental agencies as required by applicable law.

7. For Medicare Purposes: If the patient has indicated that other health insurance or a state medical assistance agency will pay part of his/her medical expenses and he/she wants information about his/her claim released to them upon request, necessary authorization is on file. The patient's signature on the provider's request to bill Medicare medical and non-medical information, including employment status, and whether the person has employer group health insurance which is responsible to pay for the services for which this Medicare claim is made.

8. For Medicaid purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, and any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws.

9. For TRICARE Purposes:

(a) The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically necessary and appropriate for the health of the patient;

(b) The patient has represented that by a reported residential address outside a military medical treatment facility catchment area he or she does not live within the catchment area of a U.S. military medical treatment facility, or if the patient resides within a catchment area of such a facility, a copy of Non-Availability Statement (DD Form 1251) is on file, or the physician has certified to a medical emergency in any instance where a copy of a Non-Availability Statement is not on file;

(c) The patient or the patient's parent or guardian has responded directly to the provider's request to identify all health insurance coverage, and that all such coverage is identified on the face of the claim except that coverage which is exclusively supplemental payments to TRICARE-determined benefits;

(d) The amount billed to TRICARE has been billed after all such coverage have been billed and paid excluding Medicaid, and the amount billed to TRICARE is that remaining claimed against TRICARE benefits;

(e) The beneficiary's cost share has not been waived by consent or failure to exercise generally accepted billing and collection efforts; and,

(f) Any hospital-based physician under contract, the cost of whose services are allocated in the charges included in this bill, is not an employee or member of the Uniformed Services. For purposes of this certification, an employee of the Uniformed Services is an employee, appointed in civil service (refer to 5 USC 2105), including part-time or intermittent employees, but excluding contract surgeons or other personal service contracts. Similarly, member of the Uniformed Services does not apply to reserve members of the Uniformed Services not on active duty.

(g) Based on 42 United States Code 1395cc(a)(1)(j) all providers participating in Medicare must also participate in TRICARE for inpatient hospital services provided pursuant to admissions to hospitals occurring on or after January 1, 1987; and

(h) If TRICARE benefits are to be paid in a participating status, the submitter of this claim agrees to submit this claim to the appropriate TRICARE claims processor. The provider of care submitter also agrees to accept the TRICARE determined reasonable charge as the total charge for the medical services or supplies listed on the claim form. The provider of care will accept the TRICARE-determined reasonable charge even if it is less than the billed amount, and also agrees to accept the amount paid by TRICARE combined with the cost-share amount and deductible amount, if any, paid by or on behalf of the patient as full payment for the listed medical services or supplies. The provider of care submitter will not attempt to collect from the patient (or his or her parent or guardian) amounts over the TRICARE determined reasonable charge. TRICARE will make any benefits payable directly to the provider of care, if the provider of care is a participating provider.

http://www.nubc.org/ FOR MORE INFORMATION ON UB-04 DATA ELEMENT AND PRINTING SPECIFICATIONS

R-002

## COVER SHEET – FAX to ACCRETIVE HEALTH
### ED Service Associate Pre-Fax Check

_____ **Face Sheet?** (If NOT, contact CFC to complete registration – If NOT registered in 15 min. - view prior registration, use the insurance information from prior visit, if less than 6 months ago)

_____ Is patient "SELF PAY"?     Is patient going to "OR"?     Is patient going to "ICU"?
If YES Then STOP, Do NOT Fax chart to Accretive Health.

_____ Is this an **ADMISSION** (not observation/short stay patient?)
If **YES** then STOP, Do NOT fax chart to Accretive Health (<u>unless</u> MD or Clinical Resource Management Staff Requests send)

_____ Do you have completed ED Physician notes (if NOT check for handwritten note by the ED Attending on the Clin. I & II – History and Physical)
If NOT handwritten, then ask the ED Physician to complete the typed note as soon as possible and return to you

_____ Print **LABS** from current visit (Info Labs)

_____ Print **Radiology Readings** from current visit (Info Radiology Readings)

When all above data is obtained, circle team doctor below; FAX this cover sheet and ED chart (including nursing notes – with as much documentation available at this time) to Accretive Health, then enter required data in Accretive Portal and Monitor the Work-list.

