**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. | ) | |
| CHERRY GRAZIOSI, | ) | |
| | ) | Case No. 13-CV-1194 |
| Relator, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| v. | ) | |
| | ) | |
| ACCRETIVE HEALTH, INC., | ) | |
| MEDSTAR HEALTH, INC., | ) | |
| THE METHODIST HEALTH CARE | ) | |
| SYSTEM, INC., | ) | |
| BAPTIST HEALTH HOSPITALS, INC., | ) | |
| SOUTHEAST HEALTH SYSTEM, INC., | ) | |
| V.B. HARLIGEN HOLDINGS, INC., | ) | |
| and "JOHN DOE HOSPITALS," | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Relator Cherry Graziosi ("Relator") brings suit against Defendant Accretive Health, Inc. ("Accretive") and Defendants MedStar Health Inc. ("MedStar"), the Methodist Health Care System, Inc. ("Methodist"), Baptist Health Hospitals, Inc. ("Baptist"), Southeast Health System, Inc. ("Southeast) (collectively, the "Hospital Defendants"), as well as unnamed John Doe hospitals under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA").[1]  Before the Court are Accretive's and the Hospital Defendants' motions to dismiss Relator's second amended complaint.  See [62], [67], [72], [78], and [81].  For the reasons explained below, Baptist's motion to dismiss [62] is granted; Methodist's motion to dismiss [67] is granted; Southeast's motion to dismiss [78] is granted; MedStar's motion to dismiss [81] is

---

[1] Defendant V.B. Harligen Holdings, Inc. was dismissed without prejudice on August 12, 2016 pursuant to Relator's notice of voluntary dismissal.  See [100].

denied; and Accretive's motion to dismiss [72] is granted in part and denied in part. This case is set for status hearing on April 19, 2017 at 9:00 a.m.

## I.    Background[2]

Relator is a resident of Maryland and current employee of Defendant MedStar. MedStar is a Maryland corporation with its principal place of business in Columbia, Maryland. MedStar operates nine hospitals and twenty other health-related facilities in Maryland and Washington D.C. Relator has worked as a Service Associate in the emergency department of a MedStar-owned hospital in Washington D.C., "WHC," since January 2010.

Between mid-2012 and October 2013, part of Relator's job was to make and receive daily communications from WHC's emergency department to staff of Defendant Accretive, a Delaware corporation with its principal place of business in Chicago, Illinois. Specifically, Relator worked in the implementation of what she calls the "Accretive admissions certification scheme" to submit allegedly false claims for health care costs reimbursed by the federal Medicare, Medicaid, and Tricare programs. See [59] at 3-4, 9. Relator also alleges, on information and belief, that in the course of her work she "became aware through non-public information that" Methodist (a Texas nonprofit corporation with a principal place of business in Houston, Texas), Baptist (an Arkansas nonprofit corporation with a principal place of business in Little Rock, Arkansas), and Southeast (a Missouri nonprofit corporation with a principal place of business in Cape Girardeau, Missouri) also had agreements with Accretive to engage in the same admissions certification scheme. *Id*. at 4.

According to Relator, the Defendant Hospitals present a claim for payment to the federal health insurance programs by submitting a "CMS Form 1450," which includes a physician's

---

[2] For purposes of Defendants' motions to dismiss, the Court assumes as true all well-pled allegations set forth in Relator's second amended complaint [59]. See *Mutter v. Madigan*, 17 F. Supp. 3d 752, 756 (N.D. Ill. 2014).

certification of the medical necessity of a hospital admission. [59] at 10-11. Relator alleges that each hospital is obligated to assure that medical services will be provided only to the extent that they are "'medically necessary,'" as "determined by a licensed physician with personal knowledge of that medical necessity." *Id*. at 11 (quoting 42 U.S.C. § 1320c-5(a)). Relator also alleges that each hospital Defendant, in its contract with the federal agency Centers for Medicare and Medicaid Services ("CMS"), represented that it understood that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with (Medicare) laws, regulations, and program instructions . . . and on the provider's compliance with all applicable conditions of participation in Medicare," including the "federal anti-kickback statute." *Id*. at 8-10 (citing 42 U.S.C. § 1320a-7b(b)).

Under the Accretive admissions certification scheme, Accretive allegedly "generated written 'recommendations' purporting to justify the inpatient admission of federal-insured patients as to whom the hospitals' own Emergency Departments and Hospital Staff physicians had previously determined, based on their own medical judgments after consulting with the patients and reviewing their relevant medical records, did not then meet the medical necessity requirements for an inpatient hospital stay, but instead only met medical necessity requirements for an 'observation' of their medical condition for a period of up to twenty-four (or forty-eight) hours." [59] at 13. According to Relator, "[a] physician's order that a patient is to be admitted as an 'inpatient' constitutes a representation that a hospital stay involving treatment longer than forty-eight hours is medically necessary." *Id*. at 14. The federal health insurance programs allegedly pay substantially more for patients for whom an inpatient admission, rather than an in-hospital observation, is ordered.

