IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. CHERRY GRAZIOSI, | ) ) ) |
| Relator, | ) ) ) |
| v. | ) ) |
| ACCRETIVE HEALTH, INC., MEDSTAR HEALTH, INC., and WASHINGTON HOSPITAL CENTER CORPORATION, | ) ) ) ) ) |
| Defendants. | ) ) |

Case No. 13-cv-1194

Judge Robert M. Dow, Jr.

## MEMORANDUM OPINION AND ORDER

Relator Cherry Graziosi ("Relator") brings suit against Defendants MedStar Health Inc. ("MedStar"), MedStar subsidiary Washington Hospital Center Corporation ("WHC") and R1 RCM, Inc. (formerly named Accretive Health, Inc.) ("R1") under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA").[1]  Currently before the Court is Relator's motion for leave to file a third amended complaint ("TAC") [159], which is opposed in part by Accretive only.  For the reasons explained below, Relator's motion [159] is granted.  Defendant MedStar's motion to dismiss Relator's second amended complaint [169] remains pending; it will be construed as a motion to dismiss the TAC, as MedStar requests, and resolved in a separate opinion.

---

[1] Defendant V.B. Harligen Holdings, Inc. was dismissed without prejudice on August 12, 2016 pursuant to Relator's notice of voluntary dismissal.  See [100].  Defendants the Methodist Health Care System, Inc. ("Methodist"), Baptist Health Hospitals, Inc. ("Baptist"), and Southeast Health System, Inc. ("Southeast") were dismissed pursuant to the Court's March 22, 2017 opinion deciding various motions to dismiss.  See [115].

I. **Background**

In this lawsuit, Relator alleges that R1 has engaged in an "admission certification scheme" with its hospital clients. R1 allegedly generates written recommendations that purport to justify the inpatient admission of the hospital clients' federally-insured patients after the hospitals' own physicians determined that the patients did not meet the medical necessity requirements for inpatient admission. On March 22, 2017, the Court dismissed three defendant hospitals—the Methodist Health Care System, Inc. ("Methodist"), Baptist Health Hospitals, Inc. ("Baptist"), and Southeast Health System, Inc. ("Southeast")—from the lawsuit. Baptist was dismissed for lack of jurisdiction, while Methodist and Southeast were dismissed due to Relator's failure to plead with particularity the circumstances under which those hospitals presented false or fraudulent claims to the Government for payment.

Currently before the Court is Plaintiff's proposed TAC [160-1]. The TAC adds WHC as a Defendant. The TAC also expands the scope of Plaintiff's claims against R1 to cover R1's "national fees-for-recommendations operation" in more than 250 hospitals. [166] at 12; see also [160-1] at 12. R1 opposes the TAC to the extent that it is based on R1s interactions with any hospitals other than WHC.

In particular, the proposed TAC alleges the following facts, which are assumed to be true for purposes of Relator's motion. Relator is a resident of Maryland. Between January 2010 and October 2013, she worked as a "Service Associate" in the Emergency Department of WHC in Washington, D.C. WHC is owned and controlled by MedStar, a Maryland corporation with its principal place of business in Maryland. This lawsuit arises out of WHC's agreement with R1, a Delaware corporation with its principal place of business in Chicago, pursuant to which R1 reviews WHC's physicians' decisions concerning the medical necessity of admitting patients for inpatient stays.

According to the proposed TAC, hospitals that participate in the Medicare program and other federal health programs are required to enter into contracts with the Centers for Medicare and Medicaid Services ("CMS"). In these contracts, the hospitals agree to comply with federal laws and regulations, including specifically the federal Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b) ("AKA").[2] MedStar's and R1's other hospital clients present claims for payment to federal insurance programs by submitting a "CMS Form UB-04" and/or "CMS Form 1450," in which they certify that "(r)ecords adequately disclosing services will be maintained" by the hospitals. [160-1] at 7.

