## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **ex rel. CHERRY GRAZIOSI, Relator** | ) | **Case No. 13-cv-01194** |
| | ) | |
| **Plaintiff** | ) | **Judge Robert M. Dow, Jr.** |
| **v.** | ) | |
| | ) | |
| **R1 RCM, INC. (formerly named** | ) | |
| **ACCRETIVE HEALTH, INC.),** | ) | |
| **MEDSTAR HEALTH, INC., and** | ) | |
| **WASHINGTON HOSPITAL** | ) | |
| **CENTER CORPORATION** | ) | |

**Defendants**

## THIRD AMENDED COMPLAINT
### (JURY TRIAL REQUESTED)

*Qui tam* relator, Cherry Graziosi, by her undersigned attorneys and pursuant to
Rule 15 of the Federal Rules of Civil Procedure and the Court's Order herein, alleges as
her Third Amended Complaint in this proceeding the following:

1.     This is a civil action brought on behalf of the United States of America
against the Defendants named herein to recover treble damages and civil penalties under
the False Claims Act, 31 U.S.C. §§ 3729-3732, as amended ("FCA").  Relator Cherry
Graziosi ("Graziosi"), acting on behalf of the United States, brings this civil action under
the *qui tam* provisions of the False Claims Act.

### I.  JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345
and 31 U.S.C. §§ 3730(b) and 3732(a).

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a).  Defendant R1 RCM, Inc., managed and conducted the activity alleged and attributed to it herein from and through its corporate headquarters located in Chicago, Illinois, and thus in this District and Division.

## II. THE PARTIES

4.      *Qui tam* relator Graziosi is an adult citizen of the United States and a resident of the State of Maryland. She was employed on a full-time basis, between January of 2010 and October of 2013, as a "Service Associate," in the Emergency Department of the hospital operated as the MedStar Washington Hospital Center, a 926-bed hospital owned directly by the Defendant Washington Hospital Center Corporation and indirectly by the Defendant MedStar Health, Inc., and located in Washington, D.C. That Hospital is the largest privately-owned hospital in the Nation's Capital, and is among the fifty largest hospitals in the United States. Between mid-2012 and October of 2013, Relator Graziosi was required as a substantial part of her job to make and receive daily communications from that Hospital's Emergency Department staff to the staff of Defendant R1 RCM, Inc. (then named "Accretive Health, Inc."), in  the implementation of what R1 RCM, Inc. referred to as "concurrent reviews" and what the Second Amended Complaint herein referred to as "the Accretive admissions certification scheme." The same service or program provided by R1 RCM, Inc. shall also be referred to hereafter as "Accretive/R1's fees-for-recommendations concurrent review" operation. As a result of her daily work Ms. Graziosi gained personal knowledge of many of the facts set forth

2

herein.

5.     Defendant R1 RCM, Inc., a corporation previously named Accretive Health, Inc. (and frequently referred to hereafter as "Accretive/R1"), is organized under the corporate laws of the State of Delaware, the stock of which is publicly traded. Accretive/R1 maintains its principal place of business at 401 North Michigan Avenue, Suite 2700, Chicago, Illinois 60611, from which it originated and has managed the activity described and attributed to it herein.  Since 2007, Accretive/R1 has solicited, entered and operated, for and with over 250 hospital clients in the United States, a uniform program of "concurrent reviews" described hereafter as the "Accretive/R1 fees-for-recommendations concurrent review" operation.

6.     Defendant MedStar Health, Inc. (hereafter, "MedStar"), is a Maryland corporation which maintains its principal place of business at 5565 Sterrett Place, Columbia, Maryland 21044.  MedStar ultimately controls the operation of nine different hospitals, including Defendant Washington Hospital Center Corporation (doing business as MedStar Washington Hospital Center), and caused the fees-for-recommendations "concurrent review" agreements and arrangements to be entered by its subsidiary, Washington Hospital Center Corporation.

7.     Defendant Washington Hospital Center Corporation, doing business now and during all times relevant to this Third Amended Complaint as MedStar Washington Hospital Center (hereafter, "MedStar WHC"), is a corporate entity owned and controlled by Defendant MedStar Health, Inc., for the operation of the hospital

facility known as MedStar Washington Hospital Center, located in Washington, D.C.

(Defendants MedStar Health, Inc. and MedStar WHC shall sometimes be referred to

hereafter as "the MedStar Defendants.")

### III. THE FALSE CLAIMS ACT

8.  The False Claims Act (FCA) provides in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be
> presented, to an officer or employee of the United States
> Government or a member of the Armed Forces of the United
> States a false or fraudulent claim for payment or approval;[1]
> (2) knowingly makes, uses, or causes to be made or used,
> a false record or statement to get a false or fraudulent claim
> paid or approved by the Government;[2] (3) conspires to
> defraud the Government by getting a false or fraudulent claim
> paid or approved by the Government; ... or (7) knowingly
> makes, uses, or causes to be made or used, a false record or
> statement to conceal, avoid, or decrease an obligation to pay
> or transmit money or property to the Government,
>
> * * *
>
> is liable to the United States Government for a civil penalty of
> not less than $5,500 and not more than $11,000, plus 3 times
> the amount of damages which the Government sustains
> because of the act of that person....
> (b) For purposes of this section, the terms "knowing" and
> "knowingly" mean that a person, with respect to information
> (1) has actual knowledge of the information; (2) acts in

---

[1] In 2009 that language was amended by Congress, and re-codified as 31 U.S.C. § 3729(a)(1)(A), to apply to any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

[2] The same 2009 amendments revised that language to apply to any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," and re-codified that language as 31 U.S.C. § 3729(a)(1)(B).

> deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent is required.

31 U.S.C. § 3729.

## IV. THE MEDICARE AND MEDICAID FEDERAL HEALTH INSURANCE PROGRAMS

9.      The United States, through the Department of Health and Human Services ("HHS") and its component agency, the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare Part A and Medicare Part B programs.  Generally, hospitals are reimbursed, particularly for "inpatient services," through the Medicare Part A program.

10.      Hospitals and other health care providers who participate in the Medicare program, as well as other federal health care programs, are required to enter into contracts or "Medicare Enrollment Applications" with CMS, in a contract form known as a "CMS-855A" form.  MedStar WHC and each of Accretive/R1's other hospital clients executed (and, in order to get paid by CMS each of the claims alleged herein as false, inherently used) an Enrollment Application and Agreement with CMS in which each such hospital represented that through its authorized responsible official it "understand(s) that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with (Medicare) laws, regulations, and program instructions . . . and on the provider's compliance with all applicable conditions of participation in Medicare."

11.     The United States also maintains a federally-approved Medicaid program to reimburse health care charges made by hospitals for the treatment of many Americans, including low-income Americans, not covered by Medicare, most of the payments for which are made by funds of the United States (with the remainder funded by the States and the District of Columbia). Claims made to the Medicaid system or payors are claims made to the United States, within the meaning of the FCA.

12.     As a material part of enrolling and re-enrolling in the Medicare system, for instance, MedStar WHC and each of Accretive/R1's other hospital clients expressly certified, above a signature by its authorized management and on a CMS Form 855-A, that the hospital's administration then had an actual understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with (Medicare) laws, regulations, and program instructions," expressly "including" the "Federal anti-kickback statute" among other federal health care laws. Each such hospital therefore had actual knowledge, prior to any claim of the kind alleged to be legally false in this case, that its entitlement to be paid under any such program any amount for any claim was conditioned on that claim not being the result of and not arising from any activity undertaken in exchange for any inducement paid or offered in violation of the Anti-Kickback Act ("AKA"), codified at 42 U.S.C. § 1320a-7b(b), which in relevant part provides as follows:

> (B)(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind - - (B) in return for . . . arranging for or recommending . . . or

6

ordering any . . . services . . . for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(B)(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person - - (B) to . . . arrange for or recommend . . . ordering any . . . service . . . for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

## V. LICENSED HOSPITAL PHYSICIANS' DETERMINATIONS OF MEDICAL NECESSITY AS CONDITIONS OF ANY HOSPITAL'S RIGHT TO PAYMENTS

13.     MedStar WHC, like other Accretive/R1 "concurrent review" hospital clients (and all other hospitals which seek payments for hospital inpatient admissions from federal health insurance programs), present claims for payment to such programs through submission of a CMS Form UB-04 (and/or a CMS Form 1450), and certify on each such payment submission form, as "pertinent to this Bill," that sufficient "(r)ecords adequately disclosing services will be maintained" by the hospital. A sample of such a hospital payment form is attached hereto as Exhibit A.

14.     In order for any such hospital to be legally entitled to be paid on any claim for inpatient hospital services rendered to a Medicare or Medicaid beneficiary, it is by federal statute "the obligation" of the hospital "to assure, to the extent of (its) authority that services or items ordered or provided" to such beneficiaries "will be provided

7

economically and only when, and to the extent, medically necessary," which determination must "be supported by evidence of medical necessity" as determined by a licensed physician with personal knowledge of that medical necessity. 42 U.S.C. § 1320c-5(a).

16. As a mandatory part of assuring the medical necessity of inpatient hospital admissions of Medicare and Medicaid beneficiaries, federal law further provides that a licensed "physician has a major role in determining utilization of health services furnished by providers," and that likewise only a "physician decides upon admissions" in particular. 42 C.F.R. § 424.10(a).

16. As a condition of any hospital's participating in the Medicare program or making resulting claims for payment, a further Medicare "standard" has required by regulation that any medical record of a Medicare beneficiary admitted as a hospital inpatient must contain an "order" of admission reflecting a decision by "the ordering practitioner or by another practitioner who is responsible for the care of the patient only if the practitioner is acting in accordance with State law, including scope-of practice laws, hospital policies, and medical staff bylaws, rules, and regulations." 42 CFR § 482.24. (Between November of 2007 and May of 2012, that regulation provided similarly that all orders to admit as an inpatient must have been "authenticated . . . by the person responsible for providing or evaluating the service provided, consistent with hospital policies and procedures," and that ordering practitioners must have been "authorized to write orders by hospital policy in accordance with State law.")

17.    Continually since prior to 2007, and thus throughout the Defendants'
operation of their "concurrent review" agreements, Section 10 of Chapter 1 of the
Medicare Benefit Policy Manual, CMS Pub. 100-02, in governing the prerequisites for
determining payable Medicare claims, has required in relevant part the following as
material prerequisites for any entitlement of any hospital to be paid any amount for any
inpatient hospital stay:

> The physician or other practitioner responsible for a patient's care at the hospital is
> also responsible for deciding whether the patient should be admitted as an inpatient.
> . . . However, the decision to admit a patient is a complex medical judgment which
> can be made only after the physician has considered a number factors, including the
> patient's medical history and current medical needs, the types of facilities available
> to inpatients and to outpatients, the hospital's by-laws and admissions policies, and
> the relative appropriateness of treatment in each setting. Factors to be considered
> when making the decision to admit include such things as: . . . (t)he availability of
> diagnostic procedures at the time when and at the location where the patient
> presents . . ."

18.    Implicitly prior to October of 2013, and explicitly by regulation thereafter,
Medicare rules have required, as a material condition of any hospital's entitlement to
payments for any inpatient hospital stay, that any decision and order that it was medically
necessary to admit a patient as a hospital inpatient must have been made by a physician
who (a) was then admitted to the hospital's medical staff, (b) was then acting under a valid
medical license in the jurisdiction where the hospital was located, and (c) had certified
that the inpatient admission was medically necessary and that the certifying physician had
made that decision regarding medical necessity. No decision to admit a Medicare or
Medicaid patient as a hospital inpatient (or to request payment for a resulting inpatient

admission stay) is legally valid (or results in a legally valid claim) unless the decision was made by a person meeting those professional standards.

