**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. CHERRY GRAZIOSI, | )<br>)<br>) |
| Relator, | ) Case No. 13-cv-1194<br>) |
| | ) Judge Robert M. Dow, Jr. |
| v. | )<br>) |
| R1 RCM, INC. f/k/a Accretive Health, Inc., MEDSTAR HEALTH, INC., and WASHINGTON HOSPITAL CENTER CORPORATION, | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Relator Cherry Graziosi ("Relator") brings suit under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") against Defendants R1 RCM, Inc., formerly known as Accretive Health, Inc. ("R1") and against MedStar Health Inc. ("MedStar") and Washington Hospital Center Corporation ("WHC") (together, the "MedStar Defendants"). Before the Court is the Medstar Defendants' motion to dismiss for lack of jurisdiction or, in the alternative, for summary judgment [169].[1] For the reasons explained below, the MedStar Defendants' motion [169] is denied. This case is set for status hearing on March 7, 2019 at 9:00 a.m.

### I. Background

The governing Third Amended Complaint ("TAC") [184] alleges the following facts which are relevant to the present motion. Between January 2010 and October 2013, Relator worked as

---

[1] Although this motion was directed at the now-superseded second amended complaint, the Court explained in its order allowing amendment that it would construe the motion as a motion to dismiss/for summary judgment on the third amended complaint ("TAC"). See [183]. The Court also construes the motion as a motion by both of the MedStar Defendants, since WHC was named a Defendant for the first time in the TAC and all of Relator's claims against MedStar (Counts IV, V and VI) are brought against the "MedStar Defendants" collectively.

a "Service Associate" in the Emergency Department of WHC in Washington, D.C. WHC is owned and controlled by MedStar. This lawsuit arises out of R1's agreement with the MedStar Defendants to review WHC's physicians' decisions concerning the medical necessity of admitting patients for inpatient stays.

According to the TAC, hospitals that participate in the Medicare program and other federal health programs are required to enter into contracts with the Centers for Medicare and Medicaid Services ("CMS"). In these contracts, the hospitals agree to comply with federal laws and regulations, including specifically the federal Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b) ("AKA"). Hospitals also have the obligation, pursuant to federal statute, "to assure *** that services *** ordered or provided *** to [federal health insurance] beneficiaries and recipients *** will be provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a). According to the TAC, since 2007 "Section 10 of Chapter 1 of the Medicare Benefit Policy Manual, CMS Pub. 100-02, in governing the prerequisites for determining payable Medicare claims, has required in relevant part the following as material prerequisites for any entitlement of any hospital to be paid any amount for any inpatient hospital stay:

> The physician or other practitioner responsible for a patient's care at the hospital is *** responsible for deciding whether the patient should be admitted as an inpatient. *** [T]he decision to admit a patient is a complex medical judgment which can be made only after the physician has considered a number factors, including the patient's medical history and current medical needs, the types of facilities available to inpatients and to outpatients, the hospital's by-laws and admissions policies, and the relative appropriateness of treatment in each setting. Factors to be considered when making the decision to admit include such things as: *** (t)he availability of diagnostic procedures at the time when and at the location where the patient presents[.]"

[160-1] at 9.

In addition, the TAC alleges, "[i]mplicitly prior to October of 2013, and explicitly by regulation thereafter, Medicare rules have required, as a material condition of any hospital's

2

entitlement to payments for any inpatient hospital stay, that any decision and order that it was medically necessary to admit a patient as a hospital inpatient must have been made by a physician who (a) was then admitted to the hospital's medical staff, (b) was then acting under a valid medical license in the jurisdiction where the hospital was located, and (c) had certified that the inpatient admission was medically necessary and that the certifying physician had made that decision regarding medical necessity." [184] at 9.