**TO:**   Accretive Health FAX: **1-877-411-5501**

**FROM:** Medstar Washington Hospital Center Emergency Department   **202-877-8800**

**\*\*Remember Comment\*\*** "If Status Change Please Call - Dr. TEAM COLOR & TELEPHONE W/AREA CODE"
        THIS COMMENT MUST BE ENTERED IN THE ACCRETIVE PORTAL ON EVERY CASE

ED Physician Team Contact for Call Back (circle one)

| | | |
|---|---|---|
| RED: | 202-877-5520 / 202-877-8801 | |
| GREEN: | 202-877-5530 / 202-877-8828 | |
| BLUE: | 202-877-5560 / 202-877-9924 | |
| SILVER: | 202-877-5570 / 202-877-9514 | |
| ACA: | 202-877-5516 | |
| GOLD: | 202-877-5590 / 202-877-9532 | |

## Patient Sticker:



**Confidentiality Notice:** This material is intended only for the individual(s) to whom it is addressed and contains information that is both confidential and legally privileged. If you are not the intended recipient(s) or the employee or person responsible for delivering it to the intended recipient(s), you are hereby notified that any dissemination, distribution, copying, or other use is strictly prohibited. Please notify the sender by return email or by calling 202-877-6286 and follow the directions given for safeguarding or the destruction of the document in question.

THIS IS NOT A PART OF THE MEDICAL RECORD – THIS DOCUMENT MUST BE PLACED IN SHRED BIN



# Accretive**PAS**®

CHERRY GRAZIOSI    WHDC - WASHINGTON HOSPITAL CENTER    LOGOUT

HOME    WORKLIST    HELP

| New | Tree | Worklist | Search | Export | Batch Print | | I< | < | > | >I |

| Patient Access | < > | PAS ☑ | Notes ☑ | Log ☐ | Documents ☑ |
|---|---|---|---|---|---|

Phone    Exceptions    **Status: Completed**

Update
ReSubmit
Create Denial

**Physician Advisory Services Assessment**
Phone: 877-411-6531    Fax: 877-411-6501

**Physician Advisory S**
- Classification Co
- Classification Ind
- Classification Ind
- Referred Type /
- Process Opportu

### Consult Information

| | | | |
|---|---|---|---|
| Date : | 01/21/2013 10:39:08 PM | Facility : | WHDC - Washington Hospital Center |
| | | | Discharge ☐ |
| Completed Date : | 1/21/2013 11:52:07 PM | MedStar Health | |
| Payer Type : | Medicare - B | Review Type | ED - Emergency |
| Request Sponsor (CM staff) : | Forgy Darnise | Case Status : | Unaudited |
| | | Assigned To: | |
| | | Checked Out To: | |
| CM Phone Number: | 202-877-8800 | Completing Physician: | Lee, Alice |
| Preferred Contact : | Other | Plan Code : | --Select-- |
| | | Ready for Review Date : | 01/21/2013 11:25:00 PM |

### Attending Physician

| | | | |
|---|---|---|---|
| First Name : | SHAMEEM | Middle Name : | A |
| Last Name : | HUQ | | |
| Phone Number : | (202) 877-8536 | Phone Extension : | |

### Patient Account Information

| | | | |
|---|---|---|---|
| Account Number: | | Admit Date : | 1/21/2013 12:00:00 AM |
| MRN : | | Discharge Date : | |
| Last Name : | | Patient Type : | IO - Initial Observation |
| First Name : | | Additional Detail: | |
| Location : | ED - Emergency | Patient DOB : | |
| | | Calculated Age : | |

EXHIBIT C

---

**Medical Diagnosis Information**

**Primary Diagnosis :**
Pain

**Additional Medical
Information :**
red team
202-877-5520

Info Needed ☐ No

H & P ☐
Info Text :