Relator alleges that Accretive's recommendations for inpatient admission were made by persons who did not have the proper qualifications and information to make such recommendations. Relator also alleges that the "Hospital Defendants" pressured and expected their medical staff members to adopt and enforce Accretive's recommendations when presenting claims to Medicare, Medicaid, and Tricare. The Hospital Defendants allegedly "regularly 'copied' the purported clinical contents of [Accretive's] inpatient admission 'recommendations' . . . and 'pasted' [the] contents onto records which falsely appeared to have been authored and generated by licensed personnel" working in the hospitals. [59] at 2. The purpose of this scheme, Relator alleges, was for Accretive to receive remuneration (in the form of per-review fees paid by the Hospital Defendants) in return for substantial numbers of recommendations from Accretive to change the level of health care services provided to substantial numbers of patients from observation-only to inpatient admission, and for the Hospital Defendants to receive more revenue from federal health insurance programs. Relator alleges that Accretive recommended changing 40% to 60% of the records it reviewed from observation-only to inpatient admission, as confirmed by monthly reports that Accretive sent to hospital administrators.

According to the second amended complaint, Accretive's recommendations were "legally and factually false" because they "contradicted . . . medical staff members' own prior professional judgments that [inpatient] admission was not . . . medically necessary." [59] at 15, 19. Relator also asserts that claims based on Accretive's recommendations "would not have been paid but for the explicit and implicit" certifications by the Hospital Defendants that the claims were certified as medically necessary by properly licensed physicians. *Id*. at 12.

Relator provides what she calls a "random and representative sample of the hospital admissions (and resulting claims to Medicare and Medicaid) resulting from the Accretive admissions certification scheme." [59] at 24. All nine of the admissions in the sample were drawn from the hospital in which Relator works, WHC. Relator alleges, for example, that one patient was examined by a WHC emergency room physician for complaints of lower back pain and resulting inability to walk. The physician found that the patient's condition did not medically justify a full hospital admission and prescribed an initial observation of her condition. Accretive changed the patient's diagnosis, "representing that '[d]ue to inability to ambulate patient is at immediate risk for traumatic fall injuries, increased morbidity and mortality." *Id*. at 25. Accretive also changed the patient's prescribed treatment to a hospital admission, resulting in a claim to Medicare.

Relator alleges that Accretive violated 31 U.S.C. § 3729(a)(1)(A) by causing false claims for payment to be presented to the United States (Count I); 31 U.S.C. § 3729(a)(1)(B) (post-2009 amendments) and (a)(2) (pre-2009 amendments) by making false records to get false or fraudulent claims paid by the United States government (Count II); and 31 U.S.C. §§ 3729(a)(1)(C) and (a)(3) by conspiring with the Hospital Defendant to carry out the fraudulent admissions certifications scheme (Count III). Similarly, Relator alleges that the Hospital Defendants violated 31 U.S.C. § 3729(a)(1)(A) by presenting false or fraudulent claims for payment to the United States Government (Count IV); 31 U.S.C. § 3729(a)(1)(B) (post-2009 amendments) and (a)(2) (pre-2009 amendments) by causing to be made or using false records or statements to get false or fraudulent claims paid or approved by the United States government (Count V); and 31 U.S.C. §§ 3729(a)(1)(C) (post-2009 amendments) and (a)(3) (pre-2009

amendments) by conspiring with Accretive to carry out the fraudulent admissions certifications scheme (Count VI).

## II.     Baptist's Motion to Dismiss for Lack of Jurisdiction

### A.     Personal Jurisdiction

Baptist argues that Relator's complaint should be dismissed for lack of personal jurisdiction because Baptist does not have any contacts with the state of Illinois other than contracting with Accretive, which is an Illinois corporation with its principal place of business in Illinois. Relator responds that because Congress authorizes nationwide service of process in any cases brought under the FCA, Baptist need only have minimum contacts with the United States as a whole to render Baptist amenable to suit in this district. See [99] at 5 n.9 (citing 31 U.S.C. § 3732(a)).