The proposed TAC alleges that, pursuant to federal statute, hospitals have "the obligation *** to assure *** that services *** ordered or provided *** to [federal health insurance] beneficiaries and recipients *** will be provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a); see also [160-1] at 8. According to the proposed TAC, since 2007 "Section 10 of Chapter 1 of the Medicare Benefit Policy Manual, CMS Pub. 100-02, in governing the prerequisites for determining payable Medicare claims, has required in relevant part the following as material prerequisites for any entitlement of any hospital to be paid any amount for any inpatient hospital stay:

> The physician or other practitioner responsible for a patient's care at the hospital is *** responsible for deciding whether the patient should be admitted as an inpatient. *** [T]he decision to admit a patient is a complex medical judgment which can be made only after the physician has considered a number factors, including the patient's medical history and current medical needs, the types of facilities available to inpatients and to outpatients, the hospital's by-laws and admissions policies, and the relative appropriateness of treatment in each setting. Factors to be considered when making the decision to admit include such things as: *** (t)he availability of

---

[2] The AKA makes it a felony to "knowingly and willfully solicit[] or receive[] any remuneration *** (B) in return for *** arranging for or *** or ordering any *** services *** for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(1)(B). The AKA also makes it a felony to "knowingly and willfully offers or pays any remuneration *** to any person to induce such person *** (B) to *** arrange for or recommend *** ordering any *** service *** for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(B).

3

diagnostic procedures at the time when and at the location where the patient presents[.]"

[160-1] at 9.

In addition, the TAC alleges, "[i]mplicitly prior to October of 2013, and explicitly by regulation thereafter, Medicare rules have required, as a material condition of any hospital's entitlement to payments for any inpatient hospital stay, that any decision and order that it was medically necessary to admit a patient as a hospital inpatient must have been made by a physician who (a) was then admitted to the hospital's medical staff, (b) was then acting under a valid medical license in the jurisdiction where the hospital was located, and (c) had certified that the inpatient admission was medically necessary and that the certifying physician had made that decision regarding medical necessity." [160-1] at 10.

The proposed TAC alleges that since 2007, R1 has entered into uniform "fees-for-recommendations 'concurrent review' contracts" with over 250 hospitals—including WHC beginning in 2012—in more than 30 states. [160-1] at 12; see also *id*. at 14-17 (identifying "fees-for-recommendations hospital clients"). Pursuant to these contracts, R1 allegedly uses "off-site 'reviewers'" to generate "written 'recommendations' purporting to justify the inpatient admission of federally-insured patients as to whom the hospitals' own Emergency Departments and other Hospital Staff physicians had previously determined *** did not then meet the medical necessity requirements for an inpatient hospital stay, but instead only met medical necessity requirements for an 'observation' of their medical condition for a period of twenty-four (or, as of October 1, 2013, forty-eight) hours." *Id*. at 10. "Observation" services are regarded as "outpatient" services and billed through Medicare Part B, whereas inpatient services are paid through Medicare Part A. According to the TAC, Medicare Part A payments are "far more financially lucrative for a hospital" than Medicare Part B payments. R1 represented to potential hospital clients that "the

4

compensation to a hospital for an inpatient admission and stay could be as much as ten times the compensation for an outpatient 'observation' stay." *Id.* at 12.

According to the proposed TAC, R1 undertakes "concurrent review" pursuant to a standard agreement and in the same manner for all of its client hospitals. The TAC alleges that in all the agreements, R1 "promised to 'review' the 'patient classification submitted by the (Hospital) Client to determine the appropriate admission status,' and to 'review and communicate their Recommendation regarding the proper patient classification to the attending physician and/or case managers where possible, to the extent required by the hospital client.'" [160-1] at 18. The agreements also included standard language that "'[i]n order to implement the (Accretive/R1) Recommendation, (Hospital) Client may need to change the admission classification status' of patients.'" *Id*. In exchange for R1s recommendations, Medstar and other hospital clients "agreed to (and did) pay []R1 a per-review amount, which varied in amount (between '$210 per case' and '190 per case') depending on what fraction of the hospital's patients were (or were not) 'Meeting Inpatient Criteria or Equivalent.'" *Id*.

The proposed TAC alleges that R1 employed approximately 250 physicians at three office sites (in Chicago, Houston, and Seattle) to prepare "concurrent reviews." R1 provided the physicians with uniform training for compiling and communicating their recommendations. The proposed TAC alleges that the training materials "urged all such reviewers as to all such hospitals, in leading-question fashion, to formulate rationales for recommendations to 'admit inpatient' persons previously classified by hospital physicians as then only in medical need of observation (or 'OBS') services." [160-1] at 23. R1 "uniformly instructed all of it physicians in the course of the same uniform national training to insert, into their 'recommendations,' language to '(j)ustify

5

the hospitalization' and to '(l)ist possible adverse events (consider only for Inpatient)' as to any 'high risk' condition they could identify." *Id*.