19.     This case challenges the legality of claims for payments for inpatient hospitals stays made to Medicare and Medicaid by Accretive/R1's hospital clients pursuant to fees-for-recommendations "concurrent review" contracts which Accretive/R1 has entered with MedStar WHC and many other such hospitals under which Accretive/R1's off-site "reviewers" have generated written "recommendations" purporting to justify the inpatient admission of federally-insured patients as to whom the hospitals' own Emergency Departments and other Hospital Staff physicians had previously determined, based on their own medical judgments after consulting with the patients and reviewing their relevant medical records, and with their local knowledge of the particular services available to such patients through outpatient "observation" services, did not then meet the medical necessity requirements for an inpatient hospital stay, but instead only met medical necessity requirements for an "observation" of their medical condition for a period of up to twenty-four (or, as of October 1, 2013, forty-eight) hours.

20.     Section 20.6 of Chapter 6 of the governing Medicare Benefit Policy Manual (Pub. 100-02), routinely relied on by payors of Medicare and Medicaid claims for hospital services, defines an "observation" service by a hospital as follows: "Observation care is a well-defined set of specific, clinically appropriate services, which include ongoing short-term treatment, assessment, and reassessment before a decision can be made regarding whether patients will require further treatment as hospital inpatients or if they are able to

10

be discharged from the hospital." After a patient is ordered for "observation" (or "OBS") for a limited period of time within a hospital, hospital physicians continue to treat the patient, continue to gather laboratory test results or other diagnostic information, and may later decide as a result of such additional clinical information to discharge the patient to his or her home, or to admit the patient as an inpatient. "Observation" services are regarded as "outpatient" services, and are paid for by Medicare through Medicare's "Part B" outpatient reimbursements.

21    Section 10 of Chapter 1 of the same Medicare Benefit Policy Manual defines an "inpatient," on the other hand, as follows: "An inpatient is a person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services." Inpatient services for Medicare patients are paid through an entirely different reimbursement system, called "Medicare Part A."

22.    Medicare Part A payments are calculated to pay for an entire multi-day hospital stay based on the patient's particular diagnosis (or "diagnostic-related group"), and are far more financially lucrative for a hospital than are payments under Medicare's Part B system for observation or other outpatient services. Accretive/R1 itself, in attempting to induce hospitals to enter is fees-for-recommendations contracts, represented to potential hospital clients that the compensation to a hospital for an inpatient admission and stay could be as much as *ten times* the compensation for an outpatient "observation" stay.

23.    Underlying the financial motive for all Defendants' participation in

11

Accretive/R1's fees-for-recommendations concurrent review operation was, indeed, that Medicare and Medicaid federal hospital insurance programs pay substantially lower amounts for outpatient "observation" services than those programs pay for inpatient hospital stays.

## VI. ACCRETIVE/R1's NATIONAL NETWORK OF HOSPITAL CLIENTS PAYING R1 FEES IN EXCHANGE FOR "ADMIT INPATIENT" RECOMMENDATIONS

24.     As a part of what it calls its "Physician Advisory Services" to hospital clients (or "PAS"), Accretive/R1 since 2007 has pursued and entered fees-for-recommendations "concurrent review" contracts with what Accretive/R1 itself has described as "250+ hospitals" in "more than 30 states" of the United States, resulting in hundreds of thousands of recommendations to such hospitals to "admit as inpatient" persons previously determined by hospital staff physicians only to be in medical need of observation services on a lower-compensated outpatient basis.

25.     In describing the particulars of its uniform operation of its fees-for-recommendations arrangements with its hundreds of hospital clients, Accretive/R1 asserted as of 2012 the following representations (within which all words included below in quotation marks were words authored by Accretive/R1 to describe the uniform nature of its own national "concurrent review" operations among is hospital clients):

(A)     Accretive/R1 employed "roughly 250 physicians for 250 hospitals" for the purpose of its "physician advisory services" or "PAS" services involving

12

"concurrent reviews" (i.e., fees-for-recommendations services), further representing that the "(c)losest large competitor is 100 - for every 300 Hospitals."

(B)     Accretive/R1 represented that its hospital clients included "the largest and most prestigious health systems in the country."

(C)     As a result of "ranking our Top 1 - 50 hospitals by bed-size and NPR," Accretive/R1 officials affirmed on June 13, 2014, in their "Summary Report" to MedStar WHC, that ""WHC is # 8."

(D)     Accretive/R1 "concurrent reviewers" had already conducted by 2012 "half of a million concurrent level of care reviews" and resulting recommendations.

(E)     Accretive/R1 maintained three "office sites" at which such "concurrent reviews" were conducted by "physician advisers," located in Chicago (at 231 South LaSalle Street, Suite 1600), Houston (at 2100 West Loop South, Suite 900), and Seattle (at 800 Fifth Avenue, Suite 4100). Noelle Tallungan supervised "concurrent reviews" on behalf of Accretive/R1 at that Chicago office, while Dr. Stephanie Smith oversaw the reviews at that Houston office, and Dr. Richard Phillips oversaw reviews at that Seattle office of Accretive/R1. Patrick Sinclair in 2012 was General Manager of Accretive/R1's concurrent review activities.

(F)     Accretive/R1's hospital clients include Dartmouth Hitchcock Memorial

13

Hospital and Intermountain."

(G)   Accretive/R1's fees-for-recommendations hospital clients also included the "Henry Ford Health System" in Detroit.

(H)   Accretive/R1's fees-for-recommendations hospital clients also included the Southwest Vermont Medical Center.

(I)   Accretive/R1's fees-for-recommendations hospital clients also included the Presbyterian/St. Luke's Medical Center and the Rocky Mountain Hospital for Children.

26.   Hospitals in the "Ascension Health System" were a "founding client" of Accretive/R1's, beginning with Ascension-owned hospitals named "St. John's Providence" Hospital in Detroit, Michigan, "and then other Ascension sites in Michigan, the southeast and Nashville." Accretive/R1's hospital clients have included the following additional hospitals owned and operated by the Ascension Health System: Ascension Providence (Mobile, Alabama), Ascension Tucson Holy Cross (Tucson, Arizona), Ascension Tucson Carondelet St. Mary's (Tucson, Arizona), Ascension Tucson Carondelet St. Joseph's (Tucson, Arizona), Ascension Tucson Carondelet St. Joseph Hospital (Tucson, Arizona), Ascension Tucson Carondelet St. Mary's (Tucson, Arizona), Ascension St. Vincent Medical Center (Jacksonville, Florida), Ascension St. Luke Hospital (Jacksonville, Florida), Ascension Sacred Heart Hospital (Pensacola, Florida), Ascension Emerald Coast Hospital (Pensacola, Florida), Ascension Gulf Coast Hospital (Pensacola, Florida), Ascension St. Johns Hospital (Macomb, Michigan), Ascension St. Johns Medical Center

(Michigan), Ascension St. Johns Hospital (Northshore, Michigan), Ascension St. Johns Hospital (Oakland, Michigan), Ascension St. Johns Hospital (Riverdale, Michigan), Ascension St. Johns Hospital (Riverview, Michigan), Ascension St. Johns Hospital (Providence, Michigan), Ascension St. Johns Hospital (Providence Park, Michigan), Ascension Borgess Medical Center (Michigan), Ascension Borgess Lee Memorial Hospital (Michigan), Ascension Borgess Pipp Hospital (Michigan), Ascension Borgess Woodbridge Hills Hospital (Michigan), Ascension Genesys Medical Center (Michigan), Ascension St. Joseph Hospital (Tawas, Michigan), Ascension St. Mary's Hospital (Michigan), Ascension St. Johns Crown Village Hospital (Michigan), Ascension Carondelet St. Joseph Hospital (Missouri), Ascension Carondelet St. Mary's Hospital (Missouri), Ascension Baptist Hospital (Nashville, Tennessee), Ascension Middle Tennessee Medical Center (Nashville, Tennessee), Ascension St. Thomas Hospital (Nashville Tennessee), Ascension Providence Hospital (Washington, D.C.), Ascension Columbia Medical Center (Milwaukee, Wisconsin), Ascension Columbia Hospital (Wisconsin), Ascension Columbia Ozaukee (Wisconsin), and Ascension Columbia Sacred Heart Hospital (Wisconsin).

27.    Accretive/R1's fees-for-recommendations "concurrent review" hospital clients also included, until October 1, 2013, the Hospital Corporation of America ("HCA") hospital system, as confirmed in an October 5, 2012 email received by MedStar Finance Division Assistant Vice President Nik Alexiades from HCA executive Brett Rungwerth, confirming that HCA was then "still using Accretive," for the purpose of "sending

15

Medicare accounts that fail InterQuail, OBS, and 1 day stays." Accretive/R1 Senior Vice President Patrick Sinclair had also confirmed in a March 5, 2012 email to the MedStar WHC Chief Financial Officer that HCA effectively paid Accretive/R1 $185 for each recommendation it made to an HCA hospital, through a pricing term providing that HCA could achieve a $5 per-recommendation "rebate" off of a $190 price based on "hitting volume targets which they have of course done in spades."

28.      Accretive/R1's fees-for-recommendations hospital clients have also included hospitals in Massachusetts owned and operated by the "Caritas Christi" Hospital System, including the Caritas Christi St. Elizabeth Hospital, the Caritas Christi St. Anne's Hospital, the Caritas Christi Norwood Hospital, the Caritas Christi Holy Family Hospital, Carias Christi Good Samaritan Hospital, and the Caritas Christi Carney Hospital.

29.      Accretive/R1's fees-for-recommendations hospital clients have also included hospitals located in Minnesota and owned and operated by the Fairview Hospital System, including Fairview Lakes Medical Center, Fairview Maple Grove Hospital, Fairview Northland Medical Center, Fairview Red Wing Hospital, Fairview Ridges Hospital, Fairview Southdale Hospital, and the Fairview University Medical Center.

30.      Accretive/R1's fees-for-recommendations hospital clients also included, beginning in 2012, Defendant MedStar WHC.

31.      Effective March 13, 2012, MedStar-owned Defendant MedStar WHC, then the location of the Relator's workplace, entered Accretive/R1's standardized "Services Agreement" providing for MedStar to pay Accretive/R1 per-review fees in exchange for

16

"concurrent reviews" and resulting recommendations regarding whether or not to "admit inpatient" persons then waiting within the Hospital.

32.     The "Services Agreement" entered by MedStar WHC, like all of the standardized "Services Agreements" entered with Accretive/R1 by its hospital clients providing for "concurrent reviews," defined in the same details the "concurrent review" services to be provided through a "description of the confidential and proprietary workflow of the Accretive PAS services," clearly authored by Accretive/R1 to serve as the standard terms of entering such contracts with its hospital clients generally.

33.     In all such "services agreements" with its hospital clients, Accretive/R1 promised to "review" the "patient classification submitted by the (Hospital) Client to determine the appropriate admission status," and to "review and communicate their Recommendation regarding the proper patient classification to the attending physician and/or case managers where possible, to the extent required by the hospital client."

34.     Accretive/R1 also included in its standard contract language with its hospital clients the following: "In order to implement the (Accretive/R1) Recommendation, (Hospital) Client may need to change the admission classification status" of patients.

35.     In explicit exchange for such recommendations by Accretive/R1, MedStar WHC agreed to (and did) pay Accretive/R1 a per-review amount, which varied in amount (between "$210 per case" and "190 per case") *depending on what fraction of the hospital's patients were (or were not) "Meeting Inpatient Criteria or Equivalent."* (Emphasis added).

17

36.     As a part of its earlier consolidation of all of the "back-office  operations"
within all of the hospitals owned by it, Defendant MedStar Health, Inc. during 2012 and
2013 maintained and enforced a requirement that no administrator within any such
MedStar-owned hospital, including MedStar WHC, was allowed to cause any such
hospital to enter any agreement with any financial consultant or adviser without the prior
approval by the Corporate Services principals at MedStar Health, Inc., of the terms of such
agreements.