The TAC alleges that since 2007, R1 has entered into uniform "fees-for recommendations 'concurrent review' contracts" with over 250 hospitals—including WHC beginning in 2012—in more than 30 states. [184] at 12; see also *id*. at 13-17 (identifying "fees-for recommendations hospital clients"). Pursuant to these contracts, R1 allegedly uses "off-site 'reviewers'" to generate "written 'recommendations' purporting to justify the inpatient admission of federally-insured patients as to whom the hospitals' own Emergency Departments and other Hospital Staff physicians had previously determined *** did not then meet the medical necessity requirements for an inpatient hospital stay, but instead only met medical necessity requirements for an 'observation' of their medical condition for a period of twenty-four (or, as of October 1, 2013, forty-eight) hours." *Id*. at 10. "Observation" services are regarded as "outpatient" services and billed through Medicare Part B, whereas inpatient services are paid through Medicare Part A. According to the TAC, Medicare Part A payments are "far more financially lucrative for a hospital" than Medicare Part B payments. *Id*. at 11. R1 represented to potential hospital clients that "the compensation to a hospital for an inpatient admission and stay could be as much as ten times the compensation for an outpatient 'observation' stay." *Id*.

According to the TAC, R1 undertakes "concurrent review" pursuant to a standard agreement and in the same manner for all of its client hospitals. The TAC alleges that in all the

agreements, R1 "promised to 'review' the 'patient classification submitted by the (Hospital) Client to determine the appropriate admission status,' and to 'review and communicate their Recommendation regarding the proper patient classification to the attending physician and/or case managers where possible, to the extent required by the hospital client.'" [184] at 17. The agreements also included standard language that "'[i]n order to implement the (Accretive/R1) Recommendation, (Hospital) Client may need to change the admission classification status' of patients.'" *Id*. In exchange for R1s recommendations, Medstar and other hospital clients "agreed to (and did) pay []R1 a per-review amount, which varied in amount (between '$210 per case' and '190 per case') depending on what fraction of the hospital's patients were (or were not) 'Meeting Inpatient Criteria or Equivalent.'" *Id*.

The TAC alleges that R1 employed approximately 250 physicians at three office sites (in Chicago, Houston, and Seattle) to prepare "concurrent reviews." R1 provided the physicians with uniform training for compiling and communicating their recommendations. The TAC alleges that the training materials "urged all such reviewers as to all such hospitals, in leading-question fashion, to formulate rationales for recommendations to 'admit inpatient' persons previously classified by hospital physicians as then only in medical need of observation (or 'OBS') services." [184] at 22. R1 "uniformly instructed all of it physicians in the course of the same uniform national training to insert, into their 'recommendations,' language to '(j)ustify the hospitalization' and to '(l)ist possible adverse events (consider only for Inpatient)' as to any 'high risk' condition they could identify." *Id*.

The TAC alleges that R1's reviewers never met or examined the patients; had no information other than the written clinical notes; never met the particular prerequisites for practicing medicine on the medical staffs of the client hospitals; and "were typically not licensed

4

to diagnose medical conditions in (or actually practice medicine in) the jurisdiction in which the relevant hospital was located." [184] at 36.  R1's reviewers were expected to review 1.5 cases per hour and were given a 50% bonus for completing 1.8 to 1.89 cases per hour and a 150% bonus for completing 2.15 or more cases per hour.

Relator, while employed at WHC, located in WHC's non-public digital records a "Service Proposal" authored by R1 and dated November 2008.  The proposal described R1 as "'a built-for-purpose company with the sole focus on generating significant, sustainable improvements in net revenue.'" [184] at 20.  The proposal explained that R1's "'physician adviser' reviewers *** 'manage(d) thousands of patient encounters per month' through a review process in which its 'physicians will evaluate all Medicare patients that do not meet Inpatient criteria and are submitted to Accretive Health by MedStar health via phone, online medi[c]al records access, fax, scanner, or Accretive Health's proprietary electronic exchange.'" *Id*.  In exchange for payments to R1, the proposal explained, R1's "'physicians will provide recommendations as to the most appropriate level of care status' (as to patients, that is, who 'do not meet Inpatient criteria')" in under 25 minutes.  *Id*.  The proposal also promised to provide WHC with "a 'Monthly Statement of Value report' representing the additional dollars that [R1] could be expected to collect through its hospitals as a result of such 'concurrent review' activities." *Id*.  "A sample 'impact summary' represented that [R1] provided a hypothetical client a monthly 'Reimbursement Lift' of $172,000 as a result of re-classifying 26 patients as 'inpatient' who had an 'initial client classification' by the hypothetical client hospital of only 'observation.'  For each of twelve different inpatient hospital diagnoses [R1's] Proposal itemized the dollars that a hospital would not collect if patients were not admitted inpatient[.]'" *Id*.