---

**Patient Classification Recommendation**

Our recommendation for your physician is :
InPatient

**Physician Advisor Notes**

███████ is an ██ yo woman who presents on 1/21/13 for swelling and redness of right arm after her PICC line infiltrated. She was recently hospitalized for encephalitis, and has PICC line placed 3 days ago for IV antibiotics. PMH: MI, CVA, HTN, DM, encephalopathy. Med: IV Vancomycin, IV Ceftriaxone, hydralazine, metoprolol, clopidogrel, lisinopril, pravastatin, amlodipine. Exam: T 99.9, BP 124/98, P 100, RR 18, pulse ox 96%. Her right arm has edema, and large area of redness in right forearm. Labs: AST 40, ALT 47, CK 3241, Cr 1.08, glucose 154, K 3. INR 1. WBC 9.8, Hct 40.3, platelet 260,000. CXR: no acute findings. The PICC line is in good position with its tip in the SVC. In the ED, upper extremity ultrasound cannot be done at this time, and she has order for lovenox 80mg SC. Diagnosis: PICC malfunction, cellulitis, encephalitis. Further orders are not available.

███████ is an ██ yo woman with recent admission for encephalitis, PICC placement for IV antibiotics who presents with erythema and redness of her arm after the PICC line has infiltrated. The PICC line tip is in the expected position. She is diagnosed with PICC malfunction, cellulitis, and noted to have redness and swelling around the PICC line site, and order for therapeutic anticoagulation with lovenox. She is at risk for progression of her encephalitis due to lack of IV access of her prescribed parenteral antibiotics, acute cellulitis of her arm, acute thrombosis of the PICC line, extension of the thrombosis with subsequent pulmonary embolism. She also has elevated CPK of 3241, and at risk for acute rhabdomyolysis, acute compartment syndrome.

Our recommendation to your physician is to admit ███████ as an inpatient.

---

| Secondary Review | Suggested QA Protocols |
|---|---|
| Reviewer : Locker, Olivia | Click a title below to open in new window |

☑ Review Complete

---

**Disclaimer**

The status recommendation regarding whether documentation supports inpatient or outpatient classification for billing p consideration the patient□s clinical presentation, the contributing major comorbid conditions, the risks associated with ε illness necessitating care and Medicare guidelines related to Medicare Parts A and B billing. For patient care covered ε Medicare Parts A and B and by Medicaid state programs or commercial payors, the applicable state requirements and procedures govern billing and payment (including for commercially managed Medicare and Medicaid programs). These requirements and commercial payor contracts may have terms and conditions which can be somewhat different than th secondary physician advisor, however, cannot know the specific terms of such Medicaid state programs or commercial and procedures. Thus, the hospital should be aware that despite an Accretive status recommendation, a claim may be requirements of the state regulations or the particular commercial payor contract, policies or procedures are not followe specific requirements may include such things as the need for preauthorization and limitations regarding the services c payment for those services. To facilitate proper billing and appropriate payment, the hospital/physician provider must b with Medicaid state law and their individual payor contracts, the terms, conditions and related policies and procedures o Accretive and compliance with which Accretive is not responsible.



**Tracking**

Contacted Case Manager :    Not Indicated to Contact

Notes :

Indication for physician to physician contact (i.e. change in status)?    Discussed Case

Notes :

Did the physician concur with Accretive recommendation?
Not Specified

Notes :

Date :    1/21/2013 12:00:00 AM

Date :    1/21/2013 12:00:00 AM
Notes

**Patient Documents**

| ID | Hide/Unhide | Document Title | Document Name | Document Size | Uploaded By | Upload Date/Time |
|---|---|---|---|---|---|---|
| 1 | ⊗ | Efax Clinicals | 2 Cooper.pdf | 0.730 MB | Barnes, James | 1/21/2013 11:25:26 PM |

**Related Documents**

Accretive Health

R-06

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certified that a true and correct copy of the above and foregoing Relator's **SECOND AMENDED COMPLAINT** (redacted) was served upon all parties by e-filing this 8th day of July, 2016 with the Clerk of the Court using the CM/ECF system.

<u>/s/ Robin Potter</u>
Robin Potter