The Court concludes that it has personal jurisdiction over Baptist. All of Relator's claims are brought under 31 U.S.C. § 3730 for alleged violations of 31 U.S.C. § 3729. "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, [or] transacts business." 31 U.S.C. § 3732(a). Relator alleges, and Baptist does not deny, that Accretive resides and transactions business in Illinois. Therefore, section 3732 authorizes Relator to bring her FCA claims against Accretive and the Hospital Defendants in this state. Further, this complies with the minimum requirements of due process because the FCA contains a nationwide service of process provision. See *id*. ("A summons as required by the Federal Rules of Civil Procedure shall be issued by the appropriate district court and served at any place within or outside the United States."). Where a federal statute authorizes nationwide service of process, due process is satisfied "as long as the defendants have adequate contacts with the United States as a whole,"

which Baptist—an Arkansas non-profit with its principal place of business in Little Rock, Arkansas—does. *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1035 (7th Cir. 2000) (ERISA case); see also *U.S. ex rel. Finks v. Huda*, 205 F.R.D. 225, 227 (S.D. Ill. 2001) (physicians located and practicing in various states had minimum contacts with the United States, so that district court had personal jurisdiction over physicians in *qui tam* action brought under FCA).

### B. Subject Matter Jurisdiction

Baptist argues that the Court does not have subject matter jurisdiction over Relator's claims against Baptist because Relator's allegations of fraud are based on information in the public domain for which Relator is not the original source. See [63] at 14 (citing 42 U.S.C. 3730(e)(4)(A) (2009)). According to Baptist, the pre-2010 version of section 3730(e)(4)(A)—which the parties agree should apply here—sets forth "a jurisdictional requirement that must be addressed before a court can reach the merits of any substantive FCA claim." [63] at 14 (citing *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467 (2007)). Baptist argues that Relator's allegations against it are based on two categories of information that were already in the public domain when Relator filed suit. First, Baptist points to federal government investigations from the 1980s to early 1990s into Medicare payments for medically unnecessary hospital admissions. Second, Baptist refers to an Office of Inspector General's ("OIG") audit of 2008 and 2009 Medicare claims for inpatient short stays for outpatient services. In its audit, OIG preliminarily found that one of Baptist's hospitals "allegedly submitted short stay inpatient claims as a result of: (a) improper orders for inpatient status converted from outpatient status; (b) improper inpatient standing orders for admission without proper involvement of a physician; and, (c) improper orders for inpatient status following scheduled outpatient procedures." [63] at 11

(quoting DOJ Announcement, "Baptist Health Medical Center North Little Rock Enters Into Settlement Agreement Under False Claims Act," available at https://www.justice.gov/usao-edar/pr/baptist-health-medical-center-north-little-rock-enters-settlement-agreement-under-false (last accessed Mar. 21, 2017)).  Following the audit, OIG referred its findings to the U.S. Attorneys' Office.  Baptist agreed to pay $2,700,000 to resolve its liability under the FCA.  See *id*. at 12.

Section 3730(e)(4) of the FCA provides that "[t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information."  31 U.S.C. § 3730. Case law applying both the pre-2010 and post-2010 versions of Section 3730(e)(4) have described this "public disclosure" rule as "jurisdictional."  *United States ex rel. Sheet Metal Workers Int'l Ass'n, Local Union 20 v. Horning Investments, LLC*, 828 F.3d 587, 591 (7th Cir. 2016) (citing 42 U.S.C. 3730(e)(4)); see also *Glaser v. Wound Care Consultants, Inc*., 570 F.3d 907, 920 (7th Cir. 2009).[3]

To determine whether the allegations underlying a *qui tam* FCA claim have been publicly disclosed, the Court first "examines whether the allegations in the complaint have been 'publicly

---

[3] In *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 271 & n.5 (7th Cir. 2016), the Seventh Circuit recognized that some other circuits do not consider the post-2010 version of Section 3730(e)(4)(A) to be jurisdictional, and instead treat a motion brought under this provision as a Rule 12(b)(6) motion.  *Cause of Action* applied the pre-2010 version of Section 3730(e)(4)(A) and did not resolve whether the current version of the provision is jurisdictional.  *Sheet Metal Workers* suggests that it is jurisdictional, but this Court need not resolve the issue because Section 3730(e)(4)(A) bars Plaintiff's claim against Baptist regardless of how Baptist's motion to dismiss is characterized.

disclosed'" in the manner identified by the defendant. *Cause of Action*, 815 F.3d at 274. If so, the Court "determine[s] whether the . . . lawsuit is 'based upon,' *i.e.*, 'substantially similar to,' those publicly disclosed allegations." *Id*. The bar may not be avoided by a relator by simply adding "'extra details' or 'additional instances' of false claims," *United States ex rel. McGee v. IBM Corp.*, 81 F. Supp. 3d 643, 658 (N.D. Ill. 2015) (quoting *United States ex rel. Heath v. Wisconsin Bell, Inc*., 760 F.3d 688, 691 (7th Cir. 2014)), and applies even where the *qui tam* relator's "allegations are only partly based upon publicly-disclosed allegations." *Singer v. Progressive Care, SC*, 202 F. Supp. 3d 815, 823 (N.D. Ill. 2016); see also *Heath*, 760 F.3d at 691 ("'based upon' does not mean 'solely based upon,' for a '*qui tam* action even partly based upon publicly disclosed allegations or transactions is nonetheless "based upon" such allegations or transactions'" (quoting *Glaser*, 570 F.3d at 920)).