The proposed TAC alleges that R1's reviewers never met or examined the patients; had no information other than the written clinical notes; never met the particular prerequisites for practicing medicine on the medical staffs of the client hospitals; and "typically were not licensed to diagnose medical conditions in (or actually practice medicine in) the jurisdiction in which the relevant hospital was located." [160-1] at 38. R1's reviewers were expected to review 1.5 cases per hour and were given a 50% bonus for completing 1.8 to 1.89 cases per hour and a 150% bonus for completing 2.15 or more cases per hour.

Relator, while employed at WHC, located in WHC's non-public digital records a "Service Proposal" authored by R1 and dated November 2008. The proposal described R1 as "'a built-for-purpose company with the sole focus on generating significant, sustainable improvements in net revenue.'" *Id*. [160-1] at 21. The proposal explained that R1's "'physician adviser' reviewers *** 'manage(d) thousands of patient encounters per month' through a review process in which its 'physicians will evaluate all Medicare patients that do not meet Inpatient criteria and are submitted to Accretive Health by MedStar health via phone, online medi[c]al records access, fax, scanner, or Accretive Health's proprietary electronic exchange.'" [160-1] at 20. In exchange for payments to R1, the proposal explained, R1's "'physicians will provide recommendations as to the most appropriate level of care status' (as to patients, that is, who 'do not meet Inpatient criteria')" in under 25 minutes. *Id*. at 21. The proposal also promised to provide WHC with "a 'Monthly Statement of Value report' representing the additional dollars that [R1] could be expected to collect through its hospitals as a result of such 'concurrent review' activities." *Id*. "A sample 'impact summary' represented that [R1] provided a hypothetical client a monthly 'Reimbursement Lift' of

6

$172,000 as a result of re-classifying 26 patients as 'inpatient' who had an 'initial client classification' by the hypothetical client hospital of only 'observation.' For each of twelve different inpatient hospital diagnoses [R1's] Proposal itemized the dollars that a hospital would not collect if patients were not admitted inpatient[.]'" *Id*.

Further, the proposed TAC alleges that "[p]ursuant to the incentives and purposes of participating by agreement in *** R1's fees-for-recommendations 'concurrent review' agreements, administrators at *** R1's hospital clients, including but not limited to MedStar WHC, urged and pressured their hospitals' own medical staffs and clinical support personnel to adopt and enforce [R1]'s recommendations to change 'observation only' patients to 'inpatient admission' in order for the hospital clients to make substantially higher-paying inpatient claims for payments to Medicare, Medicaid and other insurers." [160-1] at 44. The proposed TAC contends that "[t]he recommendations to 'admit inpatient' communicated by [R1] reviewers to its hospital clients, including but not limited to MedStar WHC, and *** R1's implicit and explicit communications to its hospital clients regarding the 'reimbursement lift' and increased revenue which such hospitals could gain by enforcing *** R1's recommendations through urging and causing orders to admit the same patients as inpatients, proximately caused the inpatient admissions and resulting payment claims to Medicare and Medicaid as to the patients originally 'recommended' for inpatient admission by *** R1." [160-1] at 35-36.

The proposed TAC alleges that R1's agreement with its hospital clients were "fundamentally and willfully an exchange of fees for recommendations as to such health care services, all knowingly made and operated, with respect to Medicare and Medicaid patients, in violation of the Anti-Kickback Act." [160-1] at 24. According to the proposed TAC, it was a "material condition, expectation, and purpose of all *** R1's hospital clients who agreed to pay

7

\*\*\* R1 for 'concurrent reviews,' that [R1] was expected to, and did, change a substantial fraction, often in the range of 40% or 50% or higher, of its client hospitals' medical staffs' original 'observation only' orders to 'recommendations' to 'admit inpatient.'" *Id*. at 27.