37.     Pursuant to its standard corporate governance policies, authorized officials
of MedStar Health, Inc., considered and approved the terms of each "Services Agreement"
entered between MedStar WHC and Accretive/R1. For example, MedStar WHC was not
allowed by its owner MedStar Health, Inc. to enter its "Services Agreement" through its
Chief Financial Officer Douglas Zehner until MedStar Health officials had approved of
the fees-for-recommendations terms. On March 2, 2012, Jennifer Bou, acting as Counsel
for the parent MedStar Health, Inc. in communicating such corporate approval, emailed
MedStar WHC CFO Zehner concerning the proposed "Services Agreement" between
Accretive/R1 and MedStar WHC: "You are good to go on this!" MedStar Health, Inc.
thereby knowingly caused all such fees-for-recommendations agreements and
arrangements to be entered and operated by MedStar WHC, and in turn proximately
caused all "admit inpatient" recommendations to be made and enforced on by claims for
inpatient services ultimately made by MedStar WHC.

38.     Dr. Gregory J. Argyros, then a senior official at MedStar WHC, noted in an

18

email titled "Accretive Recommended Status" on April 14, 2014, the following "key points to remember:" "Can't overestimate the potential impact of any patients that we can successfully flip. Clearly recognize that we have to watch for denials down the road but this is a major priority item for Mr. Sullivan moving forward. Please let me know what I can do to impact the prompt entry of patient data into whatever portal is necessary so that we can move Accretive assessments and status changes along." The "Mr. Sullivan" referred to therein was then a senior officer and official of both the Defendant MedStar WHC Hospital, and its owner, Defendant MedStar Health, Inc.

39.    Boosting the revenue collected by MedStar WHC from the Medicare and Medicaid programs (as well as other insurers), through boosting inpatient admissions enforcing and implementing Accretive/R1 "recommendations" to "admit inpatient," was indeed a "majority priority item" beginning in 2012 for Defendant MedStar Health, Inc., as it explicitly was for MedStar Health executive Sullivan.

40.    In 2013, the Relator herein located, in the non-public digital records of MedStar WHC and during her employment there, a "Services Proposal" authored by Accretive/R1 and dated November 21, 2008, in which Accretive/R1 described the then-existing, uniform, and nationwide operation of its fees-for-recommendations "concurrent review" agreements in the course of marketing such an agreement *directly to Defendant MedStar Health, Inc*., the owner of MedStar WHC.  The Accretive/R1 Vice President of Business Development at the time, Scott Zust, was apparently responsible for that November 2008 "Services Proposal." Accretive/R1 represented in that proposal that its

19

"physician adviser" reviewers *then "manage(d) thousands of patient encounters per month"* through a review process in which its "physicians will evaluate all Medicare patients *that do not meet Inpatient criteria* and are submitted to Accretive Health by MedStar health via phone, online medial records access, fax, scanner, or Accretive Health's proprietary electronic exchange." Resulting "(d)ata will be entered into AH2Care (Case Management Portal) by hospital case manager team." In exchange for payments to Accretive/R1, its "physicians will provide recommendations as to the most appropriate level of care status" (as to patients, that is, who "do not meet Inpatient criteria"). Accretive/R1 represented that the "(a)verage response time for Accretive physicians is under 25 minutes," and promised to provide to Defendant MedStar Health, Inc., a "*Monthly Statement of Value report*" representing the additional dollars that Accretive Health, Inc. could be expected to collect through its hospitals as a result of such "concurrent review" activities. A sample "impact summary" represented that Accretive/R1 provided a hypothetical client a monthly "*Reimbursement Lift*" of $172,000 as a result of re-classifying 26 patients as "inpatient" who had an "initial client classification" by the hypothetical client hospital of only "observation." For each of twelve different inpatient hospital diagnoses, Accretive/R1's Proposal itemized the dollars that a hospital would not collect if patients were not admitted inpatient, described as the "(f)inancial impact per DRG as % of not meeting inpatient criteria." Finally, Accretive/R1 represented to MedStar Health, Inc. that "Accretive is a built-for-purpose company with the sole focus on generating significant, sustainable improvements in net revenue." (Emphases above have

20

been added.)

41.     In the same November 2008 Proposal, Accretive/R1 also named

representative client hospitals then operating such "concurrent medicare classification"

agreements with Accretive/R1, including (but not limited to): (A) Methodist Hospital, in

Houston, Texas, a hospital with "898 M net revenue" for which the "client contact" was

Bret T. Curran, Senior Vice President for Finance and Support Services, and which had

been using Accretive/R1 since August of 2008; and (B) Southeast Missouri Hospital, with

one hospital having a "246 net revenue" for which the "client contact" was Chief Financial

Officer David Strong, and which had been operating such an agreement with Accretive/R1

since January of 2008.

42.     The hospital entities, hospital operational names, and hospital owners (direct

and indirect) named in Paragraphs 25 through 41 above shall be referred to hereafter as

"Accretive/R1's hospital clients."

### VII. UNIFORM NATIONAL TRAINING OF ALL ACCRETIVE/R1 "REVIEWERS" MAKING RECOMMENDATIONS REGARDING INPATIENT ADMISSIONS:

43.     All of the "roughly 250 physicians" engaged by Accretive/R1 to prepare

"concurrent reviews" and resulting "recommendations" for "250 hospitals" about whether

hospital patients should be "admitted inpatient" were trained by Accretive/R1 utilizing the

same training instruments as one another, including training in how all reviewers use were

to use the same electronic "portal," created uniquely for and by Accretive/R1, for

receiving, authoring and communicating "recommendations" to hospital staff. Plaintiff/Relator Graziosi received recommendations from Accretive/R1 "reviewers" through her use of that same Accretive/R1-generated "portal."

44. All such "roughly 250 physicians" were similarly trained by Accretive/R1 to prepare and communicate such recommendations to staff at all such "250 hospitals" through the same format and decision-making process as all other such reviewers, including use by all such reviewers of a 77-page "Anatomy of Level of Care Consults" which trained the reviewers in the identical format used by Accretive/R1 nationwide for compiling and communicating all such recommendations.

45. Those training materials urged all such reviewers as to all such hospitals, in leading-question fashion, to formulate rationales for recommendations to "admit inpatient" persons previously classified by hospital physicians as then only in medical need of observation (or "OBS") services. As to patients "currently in the Emergency Department" with an "observation only" order from a hospital physician, Accretive/R1's training materials urged all such reviewers as follows: "If OBS but can the patient be upgraded to inpatient?" Elsewhere in Accretive/R1's standard training materials, reviewers were similarly instructed to ask as to all "extended observation" patients: "Can the patient be upgraded to inpatient going forward?"

46. Accretive/R1 likewise uniformly instructed all of it physicians in the course of the same uniform national training to insert, into their "recommendations," language to "(j)ustify the hospitalization" and to "(l)ist possible adverse events (consider only for

22

Inpatient)" as to any "high risk" condition they could identify.

47.     All such "roughly 250 physicians" were instructed by Accretive/R1 to write, as their "final sentence" of each "recommendation" to each client hospital as to each patient subjected to a "concurrent review," one of two sentences, either: (1) "(o)ur recommendation to your physician is to place/maintain the patient on Outpatient Observation Services," or (2) "(o)ur recommendation to your physician is to admit/maintain the patient as an inpatient."

48.     Accretive/R1 in its uniform training of its reviewers therefore left no doubt that, in exchange for each of the per-review fees paid by each hospital client to Accretive/R1, Accretive/R1 agreed to communicate a "recommendation" about what level of hospital service should be provided to or for the patient whose records were reviewed.

49.     All such agreements and arrangements were fundamentally and willfully an exchange of fees for recommendations as to such health care services, all knowingly made and operated, with respect to Medicare and Medicaid patients, in violation of the Anti-Kickback Act as described above.

50.     Because Accretive/R1 "recommendations" to substantially all of its hospital clients to "admit as inpatient" have been made by Accretive/R1 personnel located in entirely different states or other jurisdictions from the locations of the client hospitals of AccretiveR1 (and thus their patients), all medical records "reviewed" by Accretive/R1 personnel have been faxed by the hospitals' personnel, including the Relator, to the Accretive/R1 headquarters in Chicago, Illinois.

23

51. No medical records or other documents have been faxed or otherwise communicated to Accretive/R1 personnel for purposes of "concurrent reviews" by its "reviewers" which had not previously been used by the client hospitals' on-site physician staff in the course of making their decisions that a hospital admission was not then medically necessary or justified.

52. After medical documents have been faxed by the hospitals' personnel to Accretive/R1 for the purpose of "concurrent reviews," Accretive/R1 "reviewers" generate a computer record purporting to be a "recommendation" by AccretiveR1 as to whether or not the relevant patient's condition justifies an inpatient hospital admission. A representative example of the forms used by Accretive/R1 to communicate its "recommendations" is attached hereto as Exhibit C.

## VIII. ACCRETIVE/R1 ADMITTED TO ITS HOSPITAL CLIENTS THAT THE CORE PURPOSE OF ITS "CONCURRENT REVIEW" ACTIVITIES WAS TO INCREASE HOSPITAL REVENUE THROUGH "CONVERTING" (OR "UPGRADING" OR "FLIPPING") OUTPATIENT "OBSERVATION" PATIENTS TO INPATIENT HOSPITAL ADMISSIONS.

53. Since beginning its fees-for-recommendations "concurrent review" operation in 2008, Accretive/R1 has described to potential hospital clients that Accretive/R1's underlying purpose for such clients was to provide "a value proposition of 5% net revenue lift target - more than double current operating margin averages (average 2%)."

54. In further describing what it claimed to provide generally to its hospital clients, Accretive/R1 represented that it offered a "(u)nique business model with (a)

portion of our fees at risk in a 'gainshare' model: we measure the value of benefit delivered, and the client keeps the majority of the benefit and pays Accretive a portion." As described in detail below, the "value" and "benefit" which Accretive/R1 was clearly offering through its concurrent review activities was more money for its hospital clients, not better health care for their patients.

55. In representing to prospective hospital clients the "value of benefit delivered," Accretive/R1 represented that the monetary amount of "revenue exposure" from a "(t)ypical inpatient DRG" payment of "$6,100," relative to a "typical observation" revenue of "$800," resulted in foregone "net" revenue of "$5,300 of exposure" from allowing a patient to remain in the lower-paid observation status rather than ordering the same patient into an "admit inpatient" status. ("DRG" is a reference to Medicare's and Medicaid's diagnostic-related "groups" and related payment codes for paying hospitals specifically for inpatient hospital stays based on the patient's diagnosis.)

56. In other representations to prospective hospital clients, Accretive/R1 warned hospitals that keeping even *one patient each day* in outpatient observation status, rather than "converting" or "upgrading" that patient to inpatient status, could "cost" a hospital "lost revenue" annually of *$1,640,000.00*. As Accretive/R1 specifically represented: "For hospital: Inpatient $$ = approx. 10 X Obs for same stay - Approx. $500 for obs vs. $5,000 for IP - So one potential inpt placed in obs per day: $4,500 x 365 days = $1.64 M/yr lost revenue."

57. In further describing its national fees-for-recommendations "concurrent

review" operation to prospective hospital clients in 2012, Accretive/R1 presented a sample

"Executive Summary Conversion Report," revealing a sample "recommended IO (initial

observation) - (to) IP (inpatient) conversion %" of "53%." In other words, Accretive/R1

asserted that a "conversion rate" of 53 percent, from outpatient observation to inpatient

status, was representative of what a hospital client could expect from Accretive/R1's

recommendations resulting from its concurrent reviews.