Further, the TAC alleges that "[p]ursuant to the incentives and purposes of participating by agreement in *** R1's fees-for-recommendations 'concurrent review' agreements, administrators at *** R1's hospital clients, including but not limited to MedStar WHC, urged and pressured their hospitals' own medical staffs and clinical support personnel to adopt and enforce [R1]'s recommendations to change 'observation only' patients to 'inpatient admission' in order for the hospital clients to make substantially higher-paying inpatient claims for payments to Medicare, Medicaid and other insurers." [184] at 42. The TAC contends that "[t]he recommendations to 'admit inpatient' communicated by [R1] reviewers to its hospital clients, including but not limited to MedStar WHC, and *** R1's implicit and explicit communications to its hospital clients regarding the 'reimbursement lift' and increased revenue which such hospitals could gain by enforcing *** R1's recommendations through urging and causing orders to admit the same patients as inpatients, proximately caused the inpatient admissions and resulting payment claims to Medicare and Medicaid as to the patients originally 'recommended' for inpatient admission by *** R1." *Id*. at 34.

The TAC alleges that R1's agreement with its hospital clients were "fundamentally and willfully an exchange of fees for recommendations as to such health care services, all knowingly made and operated, with respect to Medicare and Medicaid patients, in violation of the Anti-Kickback Act." [184] at 23. According to the TAC, it was a "material condition, expectation, and purpose of all *** R1's hospital clients who agreed to pay *** R1 for 'concurrent reviews,' that [R1] was expected to, and did, change a substantial fraction, often in the range of 40% or 50% or higher, of its client hospitals' medical staffs' original 'observation only' orders to 'recommendations' to 'admit inpatient.'" *Id*. at 26.

Moreover, the TAC alleges, R1 and its hospital clients "knew that when they allowed [R1's] absentee 'reviewers' *** to originate and cause the 'decision' to 'convert' or 'upgrade' outpatients to 'admit inpatient' status, they were causing such decisions effectively to be originated, caused, and made by and delegated to persons who did not know any hospital-specific information ***, and thus did not have the most basic information on which Medicare rules required such medical necessity decisions to be made in order for such inpatient stays to be lawfully payable, in violation of basic Medicare laws and rules, obedience to which was material to any such hospital's entitlement to be paid as to any such inpatient claim." [184] at 46. "In delegating to absentee *** R1 'reviewers' the authority to originate decisions to 'admit inpatient' persons previously determined not to be in medical need of such expensive treatments, and in urging clinical staff to implement and enforce those 'recommendations' as the hospital's definitive inpatient admission 'orders' so as to pursue the increased revenue," the TAC alleges, R1 and its hospital clients "knowingly and systematically violated Medicare rules and regulations requiring, as a material condition of any hospital's entitlement to payments for any inpatient hospital stay, that the decision and order regarding the medical necessity of an inpatient admission must have been made by a physician who (a) was then admitted to the hospital's medical staff, (b) was then acting under a valid medical license in the jurisdiction where the hospital was located, and (c) had certified that the inpatient admission was medically necessary and that the certifying physician had fundamentally made, and took professional responsibility for, that decision regarding medical necessity." *Id*. at 47-48.