"Some of the factors used to determine whether a relator's allegations are substantially similar to those already publicly disclosed are: (1) whether the time periods for the allegations or transactions overlap; (2) whether the relator has first-hand knowledge of the allegations; (3) whether the allegations are similar or involve different schemes such that independent investigation and analysis was required; and (4) whether the relator presents genuinely new and material information than that previously disclosed." *McGee*, 81 F. Supp. 3d at 659. If the relator's *qui tam* lawsuit is based on publicly disclosed allegations, the public-disclosure bar precludes the action unless the relator is the "original source" of the information on which the lawsuit is based. *Cause of Action*, 815 F.3d at 274. Relator bears the burden of proof at all three steps of this analysis. *Id*.

Considering the first two steps together, the Court agrees with Baptist that Relator's FCA claims against it are based on (*i.e.*, substantially similar to) the allegations made against a Baptist

hospital in the publicly disclosed federal audit and Justice Department press release described above. Relator's lawsuit and the OIG investigation involve overlapping time periods. OIG audited 2008 and 2009 claims, and Relator alleges that Baptist began its scheme with Accretive when they entered into a contract in January 2008. See [59] at 13. Relator has not alleged any facts indicating that she has personal knowledge of the allegations made against Baptist in the second amended complaint. The only fact that Plaintiff purports to have knowledge of is that Baptist and Accretive signed their contract in January 2008, and Plaintiff does not explain how she discovered this. The allegations examined in the OIG audit, and the Justice Department press release regarding the audit, contain allegations that are similar to the general allegations that Plaintiff makes against Baptist in the complaint. This lawsuit and the Justice Department's press release both allege that Baptist improperly changed orders for outpatient admissions to inpatient admissions and submitted orders for inpatient admission without proper physician involvement. The DOJ's announcement also discloses that the Baptist hospital settled potential FCA claims that the U.S. Attorneys' Office was planning to bring based on those allegations. While there is no evidence in the record that OIG was specifically investigating Accretive's involvement in Baptist's billing practices, this does not preclude application of the public disclosure bar, which applies even where a relator adds "extra details" about the alleged false claims, *McGee*, 81 F. Supp. 3d at 658, or the relator's allegations are "only part based upon publicly disclosed allegations," *Singer*, 2016 WL 4245503, at *3. Here, the "critical elements exposing" Baptist's billing practices as allegedly fraudulent under the FCA were already in the public domain when Relator brought suit: Baptist's alleged improper conversion of outpatient admissions to inpatient admissions, without proper involvement of a licensed doctor who determined that the admission was medically necessary. *Glaser*, 570 F.3d at 913. Under

Relator's theory of the case, these actions would have subjected Baptist to liability under the FCA with or without the involvement of Accretive.

Finally, Relator does not argue that she is the original source of the information on which her claims against Baptist are based.[4]  Therefore, the Court concludes that Relator has not met her burden to show that the public disclosure bar is inapplicable and her FCA claims against Baptist must be dismissed.  Baptist's motion to dismiss [62] is granted.

## III.    Motions to Dismiss for Failure to State a Claim

### A.    Legal Standards

The FCA is an anti-fraud statute and therefore "claims under it are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 775 (7th Cir. 2016) (quoting *United States ex rel. Gross v. AIDS Research All.–Chi.*, 415 F.3d 601, 604 (7th Cir. 2005)).  Under Rule 9(b), a plaintiff alleging fraud "'must state with particularity the circumstances constituting fraud or mistake.'"  *Id.* (quoting Fed. R. Civ. P. 9(b)).  Ordinarily, the plaintiff "must describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'"  *id.* (quoting *United States ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)); see also *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (Rule 9(b) requires the plaintiff to state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff").  In addition, "[a]llegations based on 'information and belief' . . . won't do in a fraud case," as "'on

---

[4] Nor do the allegations in the second amended complaint support such an argument.  Relator does not allege any facts explaining how she had knowledge of the implementation of the alleged Accretive admissions certification scheme at Baptist. For this reason and the other reasons provided below for granting Methodist's and Southeast's motions to dismiss under Rule 9(b), the Court would dismiss Relator's complaint against Baptist even if the public disclosure bar was inapplicable.

information and belief' can mean as little as 'rumor has it that....'" *United States ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016). While providing this broad guidance, "[t]he Seventh Circuit has shied away from a rigid, formulaic approach to Rule 9(b) and noted that '[t]he twin demands of detail and flexibility, though in tension with one another, make sense in light of the competing purposes of the federal rules.'" *Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 815 (N.D. Ill. 2013) (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011)).