Moreover, the proposed TAC alleges, R1 and its hospital clients "knew that when they allowed [R1's] absentee 'reviewers' \*\*\* to originate and cause the 'decision' to 'convert' or 'upgrade' outpatients to 'admit inpatient' status, they were causing such decisions effectively to be originated, caused, and made by and delegated to persons who did not know any hospital-specific information \*\*\*, and thus did not have the most basic information on which Medicare rules required such medical necessity decisions to be made in order for such inpatient stays to be lawfully payable, in violation of basic Medicare laws and rules, obedience to which was material to any such hospital's entitlement to be paid as to any such inpatient claim." [160-1] at 48. "In delegating to absentee \*\*\* R1 'reviewers' the authority to originate decisions to 'admit inpatient' persons previously determined not to be in medical need of such expensive treatments, and in urging clinical staff to implement and enforce those 'recommendations' as the hospital's definitive inpatient admission 'orders' so as to pursue the increased revenue," the proposed TAC alleges, R1 and its hospital clients "knowingly and systematically violated Medicare rules and regulations requiring, as a material condition of any hospital's entitlement to payments for any inpatient hospital stay, that the decision and order regarding the medical necessity of an inpatient admission must have been made by a physician who (a) was then admitted to the hospital's medical staff, (b) was then acting under a valid medical license in the jurisdiction where the hospital was located, and (c) had certified that the inpatient admission was medically necessary and that the certifying physician had fundamentally made, and took professional responsibility for, that decision regarding medical necessity." *Id*. at 48-49.

The Proposed TAC contains six counts, three against R1 (Counts I through III) and three against MedStar (Counts IV through VI). In Count I, Relator alleges that R1 knowingly caused to be presented false or fraudulent claims by its hospital clients to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1), and as amended in 2009 and codified as 31 U.S.C. § 3729(a)(1)(A). Count II alleges that R1 caused to be made or used false records or statements to get false or fraudulent claims paid or approved by an agency of the United States Government, in violation of 31 U.S.C. § 3729(a)(2)(as codified before 2009 amendments), and also caused to be made or used false records or statements which were material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B) as codified pursuant to amendments to the FCA in 2009. Count III alleges that, through R1's fees-for recommendations "concurrent review" agreements and program, R1 agreed and conspired with each of its hospital clients to defraud the government in order to get false or fraudulent claims paid by Medicare and Medicaid, in violation of 31 U.S.C. § 3729(a)(3), and in violation of 31 U.S.C. § 3729(a)(1)(C) as amended in 2009.

## II.     Legal Standards

A motion for leave to file an amended pleading should "freely" be granted "where justice so requires." Fed. R. Civ. P. 15(a)(2). Among other reasons, leave to amend may be denied "if the pleading is futile." *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008). Where, as here, summary judgment has not been decided, "futility is measured by the capacity of the amendment to survive a motion to dismiss"—not its ability to survive summary judgment. *Duthie v. Matria Healthcare, Inc.*, 254 F.R.D. 90, 94 (N.D. Ill. 2008). In the typical case, to survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must allege facts which, when taken as true, "'plausibly suggest that the [party] has a right to relief, raising that possibility above a speculative

9

level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007)).

However, this case alleges violations of the FCA, which "are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 775 (7th Cir. 2016) (quoting *United States ex rel. Gross v. AIDS Research All.–Chi.*, 415 F.3d 601, 604 (7th Cir. 2005)). Under Rule 9(b), a plaintiff alleging fraud "'must state with particularity the circumstances constituting fraud or mistake.'" *Id*. at 776 (quoting Fed. R. Civ. P. 9(b)). Ordinarily, the plaintiff "must describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *Id.* (quoting *United States ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)); see also *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (Rule 9(b) requires the plaintiff to state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff"). While providing this broad guidance, "[t]he Seventh Circuit has shied away from a rigid, formulaic approach to Rule 9(b) and noted that '[t]he twin demands of detail and flexibility, though in tension with one another, make sense in light of the competing purposes of the federal rules.'" *Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 815 (N.D. Ill. 2013) (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011)). Further, the Seventh Circuit has held that "a plaintiff does not need to present, or even include allegations about, a specific document or bill that the defendants submitted to the Government" in to plead an FCA claim, where "the alleged facts necessarily le[a]d one to the conclusion that the defendant ha[s] presented claims to the Government." *Presser*, 836 F.3d at 777-78.