58.     As a result of Accretive/R1's representations, it has been a material

condition, expectation, and purpose of all of Accretive/R1's hospital clients who agreed to

pay Accretive/R1 for "concurrent reviews," that Accretive was expected to, and did,

change a substantial fraction, often in the range of 40% or 50% or higher, of its client

hospitals' medical staffs' original "observation only" orders to "recommendations" to

"admit inpatient."

59.     Accretive/R1's monthly operational reports to its ongoing hospital clients

likewise featured representations by Accretive/R1 about what the "net direct quantifiable

impact" of Accretive/R1's recommendations was, in dollars of additional claims payments

received from insurers, during the month's activities addressed by the report.

60.     By way of example, Accretive/R1 reported to MedStar WHC administrators

that the "net direct quantifiable impact" of Accretive/R1's actual recommendations to that

Hospital had been $5,525,278 during the second half of 2012 and an additional $2,595,872

during 2013.

61.     Accretive/R1's monthly reports to its hospital clients also reported for each

26

month the precise fraction of referred "observation" patients which had been recommended by Accretive/R1 for what Accretive/R1 called "conversion" to "admit inpatient."

62.    By way of example, Accretive/R1 reported to MedStar WHC administrators that the "conversion rate" from observation to inpatient status achieved for MedStar WHC by Accretive/R1's reviewers had averaged 53.7% (from among 1,088 "recommendations") during 2012 and 43.9% (from among 501 "recommendations") during 2013.

63.    Doug Zehner, then the Chief Financial Officer ("CFO") of MedStar WHC, and who on behalf of MedStar WHC had negotiated and signed its "Services Agreement" with Accretive/R1, personally analyzed on June 8, 2012, the results of Accretive/R1's "first day" of its "concurrent review" operations at MedStar WHC, and found that Accretive/R1 had "produced 5 status order changes on 12 reviews," and calculated that those "changes netted us approximately $22,500 in expected reimbursement after costs."

64.    MedStar WHC CFO Zehner on the same day of June 8, 2012, reported that same "first day" financial result of Accretive/R1's operations directly to Michael J. Curran, the CFO and Chief Administrative Officer at the corporate parent, Accretive Health, Inc., acknowledging that Curran had been personally involved on behalf of Accretive Health, Inc. in the process of a "lengthy contract discussion" with Accretive/R1 to perform such "concurrent review" work.

65.    Ten days later, on June 18, 2012, the same MedStar WHC CFO Zehner took it upon himself personally to inquire about the results of Accretive/R1's "first 2 weeks" of

27

"concurrent reviews" at MedStar WHC, to determine whether the purpose of paying Accretive for those reviews and recommendations was being met to his satisfaction as Chief Financial Officer. He found, and reported to senior MedStar Health, Inc. Executive John Sullivan, that "the Accretive process is a financial boon to the Center," referring to the MedStar WHC. He specifically reported that Accretive/R1's own "preliminary review of our process (had) led them to believe that we should focus on all patients that were being sent to the floors from the ER with a suggested status of Outpatient Observation. We initiated a process 2 weeks ago where we fax Accretive every Observation chart to have one of their physician advisors review and give us their formal opinion on appropriate status (within 45 minutes). The results have been dramatic. Accretive has asserted that approximately 60% of the suggested Observation patients meet Inpatient criteria. The ROI (or "return on investment") for the first 2 weeks is around $450,000."

66. Given the revenue-centered purpose of the Accretive/R1 fees-for-recommendations program, neither the MedStar WHC Chief Financial Officer, nor apparently any other administrator at MedStar WHC, inquired about whether or not the professional medical quality of Accretive/R1's reviewers' "recommendations" was equal to, better than, or worse than, prior health care decisions by the Hospital's medical staff to order only "observation" services for the same patients.

67. Accretive/R1 termed its monthly reports to its hospital clients "Monthly Statements of Value," and referred to its recommended "conversions" from observation status to inpatient admissions as "upgrades" of patients.

28

68.     In emphasizing to all of its hospital clients through its monthly operational reports the fraction of observation patients "converted" or "upgraded" to "admit inpatient" recommendations, and in quantifying for hospital administrators within those client hospitals the estimated or claimed additional revenue presumptively generated for each hospital as a result of increased claims to federal insurers for payments for presumptively resulting actual inpatient admissions, Accretive/R1 and its hospital clients explicitly confirmed their joint motive for engaging in Accretive/R1's fees-for-recommendations "concurrent review" agreements, as obtaining for Accretive/R1's hospital clients the "reimbursement lift" or "revenue impact" from increased inpatient payments which was the core, mutual, and obvious purpose of the agreements and their operation.

69.     In describing the purpose of its ongoing fees-for-recommendations "concurrent review" operation to prospective hospital clients in 2012, Accretive/R1 represented that any practice of "under classifying" of patients (relative to inpatient admission status) typically resulted in "high compliance" but also "lost revenue."

70.     In further describing what its fees-for-recommendations agreements were achieving for its hospital clients generally (and would achieve for prospective hospital clients), Accretive/R1 during 2012 presented a sample "Executive Summary Conversion Report," in which data were presented for each month and for each of numerous different hospital clients specifying (a) the "Actual Obs (observation) to Inpatient Conversion Count," (b) the "True Financial Impact of Accretive PAS Conversions This Month," (c) the "Actual Medicare Delta (Obs / In)," meaning the precise monetary difference between

29

what the hospital would receive in monetary claims from an observation-only service vs. an inpatient admission, (d) the "Recommended ED to Inpatient Conversion Count," (e) the "Actual ED to Inpatient Conversion Count" implementing R1's "recommendations," (f) the "Actual Net Revenues (from) Upgrades," and (g) the "actual cost" (of "$220.00") which the hospital clients were each paying to R1 for each patient "review" and "recommendation."

71.     Accretive/R1 represented in 2012 that the amount of its per-review fee being paid to Accretive/R1 by its hospital clients in exchange for R1's "concurrent admission reviews" and resulting recommendations *depended on what fraction of patients were found "not meeting Inpatient criteria."* (Emphasis added.)

72.     Accretive/R1 assured its prospective hospital clients as of 2012 as follows: "We don't over promise the revenue protection 'by-product,'" and that "we are proud to provide our clients (with) significantly strengthened financial results."

73.     In further describing its uniform nationwide operation of its fees-for-recommendations "concurrent review" agreements with its hospital clients, R1 represented that "(c)urrently, Accretive PAS recommends and defends upgrades of 30-40% of all observation cases reviewed."

74.     Further expressing in more explicit monetary terms the actual and promised financial "return" to its hospital clients from claims payments resulting from its fees-for-recommendations reviews, Accretive/R1 also represented that its nationwide fees-for-recommendations operation produced "Average returns net of downgrades: 4+:1," and

30

produced for its hospital clients nationwide a "(r)eturn net of downgrades, including status maintained: 10:1."

75. While Accretive/R1 conducted some reviews as to some patients who had already been classified as in medical need of inpatient admissions, the large majority of patients whose records were sent to Accretive/R1 had been found by hospital physicians only to be in medical need of observation services. That is because, as hospital administrators and Accretive/R1 knew, Accretive/R1 could recommend "upgrading" observation patients to inpatient status and thereby enable its hospital clients to charge and receive substantially more money for their services. "Observation" patients could be "converted" or "upgraded" to higher-paying "inpatient" patients. Patients already ordered for higher-paying inpatient treatments could not.

76. As examples, a very large majority of the patients for whom medical records were sent to Accretive/R1 by both MedStar WHC and Hospital Corporation of America ("HCA") hospitals had been classified by hospital physicians as only in medical need of observation services.

77. In late 2013, Dr. Bill Frohna, then the Chair of the Emergency Department at MedStar WHC, concluded that while the characteristics of patients arriving at the WHC Emergency Room had not changed during the time Accretive/R1 had been conducting its "reviews" and "recommendations," the "inpatient Admit vs. observation status decision made by the emergency physician has shifted dramatically depending on how these, primarily financial pressures are applied, interpreted, and implemented."

31

78.     All of Accretive/R1's "reviewers" (or "physician advisers") were trained by Accretive/R1 to apply and implement with respect to all of their "reviews" the federal Medicare standards, adopted by CMS for determining the medical necessity of inpatient hospital admissions. Those Medicare standards also applied to Medicaid programs' standards for determining the medical necessity of inpatient admissions.

79.     Although Accretive/R1 reviewed in the course of its concurrent review operation some medical records of patients insured by non-governmental health insurers, the large majority of reviews conducted by Accretive/R1 were for Medicare and Medicaid patients.

80.     As examples, both MedStar WHC (until 2014) and hospitals owned by Hospital Corporation of America concentrated most of their concurrent review referrals to Accretive/R1 on files of Medicare patients.

81.     The Relator and other staff at MedStar WHC were ordered in 2012 to use, in the course of referring medical records to Accretive/R1 reviewers, a form "Cover Sheet" to instruct hospital staff what to communicate, and what not to communicate, to Accretive/R1 for that purpose. Exhibit B hereto is an example of such a Cover Sheet.  As Exhibit B indicates, MedStar WHC personnel were instructed *not* to send to Accretive/R1 any information concerning patients who were not insured, or whose medical condition had already been determined by the WHC staff physicians to *justify* a hospital *inpatient* admission.  Medical charts already reviewed or generated by the hospitals' medical staff were only to be faxed to Accretive/R1 for the purposes of a "review" if a hospital

32

admission had expressly and specifically been found *not* to be medically necessary at the time.

82.     MedStar WHC indeed decided, during most of the period of its payments to Accretive/R1 for concurrent-review recommendations, to refer to Accretive/R1 for concurrent reviews exclusively Medicare patients who had been determined to only be in medical need of outpatient observation services. Herta M. Bellefleur, MedStar WHC's "Clinical Resource Coordinator," instructed WHC physicians and clinical employees in May of 2013 in "all-caps" fashion that "PLEASE ONLY SEND OBSERVATION CASES WITH MEDICARE INSURANCE" to Accretive/R1 for reviews. Asked by email about the motive for MedStar WHC's decision to concentrate all Accretive/R1 reviews on Medicare patients ordered at that time to receive only outpatient "observation" services, Ms. Bellefleur responded by email on May 22, 2013, again in all-caps fashion: "MONEY TALKS FOO FOO WALKS."  ("Foo foo" is apparently a slang term meaning, generally, "too delicate," "prissy," or "frilly.")

83.     Effective on January 7, 2015, MedStar WHC terminated its concurrent review agreement and operation with Accretive/R1, having engaged in that operation since mid-2012. In announcing that termination, a MedStar administrator pretended that MedStar had learned through its experience with Accretive/R1 what in fact the MedStar WHC medical staff had known all along, that "our physicians are more than capable of apply (*sic*) IP (inpatient) criteria appropriately without (Accretive's) assistance."

84.     During the final months of its operation of its fees-for-recommendations

concurrent review agreement with Accretive/R1, MedStar WHC had referred fewer Medicare patients' files, but substantially more Medicaid patients' files, for concurrent reviews and recommendations by Accretive/R1.

85.    The recommendations to "admit inpatient" communicated by Accretive/R1 reviewers to its hospital clients, including but not limited to MedStar WHC, and Accretive/R1's implicit and explicit communications to its hospital clients regarding the "reimbursement lift" and increased revenue which such hospitals could gain by enforcing Accretive/R1's recommendations through urging and causing orders to admit the same patients as inpatients, proximately caused the inpatient admissions and resulting payment claims to Medicare and Medicaid as to the patients originally "recommended" for inpatient admission by Accretive/R1. But for Accretive/R1's recommendations to "admit inpatient," no such claims for inpatient hospital stays would have been made to Medicare or Medicaid. All such recommendations were material to and resulted proximately in all such claims for payment and the resulting payments thereof.

## IX.  ACCRETIVE/R1'S RECOMMENDATIONS TO "ADMIT INPATIENT" WERE NEVER INTENDED TO IMPROVE THE QUALITY OF HEALTH CARE FOR PATIENTS.