The TAC contains six counts, three against R1 (Counts I through III) and three against the MedStar Defendants (Counts IV through VI). Count IV alleges that the MedStar Defendants knowingly presented or caused to be presented false and fraudulent claims for payment to officials

of the United States Government in violation of 31 U.S.C. § 3729(a)(1), and as amended in 2009 and codified as 31 U.S.C. § 3729(a)(1)(A). Count V alleges that the MedStar Defendants used or caused to be used false records or statements to get false or fraudulent claims paid or approved by an agency of the United States Government, in violation of 31 U.S.C. § 3729(a)(2)(as codified before 2009 amendments), and also caused to be made or used false records or statements which were material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B) as codified pursuant to amendments to the FCA in 2009. Count VI alleges that, the MedStar Defendants agreed and conspired with R1 to defraud the government in order to get false or fraudulent claims paid by Medicare and Medicaid, in violation of 31 U.S.C. § 3729(a)(3), and in violation of 31 U.S.C. § 3729(a)(1)(C) as amended in 2009.

Currently before the Court is the MedStar Defendants' motion to dismiss for lack of jurisdiction or, in the alternative, for summary judgment [169].

## II. Legal Standard

The MedStar Defendants bring their motion as a motion to dismiss for lack of jurisdiction under Rule 12(b)(1) and, in the alternative, as a motion for summary judgment. This is an FCA case brought by a relator. The motion to dismiss is based on the FCA's statutory public disclosure bar, which is set forth in 31 U.S.C. § 3730(e)(4). In this circuit, the public disclosure bar is routinely raised through a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). See, e.g., *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 715 (7th Cir. 2017); *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 826 (7th Cir. 2013). Prior to 2010, this was clearly proper, given the Supreme Court's interpretation of the public disclosure bar statute as jurisdictional. See *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467 (2007). In 2010, however, Congress amended the statute and removed the language on

which the Supreme Court based its decision in *Rockwell*. See *Bellevue*, 867 F.3d at 717. Since then, some circuits have held that the 2010 version of the statute is not jurisdictional, but the Seventh Circuit has repeatedly declined to decide the issue. See *Bellevue*, 867 F.3d at 717; *Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267, 271 n.5 (7th Cir. 2016). Instead, in cases involving alleged conduct that both predated and postdated the 2010 amendment, the Seventh Circuit has continued to "address the public disclosure bar as a jurisdictional one." *Bellevue*, 867 F.3d at 717-18; *Cause of Action*, 815 F.3d at 271 n.5. Since this case relates to alleged conduct occurring from 2007 until at least 2013—and since the parties do not suggest following another course—this Court will follow *Bellevue* and *Cause of Action* and construe the MedStar Defendants' motion as a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).

Because the MedStar Defendants raise a factual challenge to the Court's subject matter jurisdiction, "the Court can 'properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Chatman v. Weltman*, 325 F. Supp. 3d 875, 879 (N.D. Ill. 2018) (quoting *Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017)). "[N]o presumptive truthfulness attaches to plaintiff's allegations," and the Court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009); see also *Montgomery v. Markel Int'l Ins. Co. Ltd.*, 259 F. Supp. 3d 857, 862 (N.D. Ill. 2017). "The burden is on the party asserting that jurisdiction exists"—here, Relator. *Corpeno-Argueta v. United States*, 341 F. Supp. 3d 856, 861 (N.D. Ill. 2018).

### III. Analysis

The MedStar Defendants argue that the Court does not have subject matter jurisdiction over Relator's claims against them because the FCA's public disclosure bar applies. See [63] at 14 (citing 42 U.S.C. 3730(e)(4)(A) (2009)). "Determining whether to apply the public-disclosure bar requires the court to complete a three-step inquiry." *Bellevue*, 867 F.3d at 718. "First, we examine whether the relator's allegations have been 'publicly disclosed.' " *Id.* (quoting *Cause of Action*, 815 F.3d at 274). "If so, we next ask whether the lawsuit is 'based upon,' *i.e.*, 'substantially similar to' the publicly disclosed allegations." *Id.* "If it is, the public-disclosure bar precludes the action unless 'the relator is an original source of the information upon which the lawsuit is based.'" *Id*. "The relator bears the burden of proof at each step of the analysis." *Id*.