### B. Methodist's and Southeast's Motions to Dismiss

The Court will consider Methodist's and Southeast's motions to dismiss first, because Relator's allegations against these two entities are nearly identical. For these two Defendants, the only specific allegations that Relator makes concerning their alleged participation in the "Accretive admissions certification scheme" is that Methodist began implementing an agreement with Accretive in August 2008 and Southeast began implementing an agreement with Accretive in January 2008. See [59] at 13. Methodist and Southeast both argue in their motions to dismiss that Relator fails to allege sufficient details to create a strong inference that the alleged scheme led to them submitting false claims to the Federal Government.

The Court concludes that Relator's allegations as to Methodist and Southeast fail to meet the heightened pleading requirements of Rule 9(b). All of Relator's FCA claims against the Hospital Defendants require Relator to allege with particularity the circumstances under which false or fraudulent claims were knowingly submitted to the Government for payment. See *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011) (a relator bringing a *qui tam* FCA action "generally must prove (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and

(3) that the defendant knew the statement was false." (citing *United States ex rel. Gross v. AIDS Research Alliance–Chicago,* 415 F.3d 601, 604 (7th Cir. 2005)). Specifically, to comply with Rule 9(b), a *qui tam* FCA relator must "identify specific false claims for payment or specific false statements made in order to obtain payment," *U.S. ex rel. Garst v. Lockheed–Martin Corp.,* 328 F.3d 374, 376 (7th Cir. 2003), and "[f]or each alleged false statement, . . . plead the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *United States ex rel. John v. Hastert*, 82 F. Supp. 3d 750, 760–61 (N.D. Ill. 2015) (internal quotation marks and citation omitted). In cases where the relator alleges a fraudulent scheme involving numerous transactions over a period of years, the relator must at minimum "provide representative examples" of alleged false claims. *Id.* (citing *Mason v. Medline Indus., Inc.,* 731 F. Supp. 2d 730, 735 (N.D. Ill. 2010)).

In this case, the only specific "who, what, when, where, and how" allegations set forth in the second amended complaint focus on the MedStar hospital in which Relator works—not on Methodist or Southeast. Relator couples these allegations with her alleged knowledge (from some unidentified source) that Methodist and Southeast had the same agreement with Accretive that MedStar did, to arrive at the conclusion that Methodist and Southeast must also have submitted false claims.

However, the fact that Methodist and Southeast allegedly had the same type of agreement with Accretive as MedStar is insufficient to overcome Relator's failure to allege any specific facts concerning the operation of the purported Accretive admissions certification scheme at Methodist or Southeast. Relator does not allege that the agreements *required* the hospital participants to submit false claims to the government. Nor does Relator allege any facts

explaining how the agreements were implemented at Methodist or Southeast in a manner that resulted in the submission of false claims. Perhaps most importantly, the second amended complaint does not explain how Plaintiff came to have any knowledge about the operations at Methodist and Southeast, which are located in different states than and have never employed Relator. See, e.g., *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1008 (7th Cir. 2014) (dismissing qui tam relator's FCA claims against pharmacy for billing Medicare or Medicaid for drugs that it never delivered, where relator failed to explain how he obtained information regarding alleged scheme).

Even assuming that, pursuant to its contracts, Accretive recommended that Methodist and Southeast change observation-only admissions to inpatient admissions in 40% to 60% of the cases it reviewed (as Accretive allegedly did with MedStar), Relators' allegations tell the Court nothing about whether the recommendations were followed or whether the physicians who made the initial determination that observation-only admissions were appropriate reviewed and/or agreed with Accretive's recommendations. Further, Relator does not identify any Methodist or Southeast patients who were improperly admitted for inpatient care after an on-staff physician determined an inpatient admission not to be medically necessary; any specific false or fraudulent claims or records (or a representative sample thereof) that Methodist or Southeast allegedly submitted to the government for payment; any facts of an alleged kickback scheme involving Methodist or Southeast; a causal link between any illegal remuneration Methodist or Southeast allegedly paid or received and the submission of a false or fraudulent claim for payment; or any agreement between Methodist and Southeast and Accretive to defraud the Government by getting a false or fraudulent claim allowed or paid.