**III.     Analysis**

R1 opposes Relator's motion for leave to file a TAC on the basis that "Relator's proposed amendment is futile because the allegations about 59 hospitals she seeks to add fail to meet the heightened pleading standard required for FCA claims." [165] at 4.  R1 asserts that Relator fails to "allege any facts explaining how the agreements were implemented" by R1's hospital clients "in a manner that resulted in the submission of false claims" or explain how she "came to have any knowledge about the operations at the 59 hospitals." [165] at 5-6.  R1 further argues that Relator fails to identify any patients of the 59 hospitals who were improperly admitted for inpatient care after an on-staff physician determined an inpatient admission not to be medically necessary; any specific false or fraudulent claims or records (or a representative sample thereof) that [any of the 59 hospitals] allegedly submitted to the government for payment; any facts of an alleged kickback scheme involving [any of the 59 hospitals]; a causal link between any illegal remuneration [any of the 59 hospitals] allegedly paid or received and the submission or a false or fraudulent claim for payment; or any agreement between Methodist and [any of the 59 hospitals] and [R1] to defraud the Government by getting a false or fraudulent claim allowed or paid." *Id.*

As the Court recognized in its prior opinion, "a plaintiff does not need to present, or even include allegations about, a specific document or bill that the defendants submitted to the Government" in order to plead an FCA claim *if* "the alleged facts necessarily le[a]d one to the conclusion that the defendant ha[s] presented" (or caused to be presented) "claims to the Government." *Presser*, 836 F.3d at 777-78.  Since the sufficiency of allegations of fraud is so context-specific, the Court has found it helpful to examine FCA case law involving allegations of medical "upcoding" to bill the government for procedures that were not medically necessary.

In *United States ex rel. Zverev v. USA Vein Clinics of Chicago, LLC*, 244 F. Supp. 3d 737 (N.D. Ill. 2017), the court held that the relator's allegation that the defendant's "ultrasound technicians recommended a 'positive diagnoses,' [sic] indicating a need for surgery, at a significantly higher rate than would be expected" was insufficient to plausibly allege that the defendant vein clinic billed the government for procedures that were not medically necessary, because the allegations "provide[d] no basis to identify, with any degree of particularity, which bills were fraudulent" on the basis that they were for unnecessary procedures. *Id*. at 747-48. Similarly, in *United States ex rel. Myers v. America's Disabled Homebound, Inc*., 2018 WL 1427171 (N.D. Ill. Mar. 22, 2018), the allegations of the relator, a former employee of defendant, that she "up-coded" certain claims for payment to show that she spent more time with patients than she actually did, were found to be insufficient to state an FCA claim, where the relator "fail[ed] to identify the patients whose care she 'up-coded,' or even a general time period when these up-coded claims were submitted." *Id*. at *4.

In contrast to these cases of alleged upcoding, Plaintiff's theory in this case appears to be that *all* bills that were submitted to the Government as a result of R1's recommendations to change a federally-insured patient from outpatient observation to inpatient admit were false or fraudulent for purposes of the FCA. In particular, the proposed TAC alleges that R1's recommendations to (1) were "originated, caused, and made by and delegated to persons who did not know any hospital-specific information about" factors that Medicare guidelines require to be considered, including "the types of facilities available to inpatients and to outpatients, the hospital's by-laws and admissions policies, and the relative appropriateness of treatment in each setting" or the "availability of diagnostic procedures at the time when and at the location where the patient presents"; and (2) "systematically violated Medicare rules and regulations requiring, as a material

12

condition of any hospital's entitlement to payments for any inpatient hospital stay, that the decision and order regarding the medical necessity of an inpatient admission must have been made by a physician who (a) was then admitted to the hospital's medical staff, (b) was then acting under a valid medical license in the jurisdiction where the hospital was located, and (c) had certified that the inpatient admission was medically necessary and that the certifying physician had fundamentally made, and took professional responsibility for, that decision regarding medical necessity." *Id*. at 47-49; compare *Universal Health Services, Inc. v. United States*, 136 S. Ct. 1989, 1999 (2016) (recognizing that "the implied false certification theory can, at least in some circumstances, provide a basis for liability" the FCA; when "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided").