86.    Accretive/R1's standardized proposals for providing fee-for-recommendation "concurrent review" services to prospective client hospitals did not represent or promise that Accretive/R1 would provide the hospitals, or that its recommendations would result from, medical judgments or medical integrity which matched or exceeded the professional

quality of the original medical judgments by the hospitals' own physicians about whether inpatient admissions were medically necessary. That is because Accretive/R1 knew that matching or improving the medical quality or medical integrity of such decisions within the hospitals was not among the purposes Accretive/R1 or its hospital clients would have, or did have, in paying Accretive/R1 for such concurrent reviews.

87.    Accretive/R1's standardized "Services Agreements," in which it agreed to provide fees-for-recommendations "concurrent review" services to its actual client hospitals, did not promise that Accretive/R1 would provide the hospitals, or that its recommendations would result from, medical judgments or medical integrity which matched or improved the quality of the original medical judgments by the hospitals' own physicians about whether inpatient admissions were medically necessary. That is because Accretive/R1 and its client hospitals knew that matching or improving the medical quality or medical integrity of such decisions within the hospitals were not among the purposes Accretive/R1 or its hospital clients had in agreeing for the hospitals to pay Accretive/R1 for its concurrent reviews and resulting recommendations.

88.    Accretive/R1's standardized monthly "Operations Summary Reports" to its actual hospital clients did not report or represent that Accretive/R1 had provided the client hospitals, or that its recommendations had resulted from, medical judgments or medical integrity which matched or improved the quality of the original medical judgments by the hospitals' own physicians about whether inpatient admissions were then medically necessary. That is because Accretive/R1 and its client hospitals knew that matching or

improving the professional quality of such decisions within the client hospitals was not among the purposes that Accretive/R1 had in providing, or that the client hospitals had in paying for, Accretive/R1's concurrent reviews and resulting recommendations.

89.     Each of the Accretive/R1 "recommendations" for inpatient admissions challenged in this case were made, after all, by "reviewers" who (a) had never met or examined the patient whose health care level was being "recommended," (b) had no information which hospital clinicians had learned from the patient, but which had not been legibly and otherwise clearly recorded in written clinical notes, (c) had never examined any medical documents not previously examined by or available to the hospitals' own physicians, (d) did not know the lab results, clinical findings or opinions of consulted hospital specialists generated during continuing observation of the patient after the point in time when medical records had been faxed or otherwise communicated to Accretive/R1, (e) did not know what distinctive diagnostic resources and treatments were available for treating the patient during any observation period within the particular hospital involved, (f) had never met the particular prerequisites for practicing medicine on the medical staff of the relevant hospital, and (g) were typically not licensed to diagnose medical conditions in (or actually practice medicine in) the jurisdiction in which the relevant hospital was located.

90.     In describing the standard "Base PAS Workflow" used in the course of its concurrent reviews for its nationwide list of hospital clients, Accretive/R1 represented that its standard "submission protocol" was to receive from its hospital clients

36

medical records of patients for whom "*inpatient screening*" by hospital physicians had already determined that "*inpatient criteria failed*." (Emphasis added).

91. In the course of paying Accretive/R1 to make recommendations to the hospitals it owned regarding inpatient admissions for Medicare patients placed under hospital physician orders only for "observation" and for "1 day stays," Hospital Corporation of America ("HCA") paid Accretive/R1 to make recommendations for patients its hospital staff physicians had specifically determined "fail Interqual." ("Interqual" was a reference to a widely-accepted set of standardized criteria for use by clinicians to determine the medical necessity for particular patients of particular health care services, especially including inpatient hospital admissions.)

92. In marketing its fees-for-recommendations "concurrent review" program to prospective hospital clients, Accretive/R1 referred to the same "Interqual" criteria for properly determining who to admit inpatient, and also to the similar "Milliman" criteria also widely used for the same purpose, and explained "how we (Accretive/R1 reviewers) can 'override' their criteria in many cases."

93. Given the purpose of its fees-for-recommendations "concurrent review" operations, Accretive/R1 focused its "physician review" activities on quantity, not quality, for churning out "recommendations" to client hospitals. In its standardized supervision of its reviewers, Accretive/R1 instructed that "(t)he minimum acceptable production is (equal to or greater than) 1.5 cases per hour" for reviewers to complete recommendations. Reviewers who produced recommendations of 1.8 to 1.89 "cases per hour on shift" were

37

entitled to a 50% "bonus." Reviewers who churned out 2.15 or more "cases per hour on shift" were eligible for a "bonus" of "150%."

94.     In February of 2014, and thus after about twenty months during which MedStar WHC had been receiving "admit inpatient" recommendations from Accretive/R1, MedStar WHC Clinical Resource Management ("CRM") Official Anner Terry-Mock reported to senior MedStar WHC financial and medical officials, in an email titled "Accretive Review," as follows:

> "Our feedback from our providers, ED (Emergency Department), Hospitalist, CRM UM staff was the reviews were not helpful and written in a worst case scenario slant, not with the admission picture."

Yet Ms. Terry-Mock, a Registered Nurse, also commented in the same email exchanges: "If we want to trade off decrease(d) observation numbers for higher denials, then Accretive would be the move."

95.     From its own receipt of communications from physicians who actually met patients and practiced medicine within its client hospitals, Accretive/R1 knew that its own "concurrent review" recommendations were being skewed (or "slanted") in favor of language purporting to justify inpatient admissions, at the expense of honest and informed clinical judgments by hospital physicians about the actual medical needs of hospital outpatients. In November of 2012, for instance, Dr. Uzma Vaince, a physician and hospitalist on the medical staff of MedStar WHC, emailed to both senior MedStar officials and senior Accretive/R1 officials (including Accretive/R1 Senior Vice President Dr. Steven Meyerson and Accretive/R1 "Concurrent Review" Manager Tiffany Zbranek) the

following protest about the medical invalidity of Accretive/R1's pattern of

recommendations:

> "My concern is with the high risk verb age used that over state's the risk. Decision based on limited information (Emergency Record Notes). As an Attending physician, we make decisions regarding patient disposition and bed status after thorough history and review of records."

96.     No doubt because canned verbiage about high medical risks (and resulting

"recommendations" of "admit inpatient"), overstating the clinical truth about those risks

and based on limited clinical information, was exactly what Accretive/R1 intended to

provide to its hospital clients, and exactly what revenue-focused hospital administrators

had agreed to pay AccretiveR1 to provide, no material changes in their conduct were made

by either Accretive/R1 or MedStar WHC as a result of having received Dr. Vaince's

professional opinion in November of 2012.

97.     Also in November of 2012, the same Dr. Vaince reported to senior

hospital administrators at MedStar WHC as follows, after hearing Accretive officials

present what they had purported to be an "Education Planning" session to MedStar

physicians: "I was more interested in the education process than to be told that this is

"Inpatient" because Accretive Health is saying so." Dr. Vaince further requested of

MedStar WHC administrators by email: "Can we be provided with the education? Or we

are (*sic*) simply going to be depend on them to make the determination which we may not

agree on."

98.     In August 2013, after MedStar WHC had been receiving recommendations

from Accretive/R1 for about fourteen months, Dr. Bill Frohna, then the Chairman of the Emergency Department at MedStar WHC, protested by email to senior clinical officials at MedStar WHC as follows: "Accretive can find a reason to place ANY patient into inpatient status." (All-capped emphasis on "ANY" original to Dr. Frohna).

99.     Dr. Jeff Dubin, then the Vice Chair of the Emergency Department at MedStar WHC, had similarly protested to MedStar WHC Clinical Resource Supervisor Anner Terry-Mock in September of 2012, by an email titled "Accretive Health," as follows:

> "I heard that there is concern that they are making every chart inpatient, regardless of whether patient is going to be leaving in less than 24 hours. I had last week, plan was 2 units of blood then go home and they recommended inpatient. Some of the stuff they do does not make sense. Some feedback from the docs is: I make everyone inpatient now because accretive just tells me to do it anyway."

100.    In its training of new medical residents at its teaching hospital, MedStar WHC directed such physicians to insert into patients' medical "chart" notations any wording, authored by any Accretive reviewer and appearing in any Accretive recommendation, that was "needed to stave off denials," by Medicare and other insurers' claims auditors or payors, of payment claims for inpatient admissions on grounds that the admissions were not medically necessary. MedStar WHC's instructions to its resident physicians included specifically the following:

> -Resident training was intended by MedStar WHC in part to "(i)ntroduce Accretive services to you and what your responsibility is."

> -"Who is Accretive? Accretive is a Physician Advisor Service. Purpose is to help with documentation of patient chart, observation's (*sic*) that can be quickly

converted to inpatient."

-"Why should you care? Accretive review has the wording needed to help stave off denials. The physician teaching part is to help you the physician to use proper terms, all the information to be as complete in your documentation as possible. Please use their wording to guide you in your write up of the chart."

101. In describing to potential hospital clients in 2012 its standard concurrent review operation, Accretive/R1 represented that it provided to its hospital clients an "End of Quarter Reconciliation Report" in which Accretive/R1 would reveal for hospital administrators how many Accretive/R1 recommendations for "conversion" (from outpatient "observation" status to "admit inpatient") had been enforced by the hospital's physicians, through an "Actual Obs to Inpatient Conversion Count" by Accretive/R1. Those Reports then were said to specify for hospital administrators an "Actual Net Revenue (from) Upgrades" originally recommended by Accretive/R1.

102. Accretive/R1 Manager Tiffany Zbranek acknowledged to MedStar WHC's Nikolas Alexiades in June of 2012 that Accretive/R1's concurrent reviews "can only provide a revenue lift to your facility if your physicians are following our recommendations," and advised that "perhaps any physician on the FLR (hospital floor) not agreeing with the PAS (Accretive/R1) recommendation should warrant a call to our docs to discuss."

103. In June of 2012, as MedStar WHC was beginning to receive Accretive/R1 recommendations, WHC Clinical Resource Supervisor Anner Terry-Mock instructed case managers at WHC that *if* Accretive recommended that a particular observation-only

patient be admitted as an inpatient, and thus "the case is in need of follow up for a status change from Obs to IP Status," non-physician case managers were instructed as follows: "Please, Please, Please, follow through on all opportunities to upgrade or get the pt (patient) in the correct status."

104.    MedStar WHC clinical resource management ("CRM") officials instructed MedStar WHC physicians and case management personnel in March of 2014: "All CRM's, CRC/CM's will follow the observation cases and *resubmit to Accretive PAS until the status changes to IP (Inpatient) or the pt (patient) is discharged."* (Emphasis added.)

105.    MedStar WHC separately instructed its Emergency Department physicians who had earlier ordered "observation only" treatment for patients who Accretive later recommended for conversion to "admit inpatient," the following: "Please write 'Admit to Inpatient' w/diagnosis," adopting Accretive's recommendation.  That directive from MedStar WHC's non-physician administrators to MedStar's own medical staff physicians was undertaken on a form ending with the following "all capped" words: "THIS IS NOT A PERMANENT PART OF THE PATIENT CHART."

106.    Pursuant to the incentives and purposes of participating by agreement in Accretive/R1's fees-for-recommendations "concurrent review" agreements, administrators at Accretive/R1's hospital clients, including but not limited to MedStar WHC, urged and pressured their hospitals' own medical staffs and clinical support personnel to adopt and enforce Accretive's recommendations to change "observation only" patients to "inpatient admission" in order for the hospital clients to make substantially higher-paying inpatient

42

claims for payments to Medicare, Medicaid and other insurers.

107. As a result, a high fraction of such "recommendations" from Accretive/R1 for such changes were implemented within the facilities of Accretive/R1's hospital clients through the actual inpatient admissions of hundreds of patients previously determined by those hospitals' own licensed medical staff members not to be in medical need of any such services.