#### A. Public Disclosure

For purposes of the bar, a public disclosure occurs "when the critical elements exposing a transaction as fraudulent are placed in the public domain." *Cause of Action*, 815 F.3d at 274. The fraud itself need not be public, so long as "facts establishing the essential elements of fraud—and, consequently, providing a basis for the inference that 'fraud has been committed'—are in the government's possession or the public domain." *Absher v. Momence Meadows Nursing Center, Inc.*, 764 F.3d 699, 708 (7th Cir. 2014) (quoting *Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)). Notably, while in some other circuits "disclosure to the government alone does not constitute 'public' disclosure," "the Seventh Circuit has repeatedly held that facts are in the public domain if they are in possession of the government." *Lisitza v. Par Pharm. Cos.*, 2017 WL 3531678, at *9 (N.D. Ill. Aug. 17, 2017) (citing *Mathews v. Bank of Farmington,* 166 F.3d 853, 861 (7th Cir. 1999), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907 (7th Cir. 2009); *Cause of Action*, 815 F.3d at 267; *Feingold v. AdminaStar*

*Federal, Inc.*, 324 F.3d 492, 496 (7th Cir. 2003)); see also, e.g., *Singer v. Progressive Care, SC*, 202 F. Supp. 3d 815, 822 (N.D. Ill. 2016) ("a *qui tam* suit is barred when the allegations in the complaint are based on information that is already known to the government"). The Seventh Circuit has reasoned that since the "'purpose of a public disclosure is to alert the responsible authority that fraud may be afoot,' the Government's possession of the information exposing a fraud is alone sufficient to trigger the public-disclosure bar." *Cause of Action*, 815 F.3d at 275 (quoting *Glaser*, 570 F.3d at 914). "This Court, of course, is obligated to apply existing circuit precedent." *Lisitza*, 2017 WL 3531678, at *9.

In this case, it is not disputed that, prior to Plaintiff filing suit in February 2013, certain public disclosures were made concerning WHC's alleged misclassification of inpatients. These disclosures include a set of audits performed by a Recovery Audit Contractor ("RAC") under contract with the Centers for Medicare and Medicaid Services ("CMS") and an audit conducted by the Office of the Inspector General of the United States Department of Health and Human Services ("OIG").

The RAC began its audit of WHC in February 2012. The MedStar Defendants present evidence that "[b]etween February 15 and September 21, 2012, the RAC submitted five rounds of audit requests seeking medical records associated with more than 900 inpatient claims submitted by [WHC] to Medicare" to audit "whether [WHC] billed Medicare for inpatients who should instead have been placed in observation status and billed on an outpatient basis." [170] at 3. According to the MedStar Defendants, by February 2013 "RAC had reviewed 870 MWHC inpatient claims and initially found that 517 of them (59.4%) did not satisfy inpatient medical necessity criteria and should have been billed on an outpatient basis." *Id.* at 4. MedStar publicly disclosed the RAC audits in its audited financial statements for fiscal year 2012 (which ended on

11

June 30, 2012), as well as in a financial report for the first quarter of fiscal year 2013 (which ended on September 30, 2012). These financial reports both disclosed the following: "Since June 2010, [MedStar's] hospitals have received audit requests from the Medicare Recovery Audit Contractor (RAC) program. These RAC audit requests have focused on medical necessity of inpatient admissions and hospital coding practices." *Id*. The OIG began its audit in June 2012. The audit covered, among other topics, "whether [WHC] submitted inpatient claims that were not medically necessary and that should have been billed as outpatients." [170] at 5. In its final audit report, issued in October 2013 (after Relator filed her lawsuit) the OIG concluded that 77 of the 127 audited inpatient claims "lacked medical necessity for an inpatient admission and should have been billed on an outpatient basis." [170] at 5.