For these reasons, the Court concludes that Relator fails to allege FCA claims against Methodist or Southeast with the particularity required by Rule 9(b). Methodist's and Southeast's motions to dismiss, [67] and [78], are therefore granted.

### C.    MedStar's Motion to Dismiss

In its motion to dismiss, MedStar argues that all of Relator's claims are deficient because she fails to plead the circumstances of fraud with particularity as required by Rule 9(b). Specifically, MedStar asserts that Relator does not "allege facts indicating that the Hospital submitted a claim to the government that request an inflated level of reimbursement or that the government paid one cent more than it otherwise should have for health care services provided." [82] at 6. MedStar also argues that Relator fails to allege that "Accretive's recommendations were incorrect" or that these recommendations "resulted in the Hospital billing services to Medicare or Medicaid that were not medically necessary or appropriate." [82] at 7.

The Court concludes that Relator has alleged sufficient facts from which to draw a reasonable inference that false claims were submitted to the government for payment. The Court disagrees with MedStar that this is a case like *United States ex rel. Kalec v. NuWave Monitoring, LLC*, 84 F. Supp. 3d 793, 803-04 (N.D. Ill. 2015), where the relator "merely describe[s] a private scheme in detail but then allege[s] simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." Although Relator does not specifically allege that Accretive's recommendations were "incorrect," she does allege that the claims are false because the WHC physicians who examined the patients determined that their conditions "could not medically justify a full hospital admission" and instead prescribed "an initial observation" of the patients' condition. [59] at 25. Relator also alleges for each of her nine specific examples that

Accretive's recommendation to change the patient's diagnosis from an initial observation to an inpatient admission "caus[ed] the patient's admission and a related claim to Medicare based on the changed diagnosis by Accretive," *id*. at 25-29, and that she has personal knowledge of how the scheme operated at WHC due to her work in 2012 through 2013 communicating daily with WHC's emergency room staff and Accretive. More generally, Relator alleges that the federal health insurance programs pay substantially more for patients for whom an inpatient admission, rather than an in-hospital observation, is ordered, and that Accretive's monthly reports to hospital administrators "focused . . . on the additional Medicare and Medicaid payments Accretive" expected the hospital to realize, *id*. at 14. While Relator does not attach records to her second amended complaint showing that claims were in fact submitted to the federal health insurance programs for the nine sample claims, Relator's factual allegations, taken as a whole, provide enough detail to support her belief that the claims were or likely were submitted. See *Kalec*, 84 F. Supp. 3d at 803-04; see also *Presser*, 836 F.3d at 777 ("a plaintiff does not need to present, or even include allegations about, a specific document or bill that the defendants submitted to the Government" in to plead an FCA claim, where "the alleged facts necessarily le[a]d one to the conclusion that the defendant ha[s] presented claims to the Government").

The Court next turns to the anti-kickback claim. "[A] claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of" the FCA. 42 U.S.C. § 1320a-7b(g). MedStar makes two primary arguments in support of its motion to dismiss the anti-kickback claim. First, MedStar argues that Accretive's activities did not constitute recommending or arranging for the ordering of health care items or services in violation of 42 U.S.C. § 1320a-7b(b)(2)(B). Plaintiff does not allege that Accretive's recommendations had any impact on patient care, and therefore, MedStar

asserts, Relator has not alleged "that patients reclassified by Accretive as inpatients received any 'good, facility, item or service' that the patient would not have received had the patient remained in 'observation' status." [82] at 11.

The relevant statute, however, does not require that a patient actually receive a recommended service; what is relevant is whether the service was recommended in exchange for payment and the government was billed for the service, which Relator alleges to be the case here. Specifically, 42 U.S.C. § 1320a-7b(b)(2)(B) provides in relevant part that it is a felony to "knowingly and willfully offer[] or pay[] any remuneration . . . to any person to induce such person . . . to . . . recommend . . . ordering any . . . service[] or item for which payment may be made in whole or in part under a Federal health care program." It is irrelevant under this statutory text that Accretive's recommendations did not actually result in patients classified as inpatient admissions receiving any greater level of care than they would have received if they had remained classified as observation only. MedStar does not cite any case law indicating that an enhanced level of service must actually be provided to violate the anti-kickback statute, so long as (1) the defendant, in exchange for payment, recommends that the service is ordered and (2) a federal health insurance program is billed for the service. MedStar's reading of the statute would create a loophole for services that were recommended and billed, but not actually provided, which cannot have been the intent of the statute's drafters.