Relator's proposed TAC alleges additional facts about the standard features of the purported admission certification scheme, which support her theory that R1's hospital clients did, in fact, use R1's recommendations to make claims to the Government for payment of inpatient hospital bills. According to the proposed TAC, Relator has learned through documents produced in discovery that receiving reimbursement at the higher inpatient rates—not improving patient care—was the entire goal of the concurrent review program. According to the proposed TAC, R1: marketed its concurrent review operation by promising its hospital clients that they would receive higher payments for inpatient admissions it recommended; focused its reviews and reviewer training on Medicare patients and patients who were originally determined not to need higher-paying inpatient stays; and instructed its reviewers on how to make the medical risks sound more severe in order to justify inpatient admission. Further, the proposed TAC explains how R1

13

provided reports to its hospital clients showing (1) the rate at which their physicians implemented R1's recommendations for inpatient admission; and (2) the monthly revenue "boost" the hospital clients received as a result of R1's recommendations, allegedly to encourage the hospital clients to pressure their physicians to, in effect, rubber stamp R1's recommendations.

In contrast to *Zverey* and *Myers*, the details alleged in the proposed TAC allow the parties to identify (albeit with some further work) that subset of each hospital client's bills to Medicare or Medicaid that allegedly are "fraudulent" for purposes of the FCA. Such bills would be limited to those cases in which: (1) the treating physician determined that it was not medically necessary to admit a Medicare or Medicaid patient as an inpatient; (2) R1 reviewed that determination and recommended inpatient admission; and (3) the hospital client admitted the patient as an inpatient and billed Medicare or Medicaid. Compare *Presser*, 836 F.3d at 777 (relator's allegations, that mental health clinic and its owner told her that almost all of clinic's patients were "on Title 19" and received Medicare and that questionable practices and procedures performed at clinic were applied to all patients, alleged with sufficient particularity required for claims of fraud that clinic and owner billed Medicare for services that were provided pursuant to the allegedly illegal policies and procedures, as required element of relator's FCA claim against clinic and owner).

Further, for purposes of Count II of the proposed TAC (making a false record or statement that is material to getting a false claims paid), Relator is required to prove that R1 "made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government,'" rather than "proof that the defendant caused a false record or statement to be presented or submitted to the Government." *Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662, 671 (2008) (citing 31 U.S.C. § 3729(a)(2)); see also *United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 735–36 (N.D. Ill. 2007) ("The FCA covers 'indirect

14

mulcting of the government' and 'a defendant may be liable if it operates under a policy that causes others to present false claims to the government.'" (quoting *United States v. President & Fellows of Harvard College*, 323 F. Supp. 2d 151, 187 (D. Mass. 2004)). Thus, for example, "a subcontractor violates § 3729(a)(2) if the subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim." *Allison Engine*, 553 U.S. at 671-72. The proposed TAC's allegations are sufficient to support Relator's theory that all of R1's recommendations were false records "made *** for the purpose of getting" claims for inpatient treatment paid, after the patients' treating physicians determined that inpatient admission was not medically necessary. *Id.*

For purposes of Count III (conspiracy to submit a false claim), Relator must "establish[] that conspirators agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim, but it is not necessary to show that the conspirators intended the false record or statement to be presented directly to the Government." *Allison*, 553 U.S. at 673 (citing 31 U.S.C. § 3729(a)(3)). According to the proposed TAC, R1 and its hospital clients all understood that R1's allegedly false or fraudulent recommendations were needed in order to receive reimbursement from the Government at the higher rates that apply to inpatient treatment, after the hospitals' own physicians found inpatient admission to be medically unnecessary. Taking the proposed TAC as a whole, the Court concludes that the TAC complies with Rule 9(b) and, therefore, allowing Plaintiff to amend the complaint would not be futile.

Apart from futility, R1 argues that Relator's motion should be denied because allowing amendment would cause delay and prejudice to R1. R1 contends that "[t]he costs R1 would incur to merely collect and produce documents if the Court were to indulge Plaintiff's 'fishing expedition' at 59 additional hospitals would be massive." [165] at 8. According to R1, "[t]hese

15

burdens cannot be justified in light of Relator's delay in seeking a third amendment to a complaint that was originally filed five years ago." *Id*. at 8-9.