108. In February of 2014, for example, after MedStar WHS had been receiving recommendations regarding inpatient admissions from Accretive/R1 for about twenty months, MedStar WHS Finance Division Official Purvi Jani reported, in an email titled "Accretive Review," the following: "Accounts placed for Medicare had higher denial rate of 8 % but still great success in my opinion with increased inpatient placement."

109. In pursuing and achieving substantial "revenue lifts" from such "success" with "increased inpatient placements" resulting from hospitals' receipts and enforcement of "admit inpatient" recommendations from Accretive/R1, Accretive/R1 and its hospital clients, including MedStar Health and its WHC, systematically, negligently, and recklessly disregarded the dangerous and well-documented additional health risks to which patients are exposed only if they become an inpatient in a hospital (and to which they would not be exposed if they remained an outpatient), namely the risks of "nosocimial infection," "iatrogenic disease," or "hospital dementia." As with Accretive/R1's hospital clients generally, MedStar Health and MedStar WHC's willful pursuit of "revenue lifts" from its conduct as described above caused hundreds of patients to be admitted as inpatients to

MedStar WHC and thus exposed to those increased health risks. Accretive/R1's willful

pursuit of fees in exchange for its recommendations caused many thousands of patients to

be admitted to its client hospitals and thus to be exposed to the same increased health risks.

## X.  ACCRETIVE/R1'S DECISION-MAKING PROCESS FOR RECOMMENDING AND CAUSING INPATIENT ADMISSIONS, AND ITS HOSPITAL CLIENTS' RELIANCE ON AND IMPLEMENTATION OF THOSE RECOMMENDATIONS, VIOLATED MEDICARE'S MINIMUM REQUIREMENTS FOR DETERMINING THE MEDICAL NECESSITY OF INPATIENT HOSPITAL STAYS.

110.    Accretive/R1, like both MedStar Defendants and all other hospital clients of

Accretive/R1, knew that in order for their fees-for-recommendations "concurrent review"

agreements to achieve their purpose of producing the "net direct quantifiable impact" of

increased revenues from increased actual inpatient admissions, the contents of the

resulting recommendations to "admit inpatient," contradicting the hospital physicians'

earlier decision that inpatient admissions were not then medically necessary, would have to

be used and implemented within the client hospitals as the primary or decisive

"information" to "explain" to insurers "why" the inpatient admissions were ultimately

ordered. Contents from the Accretive/R1 recommendations would have to be adopted or

acquiesced in (and/or inserted into the patient's medical chart) by the hospital clients'

clinical staffs in order for the recommendations to achieve their purpose of "converting" or

"upgrading" observation patients to actual paid claims for inpatient hospital stays. But the

Accretive/R1 recommendation contents served as the original and driving force for

44

"deciding" to admit such patients as hospital inpatients and causing the resulting inpatient admissions, inpatient claims for payment, and the resulting payments.

111.    Accretive/R1 and both MedStar Defendants also knew that Medicare rules, routinely followed also by payors of Medicaid claims, required as a material prerequisite to any entitlement to be paid for any such inpatient hospital stay, that the medical necessity of such a stay must have been actually decided by a hospital physician familiar with the individual hospital's medical staff bylaws, admissions policies, and outpatient resources specifically available within that hospital location for serving patients adequately and promptly on an outpatient basis.

112.    Continually since prior to 2007, and thus throughout the Defendants' operation of their "concurrent review" arrangements, Section 10 of Chapter 1 of the Medicare Benefit Policy Manual, CMS Pub. 100-02, has required in relevant part the following as material prerequisites for any entitlement of any hospital to be paid any amount for any inpatient hospital stay:

> The physician or other practitioner responsible for a patient's care at the hospital . . (is) responsible for deciding whether the patient should be admitted as an inpatient. . . . However, the decision to admit a patient is a complex medical judgment which can be made only after the physician has considered a number factors, including the patient's medical history and current medical needs, ***the types of facilities available to inpatients and to outpatients, the hospital's by-laws and admissions policies, and the relative appropriateness of treatment in each setting***. Factors to be considered when making the decision to admit include such things as: . . . (t)he ***availability of diagnostic procedures at the time when and at the location where the patient presents . . .***" (Emphasis added).

113.    The minimum and material Medicare criteria quoted above for lawfully

deciding to "admit inpatient," set forth as worded above continually for years prior to 2007 (and now) in the governing Medicare Benefit Policy Manual, was re-affirmed by CMS as the governing criteria when CMS codified related criteria for paying inpatient claims effective October 1, 2013, through 42 C.F.R. § 412.3.

114.    Accretive/R1 and the MedStar Defendants, like all of Accretive/R1's other hospital clients, knew that when they allowed absentee "reviewers" of Accretive/R1 to originate and cause the "decision" to "convert" or "upgrade" outpatients to "admit inpatient" status, they were causing such decisions effectively to be originated, caused, and made by and delegated to persons who *did not know any hospital-specific information about the categories italicized above*, and thus did not have the most basic information on which Medicare rules required such medical necessity decisions to be made in order for such inpatient stays to be lawfully payable, in violation of basic Medicare laws and rules, obedience to which was material to any such hospital's entitlement to be paid as to any such inpatient claim.

115.    As a related and also mandatory part of assuring the medical necessity of inpatient hospital admissions of Medicare and Medicaid beneficiaries, federal law further provides that a licensed "physician has a major role in determining utilization of health services furnished by providers," and that likewise only a "physician decides upon admissions" in particular. 42 C.F.R. § 424.10(a).

116.    As a condition of any hospital's participating in the Medicare program or making resulting claims for payment, a further Medicare "standard" has required by

46

regulation that any medical record of a Medicare beneficiary admitted as a hospital inpatient must contain an "order" of admission reflecting a decision by "the ordering practitioner or by another practitioner who is responsible for the care of the patient only if the practitioner is acting in accordance with State law, including scope-of practice laws, hospital policies, and medical staff bylaws, rules, and regulations." 42 CFR § 482.24. (Between November of 2007 and May of 2012, that regulation provided similarly that all orders to admit inpatient must have been "authenticated . . . by the person responsible for providing or evaluating the service provided, consistent with hospital policies and procedures," and that ordering practitioners must have been "authorized to write orders by hospital policy in accordance with State law.")

117.    In delegating to absentee Accretive/R1 "reviewers" the authority to originate decisions to "admit inpatient" persons previously determined not to be in medical need of such expensive treatments, and in urging clinical staff to implement and enforce those "recommendations" as the hospital's definitive inpatient admission "orders" so as to pursue the increased revenue (which was the core purpose of paying Accretive for such "recommendations" in the first place), all Defendants herein, like all other hospital clients of Accretive/R1, knowingly and systematically violated Medicare rules and regulations requiring, as a material condition of any hospital's entitlement to payments for any inpatient hospital stay, that the decision and order regarding the medical necessity of an inpatient admission must have been made by a physician who (a) was then admitted to the hospital's medical staff, (b) was then acting under a valid medical license in the

47

jurisdiction where the hospital was located, and (c) had certified that the inpatient

admission was medically necessary and that the certifying physician had fundamentally

made, and took professional responsibility for, that decision regarding medical necessity.

118.   All such claims for payment were accordingly legally false, as Accretive/R1

and the MedStar Defendants all knew.

## XI. PAYMENT CLAIMS BY MEDSTAR WHC AND OTHER ACCRETIVE/R1 HOSPITAL CLIENTS RESULTED FROM VIOLATIONS BY ACCRETIVE/R1'S REVIEWERS OF STATE AND DISTRICT MEDICAL LICENSE STATUTES.

119.   Any preparation and rendering of any "recommendation" regarding the

medical necessity of an inpatient admission as to a person "concurrent(ly)" being treated

(or held) within a hospital, including the "recommendations" prepared by Accretive/R1

"reviewers" pursuant to Accretive/R1's standardized training therefor as described above,

inherently involve and require the application of medical science to the diagnoses of such

individual patients based on the clinical records supplied to such reviewers, and further

involve the prescription of a specific course of treatment for each such patient, and

accordingly constitute the practice of medicine in those localities within the meaning of

medical licensing statutes and regulations issued by the District of Columbia and the fifty

States of the United States.

120.   That District and those States require licensing of the physician in and by the

District and State in which such activity is conducted before engaging in any such activity

affecting a patient or hospital therein, including licensing in the District of Columbia for

48

decisions or recommendations regarding the ordering of hospital admissions to and for the MedStar WHC.

121. Few, if any, of the "reviewers" who prepared "recommendations" and resulting "inpatient admit" prescriptions as agents of Accretive/R1 were licensed to practice medicine in the District of Columbia, or typically in the States in which the remaining hospital clients of Accretive/R1 to which they were communicating their "recommendations" were located. Such reviewers therefore had no legal authority to conduct any such analysis and to "recommend," based on any analysis of any such medical records, which patients within the hospitals should be the subject of any "admit inpatient" health care decision.

122. Accretive/R1 recklessly disregarded information about, and legal restrictions on the scope or locations of medical practice arising from, the licensing laws of the states in which its physician reviewers had obtained a medical or other health care license, and knowingly caused its reviewers routinely to violate those statutes through rendering and communicating medical judgments about the condition and proper care of patients located in jurisdictions in which the reviewers were not licensed and had no such legal authority.

123. The activities by non-licensed AccretiveR1 "reviewers" resulting in their "recommendations" and the resulting ordering of "admit inpatient" decisions were inherently illegal activities.

124. Compliance with medical licensing statutes in the course of "recommending," analyzing, urging, prescribing or otherwise causing inpatient admission

decisions within hospitals was material to (and a "prerequisite" to) the legal validity of any

claims to Medicare or Medicaid for any payment for any "admit inpatient" decision

resulting from any such recommendations, such that violations of that material condition

of any entitlement to any such payment rendered all claims for such payments legally false

as a matter of law.

## XII. ACCRETIVE/R1'S RECOMMENDATIONS CONTAINED FALSE STATEMENTS USED BY ITS HOSPITAL CLIENTS FOR AND IN THE COURSE OF SUBMITTING LEGALLY AND FACTUALLY FALSE PAYMENT CLAIMS FOR INPATIENT HOSPITAL STAYS.

125.    Each of the written "Accretive Patient Classification Recommendations"

communicated to each of the hospital clients of Accretive/R1, including MedStar WHC,

expressly represented in the course of a "Disclaimer" that the "sole purpose" of each such

document and each such "recommendation" was "to help (the hospital clients of

Accretive/R1) comply with applicable payor policies regarding the use of observation and

inpatient admission classification status."

126.    For the reasons explained above, and particularly in Section VIII above,

each such statement was factually and legally false, as the Defendants all knew.

127.    The truth, as the Defendants also knew but payment officials of the

Medicare and Medicaid programs did not know, was that the central purpose of the

Accretive/R1 fees-for-recommendations "concurrent review" operation and the resulting

"recommendations" was to pressure and cause hospital staff to increase actual inpatient

admissions in order to cause "reimbursement lifts" and "quantifiable revenue impacts" for

50

the hospital clients, including the MedStar Defendants herein.

128.    Accretive/R1 as to each of its "Accretive Patient Classification Recommendations" has also represented that it is making a "recommendation regarding whether documentation supports inpatient or outpatient classification for billing purposes," and that its recommendations are intended for "utilization review and claims management objectives only"

129.    As Accretive/R1 and its hospital clients all knew (and know), that statement was (and is) also false, since with respect to all of the hospital inpatient admissions (and resulting claims for payment) challenged in this case, Accretive/R1 created the original "medical" document later used by and through its hospital clients' medical and clinical support staffs to cause the resulting hospital admissions and inpatient claims for payment, none of which would have occurred but for the activity by Accretive/R1 as a part of its fees-for-recommendations "concurrent review" operation.  The Defendants' core purpose and effect was to cause additional inpatient admission claims to be presented and paid, not merely to describe accurately inpatient admissions which would have occurred without Accretive/R1's "recommendations," or to assist with billing advice about inpatient admission decisions originated by others.