The RAC and OIG audits are "federal audits" under 31 U.S.C. § 3730(e)(4)(A) and therefore qualify as public disclosures for purposes of applying the public disclosure bar. *See, e.g.*, *Reagan v. East Texas Med. Ctr. Regional Healthcare Sys.*, 384 F.3d 168, 175 (5th Cir. 2004). The more difficult question in this case is whether the audits contained "facts establishing the essential elements of fraud—and, consequently, providing a basis for the inference that 'fraud has been committed.'" *Absher*, 764 F.3d at 708 (quoting *Springfield Terminal Ry. Co.*, 14 F.3d at 654). The MedStar Defendants assert that the answer must be yes because "by the time the *qui tam* action was filed, the RAC had concluded that approximately 59.4% of the claims it had audited lacked medical necessity for an inpatient admission" and because "given the OIG's role in combating fraud and abuse, any OIG audit by its very nature creates an inference of fraudulent conduct." [170] at 11. But the only case law that the MedStar Defendants cite in support of this conclusion is the Court's earlier decision in this docket granting Baptist Health Hospital's Inc.'s ("Baptist") motion to dismiss based on the public disclosure bar.

Baptist's motion presented the Court with a much clearer case for applying the public disclosure bar. There, the OIG had "preliminarily found that one of Baptist's hospitals 'allegedly submitted short stay inpatient claims as a result of: (a) improper orders for inpatient status converted from outpatient status; (b) improper inpatient standing orders for admission without proper involvement of a physician; and, (c) improper orders for inpatient status following scheduled outpatient procedures.'" [115] at 7. Based on these public disclosures, the Court concluded that the "'critical elements exposing' Baptist's billing practices as allegedly fraudulent under the FCA were already in the public domain when Relator brought suit: Baptist's alleged improper conversion of outpatient admissions to inpatient admissions, without proper involvement of a licensed doctor who determined that the admission was medically necessary." *Id*. at 10. Further, in Baptist's case, the DOJ issued a press release announcing that Baptist had settled potential FCA claims that the U.S. Attorneys' Office was planning to bring based on the OIG's findings. The DOJ's press release disclosing threatened legal action is an "explicit allegation of fraud" to which the public disclosure bar undoubtedly applies. *Cause of Action*, 815 F.3d at 278. Here, by contrast, there are no allegations that any FCA claims against the MedStar Defendants were ever contemplated, much less threatened or settled. Instead, the OIG's final report shows that WHS "did not provide a cause for [its] billing errors, but indicated that it identified an opportunity for education and improvement."[2]

In order to prevail on her FCA claims against the MedStar Defendants, Relator must establish that they *knowingly* presented or caused to be presented false and fraudulent claims for payment (Count IV), *knowingly* caused to be made or used false records or statements which were material to false or fraudulent claims (Count V), or conspired to do so (Count VI). See 31 U.S.C.

---

[2] The OIG's report is available at https://oig.hhs.gov/oas/reports/region3/31206103.pdf (last visited Feb. 19, 2019).

§ 3729(a); see also *Bellevue*, 867 F.3d at 718 ("a knowing misrepresentation of facts *** is a critical element of fraud"). In keeping with the FCA's scienter requirement, the public disclosure bar applies only "in instances 'where one can infer, as a direct and logical consequence of the disclosed information, that the defendant knowingly—as opposed to negligently—submitted a false set of facts to the Government.'" *Bellevue*, 867 f.3d at 718-19 (quoting *Cause of Action*, 815 F.3d at 709 n.10)). The Court is not persuaded that evidence that WHS made even a large number of incorrect assessments of the "medical necessity" for particular inpatient admissions is enough to support an inference that the MedStar Defendants knowingly submitted false facts to the Government. The assessment of medical necessity, according to the TAC, is a "complex medical judgment which can be made only after the physician has considered a number factors." [160-1] at 9. In cases involving such "qualitative judgments," "one [can] no sooner *** infer from *** regulatory violations that [a physician] knowingly misrepresented" material facts than "one [can] infer[] that [the physician] mistakenly believed that [he or she] was compliant." *Cause of Action*, 815 F.3d at 279.