MedStar's second argument in support of dismissing the anti-kickback claim is that Relator does not adequately allege that MedStar paid Accretive to induce it to arrange for or recommend the ordering of health care services. 42 U.S.C. § 1320a-7b(b)(2)(B). MedStar asserts that, under the facts alleged in the complaint, "it is at least equally, if not more, plausible that MedStar was paying for an objective recommendation from Accretive, rather than making a

payment to 'induce' a particular result." [82] at 11. Relatedly, MedStar argues that Relator fails to adequately allege willfulness, because there is nothing inherently unlawful about a hospital entering into a contract with a national consulting firm like Accretive to review its records. MedStar emphasizes that Accretive reclassified outpatients as inpatients for only 40-60% of the records it reviewed.

The Court concludes that these arguments cannot be resolved at the pleading stage. Rule 9(b) does not require Relator to plead Plaintiff's intent or state of mind with particularity. See Fed. R. Civ. P. 9(b); *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, 159 F. Supp. 3d 898, 921 n.5 (N.D. Ill. 2016). Plaintiff alleges sufficient facts to support a plausible claim that MedStar paid Accretive to induce it to arrange for or recommend the ordering of inpatient admission for federally insured patients for whom MedStar's physicians had already determined this not to be medically necessary. See *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (to survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must allege facts which, when taken as true, "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level'"). Indeed, MedStar's own argument in support of dismissal impliedly concedes that one plausible explanation for why MedStar was paying Accretive to review only those cases in which federally insured patients were determined not to meet inpatient admission criteria (rather than all cases) was to encourage Accretive to recommend inpatient admission in a significant portion of those cases and give MedStar a "revenue lift."

Relator alleges, specifically, that MedStar sent Accretive records to review only in cases where patients were first determined not to meet inpatient criteria, such that MedStar was not simply providing a generalized review of the correctness of MedStar's billing classification

decisions. While Accretive did not recommend inpatient admission in all of the cases it reviewed, it allegedly did so in a significant portion of cases—40-60%, according to the pleadings. Relator also alleges that doctors at WHS were pressured to and did change their diagnoses based on Accretive recommendations. Further, Relator alleges that Accretive sent monthly reports to hospital administrators to "confirm . . . that Accretive was meeting" the "contractual expectation and purpose" of changing a "substantial fraction . . . of medical staffs' original 'observation only' order to 'recommendations' for inpatient admissions" and showing the "reimbursement lift" or "revenue impact" that Accretive's recommendations would have. [59] at 16, 22. Taken together, these allegations plausibly suggest that MedStar intentionally and willfully paid Accretive to induce it to recommend the ordering of and billing for inpatient admissions for federally insured patients, after MedStar's doctors found that inpatient admissions were not medically necessary.

As to Relator's conspiracy claim, MedStar argues that the claim should be dismissed because Relator does not sufficiently allege an agreement or "shared specific intent" between MedStar and Accretive to submit false claims. The FCA imposes conspiracy liability on a defendant only when the defendant conspires to knowingly "present[], or cause[] to be presented, a false or fraudulent claim for payment or approval" or "make[], use[], or cause[] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(C). Relator responds that she has alleged facts suggesting the existence of an agreement at the highest corporate levels of Accretive and MedStar for Accretive to review Relator's inpatient observation-only orders and recommend in a substantial number of cases that the orders could be changed to inpatient admissions not to provide better health care to patients, but to obtain a "revenue lift." [92] at 11 & n.14.

The Court concludes that Relator's allegations are sufficient to state a conspiracy claim against MedStar. To state a conspiracy claim under the FAC, a "relator must allege that the defendants had an agreement, combination, or conspiracy to defraud the government by getting a false or fraudulent claim allowed or paid and that they did so for the purpose of obtaining or aiding to obtain payment from the government or approval of a claim against the government." *United States ex rel. Lisitza v. Par Pharm. Companies, Inc.*, 2013 WL 870623, at *7 (N.D. Ill. Mar. 7, 2013). The second amended complaint identifies the what, when, where, why, and how of the alleged conspiracy, even though it does not name specific persons who Relator believes carried out the conspiracy on MedStar and Accretive's behalf. Relator alleges that MedStar and Accretive signed an agreement under which MedStar would make per-review payments to Accretive only for cases in which inpatient observation was ordered for federally-insured patients, with the express intent that Accretive would recommend converting a substantial portion of the cases to inpatient admissions. Relator alleges that Accretive's recommendations were made by physicians or other persons who were not licensed in the appropriate states and who did not consult with the patients, and that Accretive's recommendations disregarded the conclusions of MedStar's on-staff physicians that inpatient admission was not medically necessary. As explained above, these allegations suggest that MedStar was paying Accretive to induce it to arrange for or recommend the ordering of health care services, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B).