The Court is not persuaded that these alleged concerns justify denying Relator the opportunity to amend. "[D]elay in itself does not constitute a sufficient basis for a district court's equitable decision" to deny leave to amend a pleading. *King v. Kramer*, 763 F.3d 635, 644 (7th Cir. 2014). The delay "must be coupled with some other reason, such as prejudice to the defendants." *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 789–91 (7th Cir. 2011). "Undue delay is most likely to result in undue prejudice when a combination of factors—delay in proceedings without explanation, no change in the facts since filing of the original complaint, and new theories that require additional discovery—occur together." *McDaniel v. Loyola University Medical Center*, 317 F.R.D. 72, 77 (N.D. Ill. 2016) (quoting *J.P. Morgan Chase Bank, N.A. v. Drywall Serv. & Supply Co.*, 265 F.R.D. 341, 347 (N.D .Ind. 2010)) (internal quotation marks omitted).

That combination of factors is not present in this case. Although the lawsuit was filed five years ago, there is no evidence that Relator unduly delayed seeking leave to file the TAC. There was no progress in the case for the first three years while the Government determined whether it wished to intervene. See [13] (4/26/16 minute order indicating that the Government declined to intervene at that time). Since then, the parties have been engaged in discovery under Magistrate Judge Schenkier's supervision. On September 19, 2017, Judge Schenkier ordered R1 to produce certain documents concerning its dealings with the MedStar entities, but shielded R1 from any obligation to produce documents not directly pertaining to its dealings with MedStar. Relator explains that she learned from the documents that R1 did produce that R1's admissions

16

certification scheme was operated in a uniform manner both at MedStar and at R1's other hospital clients.[3]

Finally, it is not clear that allowing amendment will significantly expand the scope of discovery. None of the parties address this issue in any detail. To the extent that R1 has objections to Relator's future discovery demands, it can request a protective order limiting discovery's scope. "Although the federal discovery rules are permissive, they are not *** 'a ticket to an unlimited *** exploration of every conceivable matter that captures an attorney's interest.'" *Motorola Solutions, Inc. v. Hytera Communications Corp.*, 314 F. Supp. 3d 931, 939 (N.D. Ill. 2018) (quoting *Sapia v. Bd. of Educ. of the City of Chi.*, 2017 WL 2060344, at *2 (N.D. Ill. May 15, 2017)). Instead, "[a]ll discovery must be relevant and proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1), and courts do "'not hesitate to exercise appropriate control over the discovery process.'" *Leibovitch v. Islamic Republic of Iran*, 297 F. Supp. 3d 816, 834 (N.D. Ill. 2018) (quoting *Herbert v. Lando*, 441 U.S. 153, 177 (1979)). For example, the parties may consider whether sampling will suffice to test Relator's principal assertion of a uniform, nationwide scheme to defraud. And if the next round of discovery does not confirm that assertion, Defendants may renew their objection that any additional discovery amounts to nothing more than a fishing

---

[3] Relator explained that she inferred this from R1's production of, among other things, (1) "hundreds of documents describing a national 'concurrent review' operation conducted by [R1] at numerous hospitals"; (2) "marketing materials in which [R1] had represented that by 2012 it had already been performing such 'concurrent review' activities for '250+ hospitals' in 'more than 30 states,' employing 'roughly 250 physicians' to conduct its review"; (3) R1's "77-page 'Anatomy of Level of Care Consults' used to train 'roughly 250 physicians' at the '250 hospitals' [R1] admitted it had as clients, in which [R1] instructed its reviewers in leading-question fashion to formulate rationales for recommendations" to admit "observation only" patients as inpatients; (4) documents showing R1 used a "standardized pricing scheme" in exchange for its recommendations; (5) "training documents confirming that all of its medical reviewers nationwide were specifically training in how *** Medicare defined 'inpatient admission' criteria"; and (6) documents describing R1's national practice of providing its hospital clients with 'End of Quarter Reconciliation Report(s)' purportedly documenting the 'Actual Net Revenue (from) Upgrades' originally recommended by [R1] and actually resulting in financial claims for payments for inpatient treatment by [R1's] hospital clients." [166] at 5-7, 9-11.

expedition and thus should be restricted or denied outright. Magistrate Judge Schenkier has capably managed the discovery process thus far and will continue to do so in light of the filing of the TAC.

**IV. Conclusion**

For these reasons, Relator's motion for leave to file a third amended complaint [159] is granted. Defendant MedStar's motion to dismiss [169] remains pending; it will be construed as a motion to dismiss the TAC, as MedStar requests, and resolved in a separate opinion.

Dated: September 20, 2018

_____
Robert M. Dow, Jr.
United States District Judge