130.    Most such "recommendation" documents, all of which contained all such material false statements authored by AccretiveR1, were knowingly used by all of the Defendants to cause, and did cause, the submission of a legally false claim to Medicare or Medicaid, for payment of a purportedly medically necessary inpatient admission, and to

get each such claim to be paid.

131.  Each such "recommendation" and resulting claim for payment also resulted directly from an agreement, payment, and inducement made in willful violation of the Anti-Kickback Act, and was legally false for that separate reason.

132.  MedStar WHC instructed its resident physicians effectively to conceal, from any reader of patients' eventual hospital charts, the fact that the "wording needed to stave off denials" of medically unnecessary inpatient claims had been authored by Accretive reviewers and not by practicing physicians on the staff of the hospital, who alone were required by Medicare and Medicaid payment prerequisites and regulations to determine the medical necessity of inpatient admissions. In training its resident physicians on what to do with Accretive/R1 recommendations to "admit inpatient," MedStar/R1 instructed as follows: "Why should you care? . . . The actual Accretive review is NEVER placed in the chart. Accretive physician's (*sic*) do not have admitting privileges so *you have to incorporate the information on the chart* so that they can work the denial if needed. CRC's will add the total Accretive review to an insurance review and that will be faxed to the insurance company.*"* (All-capped emphasis on "NEVER" original to MedStar/R1; Italicized emphasis added here).

133.  MedStar WHC also regularly inserted the purported clinical contents of Accretive/R1-authored "recommendations" to "admit inpatient" into records which falsely appeared to have been authored and generated by licensed personnel working for and at the MedStar WHC hospital, fraudulently concealing the authorship by off-site and

non-licensed Accretive/R1 reviewers of medical analyses which served as the driving force for additional inpatient admissions and resulting inpatient claims, all constituting false and misleading medical records further used by MedStar WHC in further violation of the FCA's 31 U.S.C. § 3729(a)(1)(B).

134.    Accretive/R1 and its hospital clients, including MedStar WHC, further concealed the true role of Accretive/R1 (in causing "conversions" and "upgrades" of actual patients to "admit inpatient" status), and the falsity of the contents of Accretive/R1's recommendation forms, through entering and enforcing together confidentiality and secrecy agreements between Accretive/R1 and hospital clients.

## XIII. EXAMPLES OF ACCRETIVE-GENERATED INPATIENT ADMISSIONS AT MEDSTAR'S WHC HOSPITAL

135.    A sample of the hospital admissions (and resulting claims to Medicare and Medicaid) resulting from the Accretive/R1 fees-for-recommendations "concurrent review" operation is represented by the following Accretive/R1 "recommendations" of hospital admissions consecutively received at the WHC from Accretive/R1 during a randomly-selected week in January of 2013 (as to each of which Accretive/R1 admitted that no concurrence in any such inpatient admission by any WHC physician had been "specified"):

(A)    On January 21, WHC physicians Dr. Maloy and Dr. Huq personally examined Medicare Patient C, who complained of swelling in her right arm associated with a catheter earlier inserted in order to enable her to receive antibiotics. Finding that her condition could not medically justify a full hospital

admission, the WHC physicians prescribed instead an initial observation of her condition. Accretive/R1 (through a form a duplicate of which is attached as Exhibit C hereto) then changed the patient's diagnosis, and also changed the recommended treatment to a hospital admission, causing the patient's admission and a related claim to Medicare based on the changed diagnosis by Accretive/R1.

(B)     On January 22, WHC Emergency Room physician Dr. Pitts examined Medicare Patient R, who complained of abdominal pain. Finding that her condition could not medically justify a full hospital admission, the WHC physician prescribed instead an initial observation of her condition. Accretive?R1 then changed the patient's diagnosis to represent that she was "at risk for narcotic overdose, respiratory depression due to narcotics, hypovolemia, and inability to care for self, inability to ambulate, poor oral intake, falls which may result in head and body trauma, and increased intrahospital mortality." Based on that changed diagnosis, Accretive/R1 then also changed the recommended treatment to a hospital admission, causing the patient's admission and a related claim to Medicare based on the changed diagnosis by Accretive.

(C)     On January 23, WHC Emergency Room physicians Dr. Gatewood and Dr. Marchand personally examined a Medicare Patient H, who complained of fatigue, weakness and near syncope. Finding that his condition could not medically justify a full hospital admission, the physicians prescribed instead an initial observation of his condition. Accretive/R1 then changed the patient's diagnosis, representing that

54

he was "at risk for recurrent syncope, arrhythmia and myocardial ischemia as well as infarction." Based on that changed diagnosis, Accretive?R1 then also changed the recommended treatment to a hospital admission, causing the patient's admission and a related claim to Medicare based on the changed diagnosis by Accretive.

(D)     On January 23, WHC Emergency Room physicians Dr. OMara and Dr. Marchand personally examined Medicaid Patient D, who complained of inability to move his legs sufficiently to walk.  Finding that his condition could not medically justify a full hospital admission, the physicians prescribed instead an initial observation of his condition. Accretive?R1  then changed the patient's diagnosis, representing that he was "at risk for TIA, CVA, dehydration, hypertensive emergency, underlying occult infection and falls due to weakness." Based on that changed diagnosis, Accretive changed the recommended treatment to a hospital admission, causing the patient's admission and a related claim to Medicaid based on the changed diagnosis by Accretive.

(E)     On January 26, WHC Emergency Room physician Dr. Pontius personally examined Medicare Patient S, who complained of fever and was diagnosed as having the flu. Finding that her condition could not medically justify a full hospital admission, the WHC physician prescribed instead an initial observation of her condition. Accretive/R1 then changed the patient's diagnosis, representing that he was "at immediate short term risk of dehydration, hypertensive emergency, myocardial injury, renal failure, worsening pneumonitis, worsening hyperglycemia,

acute hypoxic respiratory failure, bacteremia, sepsis, and intrahospital mortality."
Based on that changed diagnosis, Accretive/R1 then changed the recommended
treatment to a hospital admission, causing the patient's admission and a related
claim to Medicare based on the changed diagnosis by Accretive/R1.

(F)     On January 26, WHC Emergency Room physician Dr. Chang personally
examined Medicare Patient H, who complained of lower back pain and resulting
inability to walk. Finding that her condition could not medically justify a full
hospital admission, the physician prescribed instead an initial observation of her
condition. Accretive/R1 then changed the patient's diagnosis, representing that
"(d)ue to inability to ambulate patient is at immediate risk for traumatic fall injuries,
increased morbidity and mortality." Based on that changed diagnosis, Accretive/R1
also changed the recommended treatment to a hospital admission, causing the
patient's admission and a related claim to Medicare based on the changed diagnosis
by Accretive.

(G)     On January 27, WHC Emergency Room physician Dr. Gatewood
personally examined Medicaid Patient M, who complained of shortness of breath.
Finding that her condition could not medically justify a full hospital admission, the
physician prescribed instead an initial observation of her condition. Accretive then
changed the patient's diagnosis, representing that she was at "risk of atypical
infection, worsening respiratory status, and hypoxia." Based on that changed
diagnosis, Accretive/R1 then changed the recommended treatment to a hospital

admission, causing the patient's admission and a related claim to Medicaid based on the changed diagnosis by Accretive/R1.

(H)    On January 28, WHC Emergency Room physician Dr. Chang personally examined Medicare Patient S, who complained of nausea and dizziness. Finding that his condition could not medically justify a full hospital admission, the physician prescribed instead an initial observation of his condition. Accretive then changed the patient's diagnosis, representing that he was "at significant short term risk for recurrent transient ischemic attacks, cerebrovascular accident, permanent neurological deficits, decrease in activities of daily living, acute coronary syndrome, myocardial infarction, life-threatening dysrhythmias, dislodgment of atherosclerotic plaques, and intrahospital mortality." Based on that changed diagnosis, Accretive/R1 also changed the recommended treatment to a hospital admission, causing the patient's admission and a related claim to Medicare based on the changed diagnosis by Accretive/R1.

(I)    On January 28, WHC Emergency Room physicians Dr. Phillips and Dr. Schwartz examined Medicare Patient P, who complained of numbness in her left hand (which had recently been the subject of a surgical graft). Finding that her condition could not medially justify a full hospital admission, they prescribed instead an initial observation of her condition. Accretive/R1 then changed the patient's diagnosis to represent instead that she "is at immediate short term risk of limb ischemia and limb loss," and changed the recommended treatment to a

hospital admission, causing the patient's admission and a related claim to Medicare based on the changed diagnosis by Accretive/R1.

### XIV. LEGAL EFFECTS OF THE DEFENDANTS' FEES-FOR-RECOMMENDATIONS "CONCURRENT REVIEW" AGREEMENTS AND OPERATIONS

136.    But for the design and operation by Accretive/R1 of its fees-for-recommendations "concurrent review" contracts with its hospital clients, and the resulting "recommendations" to "admit inpatient" communicated on behalf of Accretive/R1 to such hospitals, the resulting inpatient admissions would not have been ordered, and the resulting payment claims to Medicare and Medicaid for DRG-based payments for such inpatient admissions and stays would not have been submitted or paid.

137.    If the facts set forth above concerning the fees-for-reimbursements nature of Accretive/R1's contracts and their operation and resulting violations of the Anti-Kickback Act had been known by Medicare and Medicaid payment officials as pertaining to such claims, those claims would not have been lawfully paid.

138.    The conduct of Accretive/R1 as described above proximately caused all such payment claims for inpatient hospital stays on behalf of all such "250-plus" hospital clients to be improperly and unlawfully paid, causing very substantial losses to the Medicare and Medicaid programs for which Accretive/R1 is legally responsible under the FCA.

139.    But for the solicitation of and fees-for-recommendations payments for such "admit inpatient" recommendations by MedStar WHC (materially controlled and governed by Defendant MedStar Health, Inc.), and but for their staff clinicians' receipt and use of

such recommendations, and their hospital administrations' pressures and inducements to have such recommendations implemented through orders to admit the recommended patients as inpatients, the resulting inpatient admissions would not have been ordered, and the resulting payment claims to Medicare and Medicaid for DRG-based payments for such inpatient admissions and hospital stays would not have been made or lawfully paid.

140.   All of the facts set forth above concerning the fees-for-reimbursements nature of Accretive/R1's contracts and the conduct of the two MedStar Defendants were material to all such hospitals' entitlements to be paid for such claims.

141.   If those facts and resulting violations had been known by Medicare and Medicaid payment officials as pertaining to such claims, those claims would not have been lawfully paid. The conduct of MedStar Health, Inc. in causing MedStar WHC to agree to pay Accretive/R1 in exchange for such recommendations, and the MedStar WHC itself as described above, proximately caused all such payment claims to be improperly and unlawfully paid, causing substantial losses to the Medicare and Medicaid programs.

142.   Despite knowing all of these characteristics of each such "recommendation" by Accretive/R1 that a hospital admission was purportedly "medically necessary," MedStar WHC and the remaining hospital clients of Accretive/R1, contradicting the medical judgments of their own on-site and properly-licensed staff physicians who had actually met with and examined the patients, authorized and presented to Medicare or Medicare claims for resulting inpatient hospital stays as to the patients who were the subjects of the Accretive "recommendations."  All such written "recommendations" by

Accretive were legally and factually false. All such inpatient admission payment claims by all such hospital clients pursuant to all such contracts with Accretive were legally false when made, which all such hospitals knew, or had reason to know, at the time each such claim was made.

143. The central, knowing, and willful purpose of both Accretive/R1 and its hospital clients, including MedStar Health, Inc. and MedStar WHC, in engaging in Accretive/R1's fees-for-recommendations "concurrent review" agreements, has been (and remains) for the hospitals to pay, and for Accretive/R1 to receive, remuneration (in the form of per-review fees paid by its hospital clients to Accretive/R1) in return for substantial numbers of recommendations from Accretive/R1 to change (or "convert," or "upgrade," or "flip") the level of health care services for substantial numbers of patients from observation-only (or other outpatient services), as previously ordered by the hospitals' own medical staffs, to a status and level of "inpatient admission" services, in order for each such hospital to get substantially higher monetary claims and payments for inpatient admissions to be paid by Medicare or Medicaid.

144. Every such inpatient admission resulting from and caused by Accretive/R1's recommendations for such conversions, and every claim to Medicare and Medicaid for DRG or other payments for inpatient admissions, resulted directly and proximately from the Defendants' willful and knowing violations of the Anti-Kickback Act, compliance with which was known by the Defendants to be a material condition and prerequisite to any hospital's legal right and entitlement to be paid on any such claim. If federal payment

60

officials had known that such inpatient admission claims for payment had resulted from such violations, the claims would not have been paid or payable, as a matter of statutory law, court precedent, announced CMS payment policy, and provider agreements.

145.    Such payments would not have been made but for reliance by federal and state health programs' personnel (including personnel of insurance carriers and intermediaries contracted to pay lawful claims under those programs) on the hospitals' presumed compliance with the Anti-Kickback Act and Medicare statutes, regulations and rules governing the medical necessity of inpatient hospital admissions.

146.    The total amounts of such payments not legally due to MedStar WHC and to all other hospital clients of Accretive/R1 in payment for the entire DRG-related amount due for an entire inpatient hospital treatment, were damages to the United States resulting from the Defendants' causation of, presentation of, and those payments of, those legally false claims.

147.    Because the actual medical necessity of any inpatient admission, and accurate and lawful staff-physician-authored documentation in patient files of clinical findings evidencing that medical necessity, were material to and were necessary conditions of any hospital client's entitlement to be paid any amount for any such inpatient admission, and because those conditions were not satisfied as a result of the Accretive/R1 fees-for-recommendations "concurrent review" program with MedStar WHC and other hospital clients of Accretive/R1, the Defendants knew that no payment was legally due to any such hospital for any such "inpatient admission" as a result of any such claims.

148.    Because the Defendants also knew that compliance with the Anti-Kickback Act was material to and a prerequisite to Accretive/R1's hospital clients' entitlement to any payment in any amount for inpatient admissions, and because the Defendants further knew that no monetary payment was due from any federal health care insurance program as a result of inpatient admissions (and inpatient admission claims) submitted because of recommendations paid for by such hospital clients and provided by Accretive/R1 pursuant to Accretive/R1's fees-for-recommendations "concurrent review" program in violation of the Anti-Kickback Act, all payment claims submitted for all such inpatient admissions and as to all such patients were known by all of the Defendants - correctly so - to be legally and factually false claims knowingly made in violation of the FCA.

## COUNT I

### Claim By and on Behalf of the United States under the FCA Against Accretive/R1 (Causing False Claims to be Presented)

149.    Plaintiff re-alleges and incorporates by reference paragraphs 8 through 148 as though fully set forth herein.

150.    This is a claim under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended, against Defendant Accretive/R1.

151.    The Plaintiff/Relator, Cherry Graziosi, has standing to maintain this claim by virtue of 31 U.S.C. §3730(b).

152.    By virtue of the acts described herein, Defendant Accretive/R1 knowingly

caused to be presented false or fraudulent claims for payment to be presented and demanded by MedStar WHC and all of Accretive/R1'w other hospital clients, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1), and as amended in 2009 and codified as 31 U.S.C. § 3729(a)(1)(A).

153.  By virtue of the false claims knowingly caused to be presented by Accretive/R1, as a proximate result of all such hospital clients agreeing to pay Accretive/R1 for recommendations as a part of Accretive/R1's "concurrent review" program, the United States has suffered actual damages and is entitled to recover three times the amount which it paid in response to all such false claims (and therefore the amount by which it is damaged), plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims caused to be presented, and other monetary relief as appropriate.

## COUNT II

### Claim By and on Behalf of the United States under the FCA Against Accretive/R1 (Causing False Record or Statements to be Used to Get, and/or Which were Material to, False Claims Paid)

154.  Plaintiff realleges and incorporates by reference paragraphs 8 through 148 as though fully set forth herein.

155.  This is a claim on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended, against Defendant Accretive/R1.

156.  The Plaintiff/Relator, Cherry Graziosi, has standing to maintain this claim by virtue of 31 U.S.C. §3730(b).

63

157.  By virtue of the acts described above and Defendant Accretive/R1s' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by Medicare and Medicaid payment officials for its hospital clients, and otherwise Accretive/R1s' acts causing false records and statements to be used by MedStar WHC and each of Accretive/R1's remaining hospital clients,  which were material to false or fraudulent claims, Defendant Accretive/R1  caused to be made or used false records or statements to get false or fraudulent claims paid or approved by an agency of the United States Government, in violation of 31 U.S.C. § 3729(a)(2)(as codified before 2009 amendments), and also caused to be made or used false records or statements which were material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B) as codified pursuant to amendments to the FCA in 2009.

158.  By virtue of, and as a result of, the false records and statements used to get false claims paid by the Government, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged (here meaning three times the amount paid by Medicare and Medicaid for inpatient hospital stays recommended by Accretive/R1), plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

### COUNT III

### Claim By and on Behalf of the United States under the FCA Against Accretive/R1  (Conspiracy to Submit False Claims)

159.  This is a claim under the False Claims Act,  31 U.S.C. §§ 3729-33, as amended, against Defendant Accretive/R1.

160.  Plaintiff realleges and incorporates by reference paragraphs 8 through 148 as though fully set forth herein.

161.  By reason of the foregoing with respect to Defendant Accretive/R1s' fees-for-recommendations "concurrent review" agreements and program, Accretive/R1 agreed and conspired with MedStar WHC, MedStar Health, Inc., each of Accretive/R1's remaining hospital clients, to defraud the government in order to get false or fraudulent claims paid by Medicare and Medicaid, in violation of 31 U.S.C. § 3729(a)(3), and in violation of 31 U.S.C. § 3729(a)(1)(C) as amended in 2009. In furtherance of the conspiracy, and through each of the particular activities described above, Accretive/R1 and each of those hospital clients, including MedStar Health, Inc. and MedStar WHC, acted overtly to affect the objects of the conspiracy alleged herein through their conduct itemized above.

162.  By virtue of the false claims presented or caused to be presented by the Defendants and AccretiveR1's hospital clients pursuant to this conspiracy, the United States has suffered actual damages and is entitled to recover from Accretive/R1  three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT IV

## Claim By and on Behalf of the United States under the FCA

## Against the MedStar Defendants (Presenting False Claims)

163.  Plaintiff re-alleges and incorporates by reference paragraphs 8 through 148 as though fully set forth herein.

164.  This is a claim against both of the MedStar Defendants, namely MedStar Health, Inc. and MedStar WHC, under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

165.  The Plaintiff/Relator, Cherry Graziosi, has standing to maintain this claim by virtue of 31 U.S.C. §3730(b).

166.  By virtue of the acts described herein, both of the MedStar Defendants knowingly presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1), and as amended in 2009 and codified as 31 U.S.C. § 3729(a)(1)(A), which in the case of MedStar Health, Inc., included all inpatient claims by MedStar WHC originally recommended by Accretive/R1.

167.  By virtue of the false claims presented or caused to be presented by the MedStar  Defendants, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT V

### Claim By and on Behalf of the United States under the FCA
### Against the MedStar Defendants (Using False Records or Statements)

168.  Plaintiff realleges and incorporates by reference paragraphs 8 through 148 as though fully set forth herein.

169.  This is a claim on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended, against each of the MedStar Defendants as defined herein, namely MedStar Health, Inc. and MedStar WHC.

170.  The Plaintiff/Relator, Cherry Graziosi, has standing to maintain this action by virtue of 31 U.S.C. §3730(b).

171.  By virtue of the acts described above and both MedStar Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the Government, and in otherwise using false records and statements which were material to the legal falsity of such false claims, each of the MedStar Defendants caused to be made or used false records or statements to get false or fraudulent claims paid or approved by an agency of the United States Government, in violation of 31 U.S.C. § 3729(a)(2)(as codified before 2009 amendments), and also caused to be made or used false records or statements which were material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B)(as codified pursuant to amendments to the FCA in 2009).

172.  By virtue of, and as a result of, the false records and statements used to get

false claims paid by the Government, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT VI

### Claim By and on Behalf of the United States under the FCA Against the MedStar Defendants (Conspiracy to Submit False Claims)

173.  This is a claim under the False Claims Act,  31 U.S.C. §§ 3729-33, as amended.

174.  Plaintiff re-alleges and incorporates by reference paragraphs 8 through 148 as though fully set forth herein.

175.  By reason of the foregoing with respect to Defendants' fraudulent scheme, each of the MedStar Defendants agreed and conspired with Defendant Accretive/R1 to defraud the government in order to get false or fraudulent claims paid by Medicare, in violation of 31 U.S.C. § 3729(a)(3)(as codified before 2009 FCA amendments), and also in violation of 31 U.S.C. § 3729(a)(1)(C)(as codified as a result of such 2009 FCA amendments). In furtherance of the conspiracy, each of the MedStar Defendants acted to affect the objects of the conspiracy alleged herein, through the overt acts by each as described above.

176.  By virtue of the false claims presented or caused to be presented by the MedStar Defendants pursuant to this conspiracy, the United States has suffered actual

damages and is entitled to recover from each of the MedStar Defendants, with respect to all inpatient claims recommended by Accretive/R1 and presented for payment by MedStar WHC, three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States:

1.      On Counts I - III, under the False Claims Act, against Defendant Accretive/R1 for treble (i.e., three times) the amount of the United States' actual damages (including investigative costs), plus civil penalties as are allowable by law for each and every false claim or record and for all costs of this civil action;

2.      On Counts IV - VI, under the False Claims Act, against each of the respective MedStar Defendants for treble (i.e., three times) the amount of the United States' actual damages (including investigative costs), plus civil penalties as are allowable by law for each and every false claim made by or on behalf of the respective MedStar Defendant,  and for all costs of this civil action;

3. For all costs of this civil action, including all investigative and expert expenses incurred herein; and

4. For such other and further relief as the Court deems just and equitable.

WHEREFORE, Relator Cherry Graziosi demands and prays that judgment be entered in her favor:

1. On Counts I - VI, under the False Claims Act, for a percentage of all civil penalties and damages obtained from any of the Defendants pursuant to 31 U.S.C. § 3730, reasonable attorney's fees, investigative costs, expert witness fess incurred, and all costs incurred in pursuing these claims against the Defendants; and

2. Such other relief as the Court deems just and proper.

This the 21st day of September, 2018.

Respectfully submitted,
CHERRY GRAZIOSI, Relator
By her Attorneys,
PIGOTT LAW FIRM, P.A.

By: s/Brad Pigott
J. Brad Pigott

J. Brad Pigott, Mississippi Bar No. 4350
PIGOTT LAW FIRM, P.A.
775 N. Congress Street
Post Office Box 22725
Jackson, Mississippi 39225-2725
Telephone: (601) 354-2121
Facsimile: (601) 354-7854
Admitted *Pro Hac Vice*

Robin Potter
ROBIN POTTER & ASSOCIATES
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
Phone: (312) 861-1800

## Certificate of Service

I hereby certify that I have this day served the foregoing Third Amended Complaint through electronic service to all counsel for all parties who have entered their appearances as counsel herein, including the United States, through an electronic filing hereof utilizing the ECF filing system of the Clerk of the Court herein.

This the 21st day of September, 2018.

_____s/Brad PIgott_____
J. Brad Pigott, Esquire