B.     **Substantial Similarity**

Even if the public disclosures identified by the MedStar Defendants contained sufficient facts from which to infer the essential elements of fraud, the Court would nonetheless deny the MedStar Defendants' motion because the publicly disclosed allegations are not substantially similar to the allegations of the TAC. "[A] relator's FCA complaint is 'based upon' publicly disclosed allegations or transactions when the allegations in the relator's complaint are *substantially similar to* publicly disclosed allegations." *Glaser,* 570 F.3d at 920 (emphasis added); see also *Bellevue*, 867 F.3d at 718.[3] Although the court of appeals has "cautioned against 'viewing

---

[3] The 2010 amendment to the public disclosure bar statute made a substantive, non-retroactive change to what constitutes a "public disclosure," and therefore "the pre-2010 version of [§ 3730(e)(4)(A)] governs

FCA claims at the highest level of generality *** in order to wipe out qui tam suits,'" it is nevertheless "essential that a relator present 'genuinely new and material information' beyond what has been publicly disclosed.'" *Bellevue*, 867 F.3d at 718 (quoting *Leveski*, 719 F.3d at 831; *Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 935-36 (7th Cir. 2012)). Further, a "qui tam action even partly based upon publicly disclosed allegations or transactions" is "nonetheless 'based upon' such allegations or transactions." *Glaser*, 570 F.3d at 920; see also *Cause of Action*, 815 F.3d at 282. Thus, the bar may not be avoided by a relator by simply adding "'extra details' or 'additional instances' of false claims." *McGee v. IBM Corp.*, 81 F. Supp. 3d 643, 658 (N.D. Ill. 2015) (quoting *Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 691 (7th Cir. 2014)).

"There are several factors courts consider in determining whether this standard is met: whether relators present genuinely new and material information beyond what has been publicly disclosed; whether relators allege 'a different kind of deceit'; whether relators' allegations require 'independent investigation and analysis to reveal any fraudulent behavior'; whether relators' allegations involve an entirely different time period than the publicly disclosed allegations; and whether relators 'supplied vital facts not in the public domain[.]'" *Bellevue*, 867 F.3d at 719 (quoting *Cause of Action*, 815 F.3d at 281 (collecting cases)); see also *McGee*, 81 F. Supp. 3d at 659 ("Some of the factors used to determine whether a relator's allegations are substantially similar to those already publicly disclosed are: (1) whether the time periods for the allegations or transactions overlap; (2) whether the relator has first-hand knowledge of the allegations; (3) whether the allegations are similar or involve different schemes such that independent

---

conduct that occurred in that era while the new version governs only more recent conduct." *Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 368 (7th Cir. 2016). However, "this change is not significant," because "[t]he current version of the statute expressly incorporates the 'substantially similar' standard in accordance with the interpretation of this circuit and most other circuits." *Bellevue*, 867 F.3d at 718.

investigation and analysis was required; and (4) whether the relator presents genuinely new and material information than that previously disclosed.").

Examining these factors, the Court concludes that Relator's allegations are not substantially similar to any of the publicly disclosed allegations and, therefore, the public disclosure bar does not apply to Relator's claims against the MedStar Defendants. Most notably, the public disclosures and the allegations of misconduct in this case concern entirely different time periods—there is no overlap at all. As the MedStar Defendants acknowledge, "[t]he RAC and OIG audits covered claims until December 2011, while Relator's qui tam action covers the time period June 2012 through January 2015." [176] at 6. None of the audited claims were reviewed by R1, because R1 did not enter into a contract with MedStar to review WHC's bills until the beginning of 2012. [184] at 16, ¶ 30.

The MedStar Defendants have not identified (and the Court has not found) any cases from this circuit in which the public disclosure bar was applied to a lawsuit that did not have at least some temporal overlap with the relevant public disclosure. In *Bogina*, the public disclosure (an earlier complaint) alleged fraud through 2009 and was settled in May 2010, while the relator's complaint alleged that "the fraud is continuing." 809 F.3d at 370. Similarly, in *Bellevue*, the public disclosure (a letter from CMS) occurred on May 5, 2009, while the complaint alleged conduct before and after that date and "the time periods overlap[ped]." 867 F.3d at 719. And in *Cause of Action*, the relator's complaint "allege[d] misreporting that span[ned] a broader timeframe" than the publicly disclosed audit report, but the timeframes nonetheless overlapped. 815 F.3d at 281. By contrast, in *Leveski v. ITT Educational Services, Inc.*, where the public disclosure bar was found not to apply, the public disclosure (an earlier-filed lawsuit) alleged

16

misconduct between 1993 and 1999, while the relator's lawsuit covered the period 2001 to 2006 and therefore there was "no temporal overlap." 719 F.3d 818, 829–30 (7th Cir. 2013).

The Court might be able to overlook the absence of any overlap if the public disclosures identified by the MedStar Defendants contained any details with similarities to Relator's allegations. But instead, the public disclosures focus on a high level of generality: the classification of patients as inpatients without medical necessity. As noted above, the Seventh Circuit has cautioned the district courts not to "view[] FCA claims at the highest level of generality." *Bellevue*, 867 F.3d at 718. For instance, in *Goldberg*, the public disclosure and the relator's allegations both concerned a hospital's billing for unsupervised services performed by residents, but the way in which the residents were unsupervised (performing "all by their lonesome" versus being supervised only during critical parts of their procedures without a teaching physician immediately available) was found to be different enough to preclude application of the public disclosure bar. 680 F.3d at 935-36.

Here, the RAC and OIG audits concluded that some of WHC's claims for inpatient admission were not supported by medical necessity. But the audits contain no facts or allegations suggesting how or why these billing errors occurred or that it was due to some sort of fraudulent scheme. Indeed, the OIG's final report shows that WHC offered no explanation for the errors and instead characterized the situation as an opportunity for "education and improvement"— suggesting that WHC's employees might need better training on how to evaluate and classify patients. Compared to the high-level findings in the audit reports, Relator's TAC alleges genuinely new and material information that was not previously disclosed. According to Relator, the MedStar Defendants paid R1 to review cases in which WHC's hospital physicians had determined that inpatient admission was *not* required—with the understanding that R1 would recommend

17

inpatient admission in a substantial portion of those cases—and then pressured their hospital physicians to adopt R1's recommendations rather than use their own independent medical judgment. These are more than just "extra details" added to what was disclosed in the RAO and OIG audits, *McGee*, 81 F. Supp. 3d at 658—they are essential details about how MedStar Defendants' alleged fraudulent scheme worked. Further, under Relator's theory of the case, even if R1's recommendations to classify a patient as an inpatient might ultimately be supported by medical necessity, the MedStar Defendants' reliance on R1's recommendations would nonetheless violate the FCA because the recommendations were provided in exchange for a kick-back and did not comply with Medicare and Medicaid regulations requiring such decisions to be made by qualified treating physicians.

For these reasons, the Court concludes that Relator's allegations are not substantially similar to the allegations contained in the public disclosures identified by the MedStar Defendants. Given this conclusion, it is unnecessary for the Court to consider the "original source" exception to the public disclosure bar. The public disclosure bar does not apply to Relator's claims against the MedStar Defendants and, therefore, the MedStar Defendants' motion [169] is denied.

## IV. Conclusion

For the foregoing reasons, the Medstar Defendants' motion to dismiss for lack of jurisdiction or, in the alternative, for summary judgment [169] is denied. This case is set for status hearing on March 7, 2019 at 9:00 a.m.

Dated: February 22, 2017

Robert M. Dow, Jr.
United States District Judge

18