Relator further alleges that MedStar and Accretive understood that the purpose of the agreement was to give MedStar a "revenue lift" or "reimbursement boost" when it submitted claims to the federal insurance programs. This understanding was confirmed by the monthly reports that Accretive sent to hospital administrators touting these economic benefits. These

allegations support Relator's position that MedStar and Accretive had an agreement to use Accretive's recommendations to aid MedStar in obtaining reimbursement from the government at a higher rate that MedStar would have received otherwise.

The Court does not find Relator's inability to individually name all the agents involved in the alleged conspiracy fatal to her claims. The Seventh Circuit does not apply such a formulaic approach to pleading under Rule 9(b). See *Pirelli*, 631 F.3d at 442. Relator identifies by role the persons involved in the scheme (such as the executives who signed the agreement and the persons who prepared and received Accretive's monthly reports touting "revenue lift") with enough specificity to put MedStar on notice of the substance of Relator's claims.

Finally, MedStar spends a large portion of its reply brief arguing that, at the time period relevant to the complaint, Medicare reimbursement did not require a physician certification of medical necessity for routine hospital inpatient services, and therefore MedStar's alleged failure to support its claims for inpatient admission with such certifications does not constitute a violation of the FCA. MedStar waived this argument by not including it in its opening brief in support of its motion to dismiss. See, *e.g.*, *Fletcher v. ZLB Behring LLC*, 2006 WL 218164, at *4 (N.D. Ill. Jan. 27, 2006) ("when a defendant fails to raise or develop an issue until reply, she waives the argument because the plaintiff has had no chance to respond"). MedStar claims that it waited until its reply brief to make this argument because Relator improperly stated the law in her response brief. But Relator's second amended complaint expressly references the legal provisions on which she relies for her argument that a certification of medical necessity is required, and there is no reason why MedStar could not have addressed these provisions in its original memorandum in support of the motion to dismiss. In any event, even if the Court considered and agreed with MedStar's arguments concerning certifications of medical necessity,

the Court would deny MedStar's motion to dismiss, because (as both parties acknowledge) "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of" the FCA, 42 U.S.C. § 1320a-7b(g), and Relator has sufficiently alleged a violation of the Anti-Kickback Statute for the reasons explained above.

For these reasons, MedStar's motion to dismiss [81] is denied.

### D.    Accretive's Motion to Dismiss

Accretive's motion to dismiss largely repeats arguments that the Court has already addressed above and therefore can be resolved without extensive additional analysis. First, Accretive argues that Relator's claims fail to satisfy Rule 9(b) to the extent that they are based on Accretive's agreements with the Hospital Defendants other than MedStar. The Court agrees, for the same reasons explained in Section III.B above, and therefore dismisses Relator's claims against Accretive to the extent they are based on Accretive's agreements with Methodist, Southeast, and Baptist.

Second, Accretive argues that Relator fails to allege any claim based on alleged claims made by MedStar to the Tricare program, because (among other reasons) her sample of nine claims does not include any that were allegedly submitted to the Tricare program. Relator does not respond to this argument. The Court concludes that Relator's allegations concerning Tricare are insufficient under Rule 9(b) and that Relator's FCA claims should be dismissed to the extent that they are based on claims that MedStar made to Tricare.

Third, Accretive argues that Relator fails to allege a false certification claim based on Accretive's review of MedStar cases, because she does not identify any statutes or regulations underlying her claim or allege that compliance with such statutes or regulations is material to the

government's payment decisions. This argument is belied by the pleadings. Relator specifically alleges that certifications of medical necessity are required by 42 U.S.C. § 1320c-5(a), 42 C.F.R. §§ 424.10(a), 424.11, and 424.13. While these allegations may ultimately prove incorrect as a matter of law, that issue is not properly before the Court at this stage of the case. Accretive does not address the substance of the cited statute or regulations in its brief, and MedStar's attempt to do so in its reply brief came too late and was waived for this stage of the case. See Section III.C, above.

Fourth, Accretive argues that Relator fails to allege an anti-kickback claim. Accretive's arguments are essentially the same as MedStar's, and the Court rejects them for the same reasons explained above in Section III.C.

For these reasons, the Court grants in part and denies in part Accretive's motion to dismiss. Relator's claims against Accretive are dismissed only to the extent that they are based on Accretive's agreements with Methodist, Southeast, or Baptist or on MedStar's submissions of claims to the Tricare program.

## IV.    Conclusion

For the foregoing reasons, Baptist's motion to dismiss [62] is granted; Methodist's motion to dismiss [67] is granted; Southeast's motion to dismiss [78] is granted; MedStar's motion to dismiss [81] is denied; and Accretive's motion to dismiss [72] is granted in part and denied in part. This case is set for status hearing on April 19, 2017 at 9:00 a.m.

Dated: March 22, 2017

_____
Robert M. Dow, Jr.
United States